UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
CAMILLE GROSDIDIER *et al.*,            )
                                        )
                 Plaintiffs,            )
        v.                              )        Civil Action No. 07-1551 (ESH)
                                        )
JAMES K. GLASSMAN, Chairman of the      )
  Broadcasting Board of Governors,      )
                                        )
                 Defendant.             )
_____)

### DEFENDANT'S NOTICE OF FILING OF ADMINISTRATIVE RECORD

Defendant hereby respectfully submits the attached Administrative Record..

Dated:  January 30, 2008

                                Respectfully submitted,


                                _____
                                JEFFREY A. TAYLOR, D.C. BAR # 498610
                                United States Attorney

                                 /s/_____
                                RUDOLPH CONTRERAS, D.C. BAR # 434122
                                Assistant United States Attorney


                                 /s/_____
                                JANE M. LYONS, D.C. Bar # 451737
                                Assistant United States Attorney
                                555 4th Street, N.W. - Room E4822
                                Washington, D.C. 20530
                                (202) 514-7161

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CAMILLE GROSDIDIER, JORGE BUSTAMANTE and CARLOS MARTINEZ, Personally and as class representative, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 07-1551 (ESH) |
| JAMES K. GLASSMAN, Chairman, Broadcasting Board of Governors, | ) ) ) | |
| Defendant. | ) ). | |

## NOTICE AND CERTIFICATION OF ADMINISTRATIVE RECORD

I, Donna S. Grace, declare as follows:

I am currently employed as the Director, Office of Human Resources, International Broadcasting Bureau (hereafter "IBB"), which is part of the Broadcasting Board of Governors (hereafter "BBG"). I have held this position since November 7, 2007. Prior to that, I served as a Human Resource Specialist (Employee and Labor Relations) with the Agency from 2005 until my promotion in 2007 and from 1998 to 2003. During the interim period of 2003 to 2005, I was employed by the U.S. Patent and Trademark Office in the Office of Human Resources. I have worked in human resource positions for the Agency and elsewhere in the federal government for over 15 years.

Through my positions with the BBG, I am familiar with the Agency's authority to hire non-citizens as stated in 22 U.S.C. § 1474(1).

The following documents constitute, to the best of my knowledge, a true and complete copy of all documents and materials considered by the BBG in reaching its current policy regarding its employment of non-citizens. The documents are attached hereto at the bates numbers indicated below.

1. Memorandum from P. Murphy to G. Moore, dated April 6, 2007 re: Recommendation to Change MOA V-A 822.1c(2) to Anticipate Employment of Non-citizens at the GS-14 Grade Level, bates nos. 000001-000002;

2. Guidelines for Appointment and Promotion fo Non-U.S. Citizens in the Presence of Qualified U.S. Citizens Competitors, dated December 18, 2006, bates nos. 000003-000010;

3. Agency's Manual of Operations & Administration, Part V-A, Section 820 - Employing Non-U.S. Citizens for Duty in the United States, dated 3/1/99, bates nos. 000011-000020;

4. Supplement to VOA (Voice of America) Personnel Handbook for Supervisors and Managers, dated January 1997, bates nos. 000021-000024;

5. Memorandum from J. Brambilla, S. Davis to All Language Service Employees, dated February 27, 1992 re: Revisions in Policies Governing Non-U.S. Citizen Employment, bates nos. 000025-000031;

6. Memorandum from M. Goodman to N. Painter, dated April 19, 1988 re: Procedures for Selection, Promotion, and Employment of Non-U.S. Citizens in the Presence of Qualified U.S. Citizen Competitors, bates nos. 000032-000040;

7. Memorandum from J. Manzo to G. Sutton, dated April 15, 1987 re: Selection and Employment of Non-U.S. Citizens in the Presence of Qualified U.S. Citizens, bates nos. 000041-000045;

8. VOA Personnel Handbook for Managers and Supervisors, dated August 15, 1986, Section 1002 - Non-U.S. citizen Employment and Personnel Services, bates nos. 000046-000067;

9. Memorandum from J. Sloat to W. Carroll, dated October 13, 1982 re: Employment of Aliens, bates nos. 000068-000074;

10. Memorandum from J. Futch to McGinley, dated August 22, 1979 re: Promotion of Aliens, bates no. 000075;

11. Senate Foreign Relations Committee, Report No. 97-429 accompanying S. 2581, International Communication Agency Authorization Act, Fiscal Year 1983, bates nos. 000076-000085;

12. House Committee on Foreign Affairs, Report No. 97-480 accompanying H.R. 5998, the Fiscal Year 1983 Supplemental Authorization Bill for the International Communication Agency, bates nos. 000086-000096;

13. Department of State Authorization Act, Fiscal Years 1980 and 1981, Title II - International Communication Agency, Pub. L. 96-60, 93 Stat. 395, § 203 (August 15, 1979), bates nos. 000097-000100;

14. Senate Foreign Relations Committee, Report No. 96-116 accompanying Department of State Authorization Act, Fiscal Years 1980 and 1981, Pub. L. 96-60, 93 Stat. 395, § 205, bates nos. 000101-000103;

15. United States Information and Educational Exchange Act of 1948, Pub. L. 80-402, § 80, bates nos. 000104-000108;

16. United States Information and Educational Exchange Act of 1948, Senate Rep. No. 573, 80th Congress Second Session, accompanying H.R. 3342, bates nos. 000109-000123.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief. Executed this _30_ of January, 2008, in Washington, D.C.

Donna S. Grace
Director
Office of Human Resources
International Broadcasting Bureau
Broadcasting Board of Governors

-4-

April 6, 2007

MEMORANDUM FOR:          IBB - George Moore

THROUGH:                 BBG/GC - Carol Booker

FROM:                    M/HO - Prell Murphy

SUBJECT:                 Recommendation to Change MOA V-A 822.1 c(2) to
                         Anticipate Employment of Non-citizens at the
                         GS-14 Grade Level

Background:

Under 22 U.S.C. § 1474 the Agency may employ non-citizens in the United States to perform certain foreign language broadcasting and related work. Nearly all of those employed under this provision work within the Voice of America. The Agency's MOA V-A, Part 820, further sets limits under which the Agency may employ such non-citizens. It states that non-citizens will not be promoted to supervisory positions or positions which involve policy or program decision-making without a special exception. This special exception will be allowed when the appropriate office, or Service Head, i.e., the Director of IBB, determines, with the concurrence of the Director of Human Resources, that the unavailability of an equally or better qualified U.S. citizen to perform such supervisory or managerial functions is not only significantly handicapping the ability of the Office or Service to operate, but also is having an adverse impact on Broadcasting's mission. The MOA also designates a preference for not hiring non-citizens above the GS-13 grade level. MOA V-A 822.1 c(2) currently states, "It is anticipated that positions for which an exception to the U.S. citizenship requirement would be considered will be graded no higher than the GS-13 grade level."

The policies contained in MOA V-A 820 were adopted and published by the U.S. Information Agency in 1983, a time when VOA was part of that agency and have remained in effect since. A current review of MOA V-A 822.1 c(2) shows that it is both out of date and onerous. At the time it was written, USIA Foreign Service Officers and Specialists frequently filled many of the Service Chief positions. That is no longer the case; there are currently no Foreign Service Officers in VOA Service Chief positions. Also at that time, the agency was just beginning to expand the level of work available to non-citizens, e.g., by assigning editing and original writing duties over and above the translation/adaptation work that had been the norm, permitting the classification of their positions at the GS-12 level. Before 1983, non-citizens occupying positions above the GS-11 level were rare; we have no record of any GS-13 non-citizens in VOA. Today, with the continuing growth in the level and complexity of much VOA work, non-

-2-

citizens commonly hold GS-12 level positions; the GS-13 level is still somewhat rare, but there are currently twelve non-citizens at the GS-13 level and above, both supervisors and non-supervisors. Eight (nearly one fifth of the total) VOA Service Chiefs are non-citizens. All of these non-citizen selections were approved after the agency determined that no equally or better qualified U.S. citizen was available and that not selecting the non-citizen would have an adverse impact on Broadcasting's mission.

Currently, approximately one third of VOA Language Service Chief positions are classified at the GS-14 level. The remaining two thirds are classified at the GS-13 level. Each VOA Service Chief position is classified in accordance with classification standards that take into account a variety of factors, including numbers of people (employees and contractors) and shifts for which they are responsible and the amount and type of programming produced. Though the Service Chief positions at the GS-13 and GS-14 levels differ in scope and degree of responsibility, the fundamental mission – to produce VOA programming – of all the Services is comparable. Both grade levels also report directly to the VOA Division Directors and thus are organizationally comparable positions.

From the foregoing facts, I have concluded that MOA V-A 822.1 c(2)'s current anticipation of capping non-citizen employment at the GS-13 grade level appears both out of date and onerous. Not changing the MOA may restrict certain Services from having the best qualified candidate for an available Service Chief position and unduly constrain the agency in carrying out its mission.

Recommendation:

MOA V-A 822.1 c(2) should be changed to read: "Positions for which an exception to the U.S. citizenship requirement would be considered will be graded no higher than the GS-14 grade level. The BBG may approve an exception to this grade level limit to meet a mission-critical need."


cc:    M/A - Carol Baker


Approve: _____    Disapprove: _____


George A. Moore
Deputy Director
International Broadcasting Bureau

4-10-07
Date

*Broadcasting Board of Governors*

## INTERNATIONAL BROADCASTING BUREAU

### GUIDELINES FOR APPOINTMENT AND PROMOTION OF NON-U.S. CITIZENS IN THE PRESENCE OF QUALIFIED U.S. CITIZEN COMPETITORS

The United States Information and Educational Exchange Act, PL 80-402, as amended (22 USC 1474), authorizes BBG to employ, without regard to the civil service and classification laws, non-U.S. citizens in a variety of functions related to non-English language programming. The law provides that such non-U.S. citizens may be employed "when suitably qualified U.S. citizens are not available when job vacancies occur." Based on Congressional Committee reports, the Agency has interpreted the term "suitably qualified" to mean "equally or better qualified."

MOA Part V-A, Section 820 provides that these relative qualifications determinations will be based on evaluation criteria established by the Office of Human Resources (M/H). Evaluations of U.S. citizens and non-U.S. citizens under Section 820 are to determine if, in the presence of one or more qualified U.S. citizen competitors, (1) a non-U.S. citizen candidate can be appointed and (2) a non-U.S. citizen employee can be promoted into a vacant position.

The following guidelines apply to appointments and promotions of non-U.S. citizens under MOA V-A, Section 820. Section 820 provides additional requirements for appointments and promotions to supervisory positions.

### When Evaluation is Required

1. Evaluation under these guidelines is required before effecting an appointment or promotion under MOA V-A, Section 820 when: (a) a non-U.S. citizen is selected for appointment to a vacant position in the presence of a qualified U.S. citizen competitor who is not also selected for an identical or similar position at the same grade and duty location or (b) a non-U.S. citizen employee is selected for promotion into a vacant position in the presence of a qualified U.S. citizen competitor who is not also selected for promotion into an identical or similar position at the same grade and duty location.

2. A career ladder promotion of a non-U.S. citizen is not considered a promotion to a vacant position. No evaluation is required.

3. A promotion of a non-U.S. citizen as a result of reclassification because of additional duties and responsibilities is not considered a promotion to a vacant position. No evaluation is required if the selecting element director provides acceptable written certification as to the reasons that no qualified U.S. citizen employee within the same language service or like organization at the level immediately below the grade to which promotion is sought could reasonably have been assigned the additional work.

4. A promotion of a non-U.S. citizen as a result of reclassification of his or her current position due to the application of new or revised classification standards or correction of a classification error is not considered a promotion to a vacant position. No evaluation is required.

### Making and Documenting Determinations

A non-U.S. citizen may be appointed or promoted in the presence of a qualified U.S. citizen competitor if, after full and fair consideration of all candidates against the job requirements, the selecting official determines by preponderant evidence that the non-U.S. citizen is more probably

---

330 Independence Avenue, SW          Washington, DC 20237

**000003**

better qualified than any U.S. citizen competitor and the superior qualifications of the non-U.S. citizen are supported by acceptable written documentation provided by the employing element.

When evaluation under these guidelines is required, all determinations that a non-U.S. citizen can be appointed or promoted must be based on full and fair consideration of all candidates' relative possession of job-related knowledge, skills, abilities, and other relevant factors and a balanced and objective evaluation of the available, pertinent application and performance information, including a personal interview, when appropriate and practicable.

The same means of assessment, when practicable, must be applied to all candidates.

**Guidance on Written Documentation**

All determinations must be documented by the employing element as provided below.

If the non-U.S. Citizen candidate is determined to be better qualified than a U.S. citizen candidate, an essentially similar assessment and means of assessment must be applied to the U.S. citizen candidate(s) and the non-U.S. citizen candidate(s) to the extent practicable. For example, if the basis for finding a non-U.S. citizen candidate better qualified is observation of work as an employee or contractor, and the U.S. citizen candidate is not an employee or contractor, the U.S. citizen candidate's work must be assessed by means such as an interview, samples of work products, relevant performance appraisal, and reference checks.

In all cases, documentation to demonstrate that a non-U.S. citizen is better qualified than a U.S. citizen must be in narrative form, supported by record documents, as appropriate, and signed by the selecting official and Division Director.

The documentation need not include evidence of sub-standard qualifications on the part of competing U.S. citizens. For example, when comparing the qualifications of two or more current employees, we can expect all competitors to be fully proficient professionals. The law requires the agency to establish the "better" qualifications of the non-U.S. citizen in these cases, not that the U.S. citizen necessarily has a poor background or performance record.

Every aspect of every candidate's qualifications for the position need not be analyzed in detail. For example, the selecting element may determine that candidates' qualifications are generally equal in some position areas; documentation may support this determination in summary fashion, focusing the more particularized support documentation on those job-related areas where measurable candidate differences exist.

    a.    The following types of evidence, though not fully dispositive, are strong indicators that Candidate A is better qualified than Candidate B.

        1.    Candidate B's most recent performance appraisal reflects an overall rating below the "fully successful" or equivalent level (below the "Acceptable" or "Meets Expectations" levels under BBG two-level rating systems) in a position with similar duties or with performance elements directly related to the knowledge, skills, abilities, or other characteristics critical to performance in the vacant position. Candidate A has a current "fully successful" or higher performance record in a related position.

2.  Candidate B's most recent performance appraisal includes a rating below the "fully successful" level in a performance element directly related to a knowledge, skill, ability, or other characteristic critical to performance in the vacant position. Candidate A has a current "fully successful" or higher rating in all related performance elements.

3.  Candidate B has been separated (or resigned after being notified that he or she would be separated) from a related employment for performance or conduct reasons within the last three years. Candidate A has an unblemished performance and conduct record extending over the last three years.

4.  Candidate A was rated (or would have been rated) in a higher category under a category ranking system on a Merit Promotion or Delegated Examination Unit (DEU) certificate for the position to be filled than Candidate B.

5.  Candidate A achieved a higher quality level score in an agency-administered examination required for entry into the position to be filled than Candidate B (e.g., Candidate A scored in the 90s, whereas Candidate B scored in the 80s or below).

b.  The types and sources of information on which acceptable documentation may be based include, but are not limited to, the following.

   1.  Types of information.

   - The relatedness of candidates' overall education and experience backgrounds to the work of the position;

   - The level of responsibility exercised and quality of work produced in previous jobs.

   - Awards and other professional or academic recognition received.

   - Specific professional accomplishments or a pattern of overall professional accomplishments and advancement to positions of greater responsibility.

   - Recency of experience when current knowledge in a job-related area can be shown to have a bearing on qualifications.

   - Traits related to quality of performance and versatility, such as initiative, willingness to take and follow instructions, reliability and dependability, and interpersonal skills.

   - The ability to contribute to the overall operating efficiency and effectiveness of the organization or work unit.

   - Quality of past performance in specific job-related functions.

2.    Sources of information.

- Rankings on Merit Promotion or DEU Certificates.

- Examination results.

- Application materials.

- Writing samples, voice auditions, and other work products requested of all candidates.

- Performance appraisals.

- Interviews.

- Reference checks.

**Examples**

Examples of adequate written documentation are attached.

**Approval of Actions**

In preparing the written documentation, the selecting official and division director are encouraged to consult their representative in the Human Resources Operations Division. M/HO representatives will assist the selecting organization in documenting relative qualifications assessments.

To obtain approval for covered appointments or promotions, the selecting official will transmit the case file, along with written documentation in support of the proposed action, by memorandum through his or her division director to the Chief, Operations Division, Office of Human Resources (M/HO).

For an outside appointment, pre-offer recruitment steps may continue, pending approval under these procedures.

The Chief, M/HO, will review the documentation and either: (1) obtain the concurrence of the element director (usually the Director of VOA or the Director of OCB or his/her designee) and approve the proposed action and notify the selecting official and division director or (2) recommend disapproval and forward the case to the Director of Human Resources (M/H).

The Director of Human Resources may approve the proposed action or, with the concurrence of the element director, disapprove the proposed action.

If the element director does not concur with the Director of Human Resources in a disapproval, the element director may submit the matter to the IBB Director for a final agency decision.

_____          12-18-06
John S. Welch                    Date
Director of Human Resources

000006

**Attachment**

**Examples of Adequate Written Documentation**

### Example A.  General

This memo requests approval to select Mr. AAAA, a non-U.S. citizen, for a promotion to an International Broadcaster, GS/GG-1001-12, position in the XXXX Service.  Four qualified U.S. citizen candidates are among the candidates under consideration but are not as well qualified as Mr. AAAA.

Based on a review of their applications and performance along with the interviews conducted with the four U.S. citizen candidates and the non-US citizen candidate, the non-US citizen candidate, Mr. AAAA, was selected.  He is the best qualified candidate.

Below are analyses of each citizen's qualifications compared to Mr. AAAA's.

Analyses of the candidates' knowledge, skills, and abilities:

*Knowledge of video/radio/internet broadcasting principles and methods and journalist knowledge and ability sufficient to write and produce integrated, highly targeted, well-balanced, scripts, radio or television programs, or program segments that capture the attention of the audience.*

Mr. AAAA was the most qualified candidate, primarily for his superior knowledge of radio broadcasting principles and methods as evidenced through his reporting from the field.  He regularly tackles complex subjects and initiates story ideas.  His reports are well written and balanced.  The scripts that he writes regularly capture the attention of mainstream XXXX media – including ...... who routinely plagiarized his scripts, word for word.  In addition, Mr. AAAA contributes substantively to Internet articles and regularly monitors use of his reports on the web.

Of the four U.S. citizen candidates, Mr. BBBB has the most experience in television but has no experience in either radio or Internet.  Mr. BBBB's knowledge of broadcasting principles and of what is expected of a GS-12 broadcaster is not up to Mr. AAAA's level.  Mr. BBBB has not evidenced the capability to produce an audio report as Mr. AAAA has.

While Ms. CCCC has some limited television experience, she does not have the same concept of the requirements of a radio broadcaster as Mr. AAAA.

Mr. DDDD demonstrates good understanding of the radio requirements but he has no television or Internet experience.

Ms. EEEE failed to demonstrate the fundamental principle of journalistic independence.

*Skill in radio reporting or videography that enables the candidate to voice, digitally edit, and prepare audio or shoot video using motivated camera movements with a digital video camera.*

Mr. AAAA was considered the best of all the candidates in this skill area.  He has consistently conducted outstanding field reporting for radio.  His voicing, digital editing, and preparation of audio for reports are excellent.  He has broad experience in radio reporting in the

business/economics field as well as in other areas. Mr. AAAA is particularly strong at finding key interviewees who can address a specific topic with authority. He conducts thorough interviews. While he doesn't have TV experience, he is the best overall candidate.

Mr. BBBB has demonstrated that he is an excellent videographer who can shoot and edit independently but – unlike Mr. AAAA - his voice work for radio and television is hindered by a heavy accent that is not acceptable for our audience in XXXX. Mr. BBBB has no evidence of live on-air TV or radio experience.

Ms. CCCC demonstrated less ability than Mr. AAAA in planning and conducting field reporting assignments, based on her submission and interview. In addition, Ms. CCCC has no radio reporting experience and her television experience is very limited (three months).

Mr. DDDD has demonstrated that he is a good radio reporter with a first-class voice. Like Mr. AAAA, he edits and prepares audio for radio reports. However, his reports lack the depth and expertise of Mr. AAAA's reports.

Ms. EEEE has strong voicing talent, but her field reporting experience is very limited and is clearly behind that of Mr. AAAA.

*Knowledge of the targeted area, its history, economics, culture, and socio-political development and the full range of advanced radio and television broadcasting skills to select materials, tone, and style that will be most appealing to this audience.*

Here again, Mr. AAAA was rated the superior candidate in that he has demonstrated extraordinary knowledge of XXXX's economics and socio-political development. He has consistently produced broadcast materials with appropriate tone and style to appeal to our audience. His reports have been praised by editors and colleagues alike for their insight into XXXX's complicated economic and political issues. His in-depth business reports are regularly picked up and posted and plagiarized by XXXX media.

Mr. BBBB has demonstrated good skill in producing television features for XXXX, but he has failed to demonstrate Mr. AAAA's level of knowledge of XXXX's political and economic situation. Knowledge of XXXX's political and economic situation is particularly important because of our need for daily reporting on these issues for the target area.

Ms. CCCC's application and interview failed to demonstrate Mr. AAAA's knowledge of XXXX.

Mr. DDDD has demonstrated considerable knowledge of these areas but lacks the depth of Mr. AAAA's and Ms. CCCC's knowledge.

Ms. EEEE was unable to provide in-depth responses regarding XXXX.

*Editorial skills to prepare balanced, accurate, comprehensive material and to convey often complex and sensitive content.*

Again, Mr. AAAA received the highest evaluation from all three panel members on this KSA. This is because Mr. AAAA has extensive experience preparing balanced, accurate, and comprehensive reports on extremely complex economic and political issues. His reports have been outstanding.

By comparison, Mr. BBBB's strong ability to prepare complex materials with balance and accuracy are limited to his video reports. He has not done so as a radio journalist. Comparably, Mr. AAAA's expertise in basic editorial skills are applicable to any medium.

Ms. CCCC has had no recent editorial experience. Her only editorial experience is over five years old and in a local print medium.

Mr. DDDD showed great promise but lacks Mr. AAAA's evident ability to prepare complex materials. Mr. DDDD's experience doing so as a radio reporter does not come close to matching Mr. AAAA's experience.

Ms. EEEE has prepared live programs about complex social issues, but has little experience in more complicated political or economic issues. Mr. AAAA clearly outclassed Ms. EEEE in this area.

*Knowledge of the basic objectives and program policies of the Voice of America in order to develop and produce programs consistent with these objectives and policies.*

Again, Mr. AAAA received the highest rating in this area because he has shown a deep understanding of VOA policies and objectives and he regularly demonstrates that knowledge in his field reporting.

Mr. BBBB failed to demonstrate similar knowledge about policies and objectives. He was also less knowledgeable about U.S. policy.

Ms. CCCC demonstrated a basic knowledge of VOA policies and objectives but did not excel as Mr. AAAA did in this area, particularly in interpreting and applying this knowledge in real life situations.

Mr. DDDD demonstrated much less knowledge of VOA policies and objectives and was not able to evidence Mr. AAAA's knowledge in this area.

Ms. EEEE also evidenced less knowledge of VOA policies and objectives than Mr. AAAA.

Conclusion:

All three panelists agreed that Mr. AAAA was by far the best candidate amongst the available applicants. Mr. AAAA's capabilities in field reporting and in writing and producing in-depth, comprehensive reports exceed the capabilities of the other candidates.

Mr. AAAA, from his past performance and job interview, clearly outshined all of the candidates. None of the other U.S. citizens performed in a comparable manner.

Mr. AAAA's consistent outstanding work performance and maturity in the work place have been proven. Mr. AAAA's reporting has clearly shown that he is superior to the four citizen candidates. Further evidence of this can be found in the number of programming awards that he has earned at VOA compared to the other candidates. Mr. AAAA's recent performance appraisals compared to the other candidates' also reflect his superior qualifications for this position.

Mr. AAAA has experience in Internet as well as radio. He does not have experience in television. However, radio remains an important media for XXXX programming. Though Mr. BBBB and Ms. CCCC have more experience than Mr. AAAA in television, they have far less or no experience in radio. As Mr. AAAA's qualifications in all other respects are so superior to the other competitors' qualifications, he is considered the best qualified of the candidates.

I request authorization to promote Mr. AAAA to a GG-1001-12 International Broadcaster position.

**Example B. Case When U.S. Citizens are Ranked in a Lower Category Under a Category Ranking System**

This memo is to request approval to select Ms. AAAA, a non-U.S. citizen, for appointment to an International Broadcaster, GS/GG-1001-12, position in the XXXX Service. Two qualified U.S. citizen candidates are among the candidates under consideration but are not as well qualified as Ms. AAAA.

The U.S. citizen candidates, Mr. BBBB and Ms. CCCC, were rated by a subject-matter expert panel in the merit promotion process in the C, or middle, category. Applying the same criteria, the panel rated Mr. AAAA in the A, or highest, category.

Also, based on a comparison of Ms. AAAA with the U.S. citizen candidates with regard to the rating factors listed in the vacancy announcement, I determined her better qualified than any of the US citizen candidates. Ms. AAAA's most recent experience as a reporter, independently covering and reporting on important economic and political events in the region, combined with her experience in television, reflect a higher-level of overall journalistic skill than the U.S. citizen candidates and make her a better match for the current needs of the XXXX Service.

Accordingly, I request authorization to select Ms. AAAA for the position.



# International Broadcasting Bureau
## Manual of Operations & Administration

Return to Corporate Information Page



Previous Page    Expand View    Collapse View    Next Page    Search

- ▶ **THE MANUAL SYSTEM**
- ▶ **PART I ORGANIZATION**
- ▶ **PART II GENERAL ADMINISTRATION**
- ▶ **PART III COMMUNICATIONS AND RECORDS**
- ▶ **PART IV ADMINISTRATIVE SERVICES**
- ▼ **PART V-A PERSONNEL (DOMESTIC)**
  - ▶ **000 INTRODUCTION**
  - ▶ **100 PERSONNEL POLICIES, RESPONSIBILITIES, AND AUTHORITI**
  - ▶ **200 CLASSIFICATION AND COMPENSATION**
  - ▶ **300 RECRUITMENT, SELECTION, AND APPOINTMENT**
  - ▶ **400 IN-SERVICE PERSONNEL MANAGEMENT**
  - ▶ **500 EMPLOYEE BENEFITS, CONDUCT AND RESPONSIBILITIES**
  - ▶ **600 HOURS OF DUTY AND LEAVE**
  - ▶ **700 SEPARATIONS**
  - ▶ **800 SPECIAL CATEGORIES OF PERSONNEL**
  - ▶ **900 PERSONNEL RECORDS, FILES AND REPORTS**
  - ▶ **A1100 SENIOR EXECUTIVE SERVICE**
- ▶ **PART V-B PERSONNEL (FOREIGN SERVICE)**
- ▶ **PART VI OFFICE OF THE CHIEF FINANCIAL OFFICER**
- ▶ **PART VII OFFICE OF THE CHIEF FINANCIAL OFFICER**
- ▶ **PART VIII OFFICE OF SECURITY**
- ▶ **PART IX- PROCUREMENT**

Previous Page    Expand View    Collapse View    Next Page    Search

# PART V-A PERSONNEL (DOMESTIC)
## 800 SPECIAL CATEGORIES OF PERSONNEL
### Last Updated: 03/01/99

Section 820
## EMPLOYING NON-U.S. CITIZENS FOR DUTY IN THE UNITED STATES

821    Introduction
821.1 Purpose
821.2 Related Information
821.3 Authority


822 Policy
822.1 Employment and Promotion - Limitations
822.2 Termination
822.3 Security

823 Responsibilities
823.1 Office of Personnel
823.2 Non-U. S. Citizen Employees

824 Conditions of Employment
824.1 Conditions Applicable to all Non-U. S. Citizen Employees
824.2 Conditions Applicable to Excepted Appointments (GG)

825 Exchange Visitor Program G-1-120 (J-1 Visa)
825.1 Authority and Reference
825.2 Request for Waiver of the Two-Year Home-Country Physical Presence
Requirement
825.3 Review Board Criteria for Requests for Waiver
825.4 Offer of long-term employment
825.5 Change in Visa Status

826 Rotational Assignment (Voice of America)
826.1 Purpose
826.2 Designation of Rotational Positions
826.3 Rotational Assignment - Recruitment
826.4 Rotational Assignment - Expiration of Appointment

Section 820
## EMPLOYING NON-U.S. CITIZENS FOR DUTY IN THE UNITED STATES

## 821 INTRODUCTION

821.1 Purpose - The following material prescribes Broadcasting's policies, responsibilities, and procedures governing the employment in the United States of non-U.S. citizens in positions which require (1) services related to the translation or narration of colloquial speech in foreign languages; (2) the preparation and production of foreign language programs; or (3) the selection, evaluation, editing, writing and adaptation of source material for use in foreign language programming.

000012    9/22/00 12:59 PM

821.2 <u>Related Information</u> - MOA V-B 870 prescribes procedures to be followed in overseas recruitment and hiring of non-U.S. citizens for duty in the United States.

821.3 <u>Authority</u> - The United States Information and Educational Exchange Act, P.L. 80-402, as amended, authorizes employment of non-U.S. citizens in the United States for the services described in 821.1 above when equally or better qualified U.S. citizens are not available.

## 822 POLICY

### 822.1 <u>Employment and Promotion - Limitations</u>

a. A non-U.S. citizen may be appointed only after reasonable efforts to recruit equally or better qualified U.S. citizens have been made and have been unsuccessful. A non-U.S. citizen may be employed or promoted only if no equally or better qualified U.S. citizen is available to perform the duties of the position. The determination as to whether a non-U.S. citizen is better qualified than a U.S. citizen will be based upon criteria established by Personnel to evaluate the qualifications of both citizens and non-citizens.

b. A non-U.S. citizen applicant will be required to qualify in the appropriate examination(s) and meet all other employment standards that apply to employment of U.S. citizens in such positions.

c. As a matter of Broadcasting policy, non-U.S. citizens will not be employed in or promoted to supervisory positions or positions which involve policy or program decision-making.

(1) Exceptions will be allowed only on an individual basis when the appropriate Office, or Service Head determines, with the concurrence of the Director of Personnel that the unavailability of an equally or better qualified U.S. citizen to perform such supervisory or managerial functions is not only significantly handicapping the ability of the Office, or Service to operate, but also is having an adverse impact on Broadcasting's mission.

(2) It is anticipated that positions for which an exception to the U.S. citizenship requirement would be considered will be graded no higher than the GS-13 grade level.

d. It is the policy of Broadcasting to have the terms of excepted (GG) appointments parallel the conditions of GS employment to the extent possible and practicable.

e. Under no circumstances will non-U.S. citizens be employed in circumvention of Immigration and Naturalization Service (INS), Department of Labor, or Department of State regulations.

f. When a non-U.S. citizen employed by Broadcasting becomes a U.S. citizen, the current excepted appointment will be terminated as soon as practicable and the employee may be offered a competitive service appointment if his/her performance and conduct are satisfactory, if he/she is within reach on the appropriate Office of Personnel Management (OPM) register or another legal basis for competitive appointment exists, and if he/she obtains the appropriate clearance of the Office of Security. If the individual is not selected for a competitive service appointment or other appointment under an authority for hiring

U.S. citizens, he or she will be separated from Broadcasting.

g. When an equally or better qualified U.S. citizen becomes available to fill a position occupied by a non-U.S. citizen, such U.S. citizen shall be employed as soon as practicable. (See 822.1a)

h. If a non-U.S. citizen is subject to displacement because an equally or better qualified U.S. citizen is available, his/her appointment will be terminated. The displaced non-U.S. citizen may be offered a new appointment to another position for which he/she is qualified if another position is available at the same or a lower grade level. If the position is at a lower grade level, and the higher-level position was held for a minimum of 90-days, the non-U.S. citizen will be placed at the salary level equivalent to his/her current salary, not to exceed the maximum range of the grade (i.e., step 10). If the displaced employee did not occupy the higher-level position for 90 days, salary will be set at step 1 of the grade or, if promoted from that grade, the step held immediately prior to the promotion to the higher-level position. The time spent at the higher level will be creditable for determination of WGI due date.

822.2 Termination - Non U.S.-citizen staff employees serve at the discretion of Broadcasting under the authority of P.L. 80-402, as amended. Accordingly, should such an employee's performance or conduct fall below an acceptable level, or if a need no longer exists for the employee's services, the employee's limited excepted appointment may be terminated at any time by the Director of Personnel. The employee will normally be given at least 30 days' advance notice prior to the effective date of termination.

822.3 Security

a. Official employee identification cards for limited access personnel will be issued by the Office of Security to non-U.S. citizen employees.

b. Non-U.S. citizen employees may not have access to classified material. Oral briefing is permitted on Secret, Confidential, and administratively controlled material, but not on material classified Top Secret.

c. Non-U.S. citizen employees may not be given responsibility for the opening or closing of bar-lock cabinets or safes containing classified or administratively controlled materials.

d. Safe combinations may not be made known to non-U.S. citizen employees.

823 RESPONSIBILITIES

823.1 Office of Personnel - is responsible for:

a. Assuring that a non-U.S. citizen is employed in a position covered by 821.1 of this section and only in the absence of available U.S. citizen candidates who are equally or better qualified than the non-citizen to perform the duties of the position.

b. Assuring that pre-employment processing, including approval of the Office of Security, of a non-U.S. citizen candidate is initiated only if the candidate's employment would be in accordance with the applicable regulations of the Departments of State and Labor and the Immigration and Naturalization Service.

**000014**     9/22/00 12:59 PM

c. Taking appropriate action when notified of change in visa or citizenship status of non-U.S. citizen employees.

d. Offering and determining the duration of appointments.

e. Notifying employees of renewal or non-renewal of appointments.

f. Initiating disciplinary action, as necessary.

g. Terminating appointments.

## 823.2 Non-U.S. Citizen Employees

a. Each non-U.S. citizen employee is responsible for immediately informing the Office of Personnel, of any change in visa or citizenship status.

b. Each non-U.S. citizen employee must consult with Personnel before undertaking any employment outside Broadcasting.

## 824 CONDITIONS OF EMPLOYMENT

### 824.1. Conditions applicable to all Non-U.S. Citizen Employees GG)

a. Annual and sick leave, holiday benefits, and premium pay will be accorded to non-U.S. citizen employees (GG appointees) in the same manner as GS employees.

b. Non-U.S. citizen employees are responsible for paying Federal and local taxes as required by law, including Federal, State, District of Columbia or local municipal taxes. Deductions are made from salaries when required by law or executive directive. All non-U.S. citizens on visas other than "J" and "F" will be subject to payroll deductions for Medicare coverage and Social Security taxes when applicable.

### 824.2 Conditions Applicable to Excepted Appointments (GG)

a. Basic Compensation - The basic compensation of an excepted employee serving in a GG position is the pay rate of the corresponding GS grade and step. Excepted employees serving in GG positions are eligible for within-grade step increases, including Quality Increases.

b. Health Benefits and Life Insurance - A non-citizen employee serving in an excepted (GG) position on an appointment not limited to one year or less, or on an extension of such an appointment, is eligible for coverage under the Federal Employees Health Benefits Program and the Federal Employees Group Life Insurance Program unless the employee is serving on a non-full-time appointment with no pre-arranged work schedule.

c. Retirement Coverage:

(1) A non-citizen employee, who, before January 1, 1984, served on an excepted (GG) appointment not limited to one year or less, or on an extension of such an appointment, is

000015

covered by the Civil Service Retirement System (CSRS), and a seven percent contribution to the CSRS is withheld from the employee's basic pay. All but "J-1" and "F-1" visa holders also will be covered by Part A Medicare.

(2) A non-citizen employee holding a "J-1" or "F-1" visa who, at any time, served on an excepted (GG) appointment not limited to one year or less, or an extension of such an appointment, is covered by the CSRS and will pay seven percent of basic salary to the CSRS. Such employees are excluded from Medicare coverage. If such an employee initially was covered by CSRS on or after January 1, 1984, and later attains a change in visa status to other than "J-1" or "F-1", his or her coverage under CSRS will cease and will be converted to full Social Security and will contribute 1.3% of basic salary to the Federal Employees Retirement System (FERS).

(3) A non-citizen employee holding a visa other than "J-1" or "F-1", hired on or after January 1, 1984, and serving on an excepted (GG) appointment not limited to one year or less, or an extension of such an appointment, is covered by full Social Security and will also contribute 1.3% of basic salary to the Federal Employees Retirement System.

## 825 EXCHANGE VISITOR PROGRAM G-1-120 (J-1 visa)

825.1 <u>Authority and Reference</u> - Under the authority of the U.S. Information and Educational Exchange Act of 1984, P.L. 80-402, as amended; the Mutual Educational and Cultural Exchange Act of 1961, P.L. 87-256, as amended; and the Immigration and Naturalization Act (66 State. 163), P.L. 414, as amended, the Exchange-Visitor Program G-1-120 (J-1 visa) has been designated by Broadcasting to bring to the United States foreign nationals (and their spouses and dependent children) who are especially qualified to perform as foreign language broadcasters, translators, producers, writers, editors, and for training of foreign broadcasters. Barring special circumstances, such as previous history of Broadcasting employing a non-citizen in a temporary worker's or other non-immigrant visa category, all non-immigrant foreign national employees will be brought to the United States as alien employees of Broadcasting. (8 CFR 214.2 (j); 22 CFR 514.2 and 514.23.)

825.2 <u>Request for Waiver of the Two-Year Home-Country Physical Presence Requirement</u> - A request for a waiver of the two-year home-country physical presence requirement pursuant to Broadcasting's authority as an "interested United States Government Agency" may be submitted to Consular Affairs at the Department of State by the Office of Personnel.

825.3 <u>Criteria for Requests for Waiver</u>

a. After receipt of a request for a waiver of the two-year home-country physical presence requirement, (as described above), GC shall consider the request, along with any other relevant information, and determine the following:

(1) whether the granting of a waiver would be in the public interest; and

(2) whether the exchange visitor's compliance with the two-year home-country physical presence requirement would be clearly detrimental to a program or activity of official interest to Broadcasting.

9/22/00 12:59 PM

b. When a decision is made in favor of a request for a waiver of the two-year home-country physical presence requirement, GC will make a recommendation to the Waiver Review Office, Department of State, which will send its recommendation to the Immigration and Naturalization Service (INS). The INS has the final authority to issue a waiver.

## OFFER OF LONG TERM EMPLOYMENT

825.4 Within the first two years of employment a determination will be made on whether to offer an employee long-term employment. The Office of Personnel will contact the Service Chief six months prior to the end of the first two years of an individual's employment to initiate the review and decision-making process.

In extraordinary cases, Division Chiefs may elect to initiate the review after one year. In the very rare and exceptional case in which a decision on long-term employment cannot be made within the first two years of employment (e.g., employee absent for a prolonged period of time), an employee may be given a new temporary appointment of up to one additional year during which the decision must be made. Such an appointment must be justified by the Division Chief in writing and must have the approval of the Program Director and the concurrence of the Director of Personnel.

The criteria upon which management will base the determination on whether to offer an employee long-term employment are:

Performance by the employee which demonstrates fully his or her fitness and qualifications for continued employment.
Normally, such performance is characterized as excellent or as having the potential to perform in an excellent manner;

Conduct by the employee which is fully professional;

Personal and/or character traits (e.g., willingness to accept supervision and cooperate with others and attitude towards work), which warrant continued employment;

Suitability and security standards are fully met by the employee;

Needs of the service, which includes consideration of such factors as:

Availability of other candidates and their relative skill levels;

The benefits of hiring new employees who could be expected to enhance the currency of the language usage, provide fresh understanding of the cultural and political environment of the target area, and/or provide fresh programming ideas.

Programming and staffing needs and anticipated future changes (e.g., increase or decrease in staff levels; changes in types of skills needed) the ability of the employee to meet these needs.

Based on these criteria, the Service Chief will make a recommendation as to whether the employee should or should not be offered long-term employment (and therefore,

000017

9/22/00 12:59 PM

sponsorship), and forward this recommendation to the Division Chief. The Division Chief will review the recommendation and forward it with his or her own written recommendation and cover sheet to the Visa Coordinator, Office of Personnel, who will forward it to the Director of the Voice of America.

The VOA Director shall determine, with the concurrence of the Director of Personnel, whether to offer an appointment without time limitation and sponsorship. Once a final determination is reached, the employee is notified in writing of the decision. If he/she is not offered an appointment without time limitation, the employee must be advised of his/her opportunity to have the decision reconsidered by the Director of VOA.

## 825.5 Change in Visa Status

a. After (1) Broadcasting has determined that it is necessary and proper to retain the exchange visitor in its employ for an indeterminate period, a Labor Certification is requested and (2) a favorable recommendation for a waiver has been submitted to the INS, Broadcasting will then petition on behalf of the exchange visitor for the appropriate preference immigrant status. The Office of Personnel is designated to execute such petitions on behalf of Broadcasting.

b. Non-U.S. citizens, regardless of their visa status, are employed under a limited excepted (GG) appointment. Broadcasting's intervention to obtain a change in visa status in no way obligates Broadcasting to employ permanently any non-U.S. citizen.

## 826 ROTATIONAL ASSIGNMENT (VOICE OF AMERICA ONLY)

### 826.1 Purpose

a. In order to attract and maintain the optimum overseas audience, VOA must maintain current idiomatic language capability and understanding of the cultural environment of the target areas.

b. In support of the above, broadcasters for selected language services will be assigned to rotational positions within VOA for pre-determined periods in order to:

(1) enhance the currency of the language service;

(2) provide the service with fresh understanding of the cultural, social, and political environment of the target area, and

(3) establish and maintain friendly, mutually beneficial relations with foreign countries and/or radio networks.

### 826.2 Designation of Rotational Positions

a. VOA Division Chiefs, as appropriate, may recommend to the VOA Program Director, a number of their International Radio Broadcasting (IRB) positions as "rotational," within the existing allotment.

(1) Division Chiefs will recommend designating individual positions as "rotational" as they are vacated.

000018

9/22/00 12:59 PM

(2) Positions designated as "rotational" will not be filled by individuals other than on time limited <u>non-renewable</u> appointments.

b. Because of situations which may handicap recruitment in certain overseas areas, rotational assignments will not be appropriate in all VOA language services.

c. "Rotational" positions will be reserved for individuals whose appointments to VOA as IRB's are time limited, with the mutual understanding that at the end of a pre-determined period (of between 13-36 months) their appointment <u>will terminate without renewal.</u>

d. The Office of Personnel will control positions identified by language services as "rotational."

e. In unusual cases, such as where recruitment sources are cut off, the interests of VOA may warrant re-designation of "rotational" positions. In such instances, the Division Chief will submit in writing justification for recommending removal of the "rotational" identifier from the position to the Director of Personnel or designee. Personnel will make a recommendation to the VOA Program Director, whose decision will be final.

826.3 <u>Rotational Assignment - Recruitment</u>

a. Rotational assignments to language service positions will be coordinated through overseas posts as part of agreements with:

(1) foreign governments

(2) foreign commercial networks

(3) individuals

b. The Office of Personnel will work with the VOA Program area divisions in identifying adequate lead time to ensure a "pipeline" recruitment process which supplies a continual flow of candidates for "rotational" positions. Contracts signed in advance will be subject to the successful completion of the required security and medical clearances.

c. Personnel will coordinate all pre-appointment communication with candidates for "rotational" positions regarding conditions of their appointments at VOA. Personnel will secure written acceptance and understanding of the limited nature of the appointment from each candidate before the appointment is effected.

d. Candidates for "rotational" positions must pass the appropriate examinations for civil service employment administered under the auspices of Personnel by examiners and at test sites authorized by Personnel. The exams will be evaluated at VOA before an offer of employment may be made.

e. The Office of Personnel will coordinate with the language services appropriate orientation for individuals at VOA on rotation at least 30 days before their arrival.

826.4 <u>Rotational Assignment - Expiration of Appointment</u>

**000019**

9/22/00 12:59 P

a. The appointment of a broadcaster in a rotational position may be terminated based on performance, conduct, or needs of the service at any time during the appointment.

b. Approximately 90 days before expiration of a "rotational" appointment, Personnel will remind the incumbent in writing of the impending expiration of the appointment so that he/she may begin preparation for departure.

c. The appointments of employees in the "rotational" program will not be extended. Only in rare circumstances, when the Division Chief has certified in writing that the language service will be seriously impaired by the loss of the employee, will Personnel make a review of the case, and it may recommend to the Program Director that the employee be appointed to a vacant non-rotational position.

**000020**    9/22/00 12:59 Pl

January 1997

TO:     All Supervisors and Managers

The VOA Personnel Handbook for Supervisors and Managers was created over ten years ago to provide a convenient source of information on basic personnel management policies, procedures and responsibilities. Many of you have consulted this familiar blue book as you carried out your personnel management responsibilities through the years.

Today, supervisors and managers have greater authority and more flexibility in managing their staffs than they did when the Personnel Handbook was first issued. For example, we can now reward special accomplishments through time-off awards, initiate disciplinary action where warranted, and use such programs as flexitime, maxiflex and job-sharing to create more flexible working arrangements. At the same time, we must be sensitive to new laws and regulations that provide opportunities for employees to donate leave to their colleagues, expand leave benefits, and change the way many employees are compensated.

To meet the needs of today's manager, the Office of Personnel and Administration is preparing a new personnel handbook for IBB managers. Given all the changes the last decade has brought, creating a new Handbook is a major undertaking. To assist you immediately, we are issuing the attached Supplement to the Personnel Handbook. This Supplement provides an overview of the most important changes and should be used in conjunction with the current Handbook.

In some instances, the Supplement will suggest that you contact the Office of Personnel and Administration for specific information. I would like to encourage you to do so. Staff members are always available and willing to assist you as you carry out your supervisory responsibilities. The Supplement includes an outline of the current structure and responsibilities of the Office of Personnel and Administration and a brief subject matter listing to help you locate the appropriate IBB office that deals with personnel and administrative matters.

The B/PA staff would also like to hear your thoughts and suggestions as they create the new IBB Personnel Handbook for Supervisors and Managers. How can this Handbook best meet your needs? Please drop B/PA a note or contact Janet Davis at 619-3117.

Eva Jane Fritzman
Acting Director
International Broadcasting Bureau

January 1997

assure that Broadcasting activities continue. Since each dismissal tends to vary in nature and length, specific guidance usually is issued at the time the dismissal is announced.

## Section 1002 - Employment of Non-U.S. Citizens

Non-U.S. citizens who are hired for duty in the United States are offered excepted service appointments that may vary in length and terms of employment, depending on the needs of the service. All appointments provide employees with immediate access to Federal Employees Life and Health Insurance benefits. Settling-in allowances are available to those non-U.S. citizens who are hired abroad for duty in the United States.

1. **Short-Term Temporary Appointments**

   Short-term temporary appointments are generally 13 to 24 months in length and normally will not be extended beyond two years. They do not provide employees with the option to convert to a long-term indefinite excepted appointment. Employees on these temporary appointments will not be sponsored by IBB for immigrant visas. Therefore, sections 3 and 4 below do not apply to employees on short-term temporary appointments.

   An employee's temporary appointment may be terminated at any time, based on the employee's deficiency in performance, unsatisfactory conduct, unsuitability or on changes in VOA programming or staffing needs. Normally, the employee will be provided with thirty day advance notice if the appointment will be terminated prior to its expiration date.

2. **Two-Year Appointments**

   When VOA management anticipates that a position involves a long-term, continuing need and budgetary considerations permit, a non-citizen may be offered a two-year excepted appointment that might permit the employee to convert to a long-term appointment in the future.

000021A

January 1997

The initial two-year period of employment constitutes a
formal trial period.  The trial period tests actual on
the job performance and conduct and is used to determine
the employee's fitness for successful long-term service.
IBB may terminate a non-citizen's employment at any time
during this initial two-year trial period for any of the
following reasons:

* deficiencies in performance,

* unsatisfactory conduct,

* lack of aptitude or cooperativeness,

* undesirable suitability characteristics evidenced by
  the employee's activities either prior to or during
  employment, during or outside official working
  hours, or

* changes in the programming and/or staffing needs of
  the employing organization.

If IBB decides to separate the employee during the trial
period, the Director of Personnel normally will notify
the employee in writing no fewer than thirty (30)
calendar days prior to the effective date of the
separation.  This notification will include the reasons
for the termination of employment.

3. **Decisions on Long-term Employment**

Prior to the expiration of an employee's initial two-
year appointment, Bureau management must decide whether
to offer the employee long-term continued employment and
sponsorship for an immigrant visa or to allow the
initial appointment to expire without renewal or
extension.

The following criteria must be considered in determining
whether to offer an employee long-term employment:

* The employee's performance must fully demonstrate
  the employee's fitness and qualifications for
  continued employment;

* The employee's conduct must be fully professional;

Supp-1000-7

000022

January 1997

* The employee's personal and/or character traits must warrant continued employment;

* The employee fully meets suitability and security standards;

* The needs of the service, including:

* the availability of other candidates and their relative skill levels;

* the benefits of hiring new employees who could be expected to enhance the currency of the language usage, provide fresh understanding of the cultural and political environment of the target area, and/or provide fresh programming ideas;

* current and future programming and staffing needs and the ability and potential of the employees to meet these needs; and

* any other appropriate factors.

The Director of VOA will determine, with the concurrence of the Director of Personnel, whether to offer the employee long-term employment and sponsorship. In making this decision, they will consider the recommendations of the appropriate Service and Division Chiefs. The Office of Personnel and Administration will initiate the decision-making process and assist supervisors and managers.

4. **Implementation of Employment Decisions**

**If a long-term appointment and sponsorship for an immigrant visa is offered and the employee accepts,** the employee is converted to an indefinite excepted appointment without time limitation. Annual renewals or extensions of this appointment are not be necessary. When an employee's visa is adjusted to immigrant status, the Bureau's obligation to pay return travel expenses is terminated.

**If a long-term appointment and sponsorship is offered and the employee does not accept,** the employee's appointment normally expires at the end of the employee's second year of employment, without renewal or

Supp-1000-8

January 1997

extension.  The appointment may be extended for up to
one additional year with the approval of the Director of
Programs and the concurrence of the Director of
Personnel.

**If the decision is not to offer long-term employment,**
the employee's appointment will expire at the end of the
employee's second year of employment.  If the employee
was originally hired overseas, the Agency will pay
return travel expenses (unless the employee's visa
status has changed since initial appointment) in
accordance with the conditions under which the employee
was appointed.

The employee may request that the Director of VOA
reconsider the decision not to offer long-term
employment and sponsorship.  The employee may present
any relevant information in support of this request.
This opportunity for reconsideration will not extend the
notice period or the expiration date of the appointment
nor does it confer appeal or grievance rights of any
type to the employee.  The Director of VOA, with the
concurrence of the Director of Personnel, will make the
final decision and notify the employee.

## Section 1003 - Furlough

1. A furlough is the placing of an employee in a temporary,
   non-duty, non-pay status because of lack of work or
   funds or other nondisciplinary reason.  Different
   procedures are followed in different situations, based
   on the nature and length of time of the furlough.  There
   are basically two types of furloughs -- a "shutdown" or
   "emergency" furlough and a "save money" furlough.

   "Shutdown" furlough -  an agency no longer has the
   necessary funds to operate and must shut down
   activities that do not meet Office of Management and
   Budget (OMB) standards for exceptions.  In many
   cases, the agency may have very little lead time,
   making it an "emergency" furlough.  A good example
   of a "shutdown" furlough was the lapse of funding in
   FY 1996.

*INFORMATION MEMO*

February 27, 1992

MEMORANDUM FOR:    All Language Service Employees

FROM:    B/P - Janice Brambilla
         B/VOA - Sid Davis

SUBJECT:    Revisions in Policies Governing Non-U.S. Citizen
            Employment

To address a number of long-standing concerns on the part of both management
and employees, we are making a number of changes in the policies which govern
the Bureau of Broadcasting's employment of non-U.S. citizens and sponsorship
for immigrant visas.  These improvements were developed in close consultation
with AFGE Local 1812 and employee representatives.

Major changes include:

-    reducing the period before a decision is made on sponsoring an employee
     for an immigrant visa from a minimum of three years to a maximum of two
     years;

-    offering employees who are selected for long-term employment and
     sponsorship an appointment without time limitation rather than
     appointments which expire and must be renewed every year; and

-    initiating an automatic review of all employees for long-term employment
     and sponsorship not later than 18 months after their initial appointment.

We plan to begin implementing these new policies within the next few days by
instituting a review of all current employees who have completed at least 18
months of service, both those who are on J visas (or in some other
nonimmigrant status) and have not been sponsored, and those who have been
sponsored or are on permanent resident visas but are serving on one year
appointments to determine whether to offer these employees long-term
employment.

We also are continuing our vigorous efforts to obtain a new visa to overcome
problems experienced with the J visa, such as retirement coverage and travel
limitations.

We recently met with the staff of the House Judiciary Committee, which has
drafted a nonimmigrant visa for VOA that would resolve these problems and ease
the process of converting employees selected for long-term employment to an
immigrant visa.  The meeting was encouraging.  While we cannot be certain, we
hope to have the legislation by October of this year.

A copy of the new policies governing the employment of non-U.S. citizens is
attached.  Briefings on the changes will be conducted in the G-507 Conference
Room on Thursday March 5 at 4:30 PM and Friday March 6 at 10:00 AM.

IA-1215
(11-82)

000025

## REVISED POLICIES FOR EMPLOYING NON-U.S. CITIZENS

This paper describes revisions to the employment practices and visa sponsorship policies currently used by the Bureau of Broadcasting in employing non-U.S. citizens in response to the desire of both management and employees to improve current practices.

These revisions do not apply to employees appointed to rotational positions (Section 826 of Part VA of the Agency's Manual of Operations and Administration), to employees serving pursuant to agreements with other organizations, or to employees hired for short-term employment only.

### BACKGROUND

USIA and the Bureau of Broadcasting employ non-U.S. citizens in broadcasting positions under the authority of Public Law 80-402 (22 USC 1474) without regard to the requirements of Title 5. A contract covers the first six months of employment followed by an eighteen-month temporary appointment, which conveys health and life insurance and other benefits, and, subsequently, by one-year appointments which must be renewed annually.

Non-U.S. citizens who do not have other status in the United States are provided with an exchange visitor (J) visa. USIA regulates the use of the J visa and, under current procedures, a non-U.S. citizen can remain in the Bureau's employ having the status of an exchange visitor for as long as ten years. At some point, usually after an average of 3 to 4 years employment, the non-U.S. citizen is considered by the Bureau for sponsorship for an immigrant visa, generally a prerequisite for U.S. citizenship. In some cases, employees have served with VOA for more than five years without a decision on sponsorship.

Limitations of the J visa have resulted in a number of recurring problems (e.g., retirement coverage and travel restrictions). The Bureau and the Agency are working to obtain the legislation needed to provide us with a new visa category which would resolve many, if not all, of these problems. The revisions in employment policies described below generally are consistent with the kind of visa we can reasonably hope to obtain. In the interim, they also would limit the difficulties inherent in the use of the J visa by confining the period of employment during which the J visa is used.

-2-

## SUMMARY OF REVISED POLICIES

The Bureau of Broadcasting intends to revise procedures governing the employment of non-U.S. citizens to include the following features:

- an initial time-limited, excepted appointment which will not exceed two years;

- establishment of this two-year period as a trial period;

- the Office of Personnel will contact the Service Chief after 18 months to initiate the review and decision-making process which normally will be completed within the two year period;

- decision by Bureau management before the expiration of the initial appointment either to offer long-term, continued employment and sponsorship for an immigrant visa or to allow the initial appointment to expire without renewal or extension;

- an opportunity for employees to seek reconsideration of a decision not to offer long-term employment;

- an excepted appointment without time limitation for employees who accept an offer by the Bureau of long-term employment.

## REVISED EMPLOYMENT POLICY

### INITIAL OFFER

The initial offer of employment to a non-U.S. citizen will be for a time period not-to-exceed two years (currently consisting of a six-month contract and an 18-month appointment). All pre-employment materials, documentation and discussions will be designed to reinforce the fact that employment is for a limited time and that long-term employment will depend on an individual's performance and conduct as well as on a management determination that the Bureau has a continuing need for the employee's services.

The initial two-year period will be documented as in current operations by a six-month personal services contract followed by an excepted appointment of not more than eighteen months' duration.* All benefits currently offered will continue. If the Bureau obtains a visa specific to these purposes, retirement benefits will be added to the benefits package.

### TRIAL PERIOD

The initial two-years of employment will constitute a formal trial period. The trial period will test actual on the job performance and conduct and will be used in determining an employee's fitness for successful long-term service.

* We intend to institute use of an initial two-year appointment in place of the current combination of a six-month contract and an 18-month appointment if we are able to eliminate the need for the six-month contract.

000027

-3-

## TERMINATION OF EMPLOYMENT DURING THE TRIAL PERIOD

Employment with the Bureau of Broadcasting may be terminated at any time during the initial two-year trial period based upon deficiency in performance, unsatisfactory conduct, lack of aptitude or cooperativeness, or undesirable suitability characteristics evidenced by the employee's activities either prior to or during employment, during or outside official working hours. This action may also be based upon changes in the programming and/or staffing needs of the employing organization.

If the employee is to be separated, he or she normally will be notified by the Director of Personnel in writing no fewer than thirty (30) calendar days prior to the effective date of the separation. The notification will include the reasons for the termination. The provisions of Title 5 of the Code of Federal Regulations conveying appeal and grievance rights do not apply to such terminations.

## OFFER OF LONG-TERM EMPLOYMENT

Within the first two years of employment a determination will be made on whether to offer an employee long-term employment. The Office of Personnel will contact the Service Chief six months prior to the end of the first two years of an individual's employment to initiate the review and decision-making process.

In extraordinary cases, Division Chiefs may elect to initiate the review after one year. In the very rare and exceptional case in which a decision on long-term employment cannot be made within the first two years of employment (e.g., employee absent for a prolonged period of time), an employee may be given a new temporary appointment of up to one additional year during which the decision must be made. Such an appointment must be justified by the Division Chief in writing and must have the approval of the Director of VOA Programs and the concurrence of the Director of Personnel.

The criteria upon which management will base the determination on whether to offer an employee long-term employment are:

- Performance by the employee which demonstrates fully his or her fitness and qualifications for continued employment. Normally, such performance is characterized as excellent or as having the potential to perform in an excellent manner;

- Conduct by the employee which is fully professional;

- Personal and/or character traits (e.g., willingness to accept supervision and cooperate with others and attitude towards work), which warrant continued employment;

- Suitability and security standards are fully met by the employee;

-4-

- Needs of the service, which includes consideration of such factors as:

    - availability of other candidates and their relative skill levels;

    - the benefits of hiring new employees who could be expected to enhance the currency of the language usage, provide fresh understanding of the cultural and political environment of the target area, and/or provide fresh programming ideas. In the case of current employees who have completed three or more years of service with VOA (under other than a POV arrangement), management will consider such additional factors as the level and currency of the employee's present language skills and knowledge of the cultural and political environment of the target area, the feasibility of improving these through training and/or travel to the target area, and the employee's past contributions to new programming ideas as well as the contributions they might reasonably be expected to make in the future; and

    - programming and staffing needs and anticipated future changes (e.g., increase or decrease in staff levels; changes in types of skills needed) in these needs and the ability and potential of the employee to meet these needs; and

  - other appropriate factors affecting the determination as to whether long-term employment of the employee is in the best interest of the Bureau.

Based on these criteria, the Service Chief will make a recommendation as to whether the employee should or should not be offered long-term employment (and, therefore, sponsorship *) and forward this recommendation along with the specific reasons for the recommendation to the Division Chief. The Division Chief will review the recommendation and forward it with his or her own written recommendation to the Director of the Office of VOA Programs.

The Director, B/VOA, shall determine, with the concurrence of the Director, B/P, whether to offer the employee long-term employment and sponsorship.

The employee will be notified in writing of the decision, i.e., that he or she is being offered long-term employment or that his or her appointment is to be allowed to expire without extension or renewal. If the employee is not being offered long-term employment, he or she will also be notified of the opportunity to have that decision reconsidered. This notice normally will be communicated to the employee at least thirty (30) calendar days prior to the end of his or her appointment.

* Decisions on whether to offer long-term employment must still be made for employees who may already have obtained an immigrant visa independent of Bureau sponsorship, either prior to or subsequent to their employment by the Bureau.

-5-

## OPPORTUNITY FOR RECONSIDERATION OF A DECISION NOT TO OFFER LONG-TERM EMPLOYMENT

Should an employee be notified that he or she will not be offered long-term employment and sponsorship, that employee may present any information considered relevant to the decision to the Director of VOA Programs who will seek the advice and concurrence of the Director of Personnel in determining whether upon reconsideration to offer the employee long-term employment and sponsorship. The Director of VOA Programs will notify the employee of his or her decision.

This opportunity shall not be construed as conferring appeal or grievance rights of any type to the employee and will not extend the notice period or his or her appointment. The decision of the Director of VOA Programs and Director of Personnel with regard to this determination shall be final.

## IMPLEMENTATION OF DECISIONS

By the end of the initial two years of employment, the decision on long-term employment will be implemented. If an employee is not offered long-term employment, his or her appointment will expire without renewal or extension at the end of his or her second year of employment. In such cases, if the employee was originally hired overseas, the Agency will pay return travel expenses, unless the employee's visa status has changed since initial appointment, in accordance with the conditions under which the individual was appointed.

If a long-term appointment and sponsorship are offered and accepted, the employee will be converted to an indefinite excepted appointment without time limitation (annual renewals or extensions of this appointment will not be necessary).

Acceptance of a long-term appointee and sponsorship for immigrant visa by a employee terminates the Bureau's obligation to pay return travel expenses.

All materials necessary to the visa adjustment process normally will be completed and forwarded to the Immigration and Naturalization Service within six months of the employment decision date.*

If an offer of long-term employment and sponsorship is not accepted by the employee, his or her appointment will normally expire at the end of his or her second year of employment without renewal or extension. The appointment may be extended for up to one additional year with the approval of the Director of Programs and concurrence of the Director of Personnel.

  * Employees will be responsible for completing their portion of this
  package in a timely manner.

-6-

## CURRENT NON-U.S. CITIZEN EMPLOYEES OF THE BUREAU

All current non-U.S. citizen employees of the Bureau who have been employed for 18 months or more will be reviewed immediately for long-term employment and, if needed, sponsorship.  The Office of Personnel will initiate the decision-making process with appropriate Bureau management.  The Office of Personnel will continue this process for current employees as they reach 18 months of employment.

This review will be conducted in accordance with the criteria, procedures and guidelines described above on pages 3, 4 and 5.

Employees previously sponsored by the Bureau for an immigrant visa will be offered long-term employment unless an exception is approved by the Director of VOA Programs with the concurrence of the Director of Personnel based on the recommendations of the Service and Division Chiefs, which must address the criteria listed above.

Current employees not offered long-term employment will be notified in writing and will have an opportunity for reconsideration as described above.

As described above, appointments of employees not offered long-term employment will not be renewed or extended.  Exceptions will be made when necessary to provide a thirty (30) calendar day advance notice to current employees.

## OTHER POLICIES

Other regulations and policies governing the employment of non-U.S. citizens unaffected by these revisions continue to be in effect.

The Bureau of Broadcasting and AFGE Local 1812 have agreed to these revised policies on February 24, 1992.

APPROVED BY:

For the Bureau of Broadcasting:          For AFGE Local 1812:

Sid Davis, Director                       Richard A. La Dieu
Office of Programs                        President, AFGE Local 1812

Janice Brambilla, Director
Office of Personnel

**Voice of America**

*Washington, D.C. 20547*



VOA

USIA

April 19, 1988

MEMORANDUM FOR:    Mr. Norman Painter
                   President, AFGE Local 1812

FROM:              VOA/PL  – Marv Goodman

SUBJECT:           Procedures for Selection, Promotion, and Employment of
                   Non–U.S. Citizens in the Presence of Qualified U.S. Citizen
                   Competitors

MOA V–A, Section 820 provides in subsection 822.1 that for positions in VOA,
qualifications of U.S. citizens and non–U.S. citizens are to be evaluated,
when in the presence of a qualified U.S. citizen competitor, a non–U.S.
citizen candidate is competing for appointment, promotion, or retention.
Subsection 822.1 provides that qualifications determinations will be based on
evaluation criteria established by VOA/P.

The attached document is provided for your review prior to implementation.
When signed and dated by the Director of Personnel, it will serve as a VOA/P
internal operating guideline.  Please contact me by close–of–business May 3,
1988, if you have any questions, comments, or suggestions regarding these
guidelines.

Thank you.

000032

*United States Information Agency*

GUIDELINES FOR SELECTION, PROMOTION, AND EMPLOYMENT OF NON-U.S. CITIZENS
IN THE PRESENCE OF QUALIFIED U.S. CITIZEN COMPETITORS

The United States Information and Educational Exchange Act, PL 80-402, as amended, authorizes VOA to employ, without regard to the civil service and classification laws, non-U.S. citizens in a variety of functions related to non-English language programming. The law provides that such non-U.S. citizens may be employed only when there are no suitably qualified U.S. citizens available for the position. Based on Congressional Committee reports, the Agency has interpreted the term "suitably qualified" to mean "equally or better qualified."

MOA V-A, Section 820 provides in subsection 822.1 that for positions in VOA these relative qualifications determinations will be based on evaluation criteria established by VOA/P. Evaluations of U.S. citizens and non-U.S. citizens under subsection 822.1 are to determine if, in the presence of a qualified U.S. citizen competitor, (1) a non-U.S. citizen candidate can be appointed, (2) a non-U.S. citizen employee can be promoted, and (3) a non-U.S. citizen employee can be retained. The following guidelines apply to these evaluations.

When Evaluation is Required -- Evaluation under these guidelines normally is required at any time when:

1. a non-U.S. citizen is selected for appointment or promotion to a position in the presence of a qualified U.S. citizen competitor; or

2. a qualified U.S. citizen makes known to VOA his or her candidacy for a position either occupied by or equivalent to one occupied by a non-U.S. citizen unless the U.S. citizen is selected for such a position.

However, there is no requirement to evaluate a U.S. citizen:

1. who is an Agency employee serving at the same or higher grade as the position proposed to be filled by a non-U.S. citizen unless the position has known documented promotion potential higher than that of the U.S. citizen's position;

2. who is an Agency or other U.S. Government employee whose most recent performance appraisal in a position with similar duties or with performance elements directly related to the knowledge, skills, abilities, or other characteristics critical to performance in the position proposed to be filled by a non-U.S. citizen indicates an overall rating below the "fully successful" level;

3. who is an Agency or other U.S. Government employee whose most recent performance appraisal indicates a rating below the "fully successful" level in an element which is directly related to knowledge, skill, ability, or other characteristic critical to performance in the position proposed to be filled by a non-U.S. citizen; or

4. who has been separated or resigned after being notified that he or she would be separated from the most recently held related employment for performance or conduct reasons.

Determinations of Relative Qualifications — A non-U.S. citizen may be selected, promoted, or retained in the presence of qualified U.S. citizen competitors if, after full and fair consideration of all candidates against the job requirements, the selecting official determines that the non-U.S. citizen is better qualified than any U.S. citizen competitor and the superior qualifications of the non-U.S. citizen are supported by acceptable written documentation provided by the selecting official. In no case, however, may a non-U.S. citizen (employee or applicant) be selected or promoted under circumstances which would not permit the action for a U.S. citizen.

Consideration and Evaluation of Candidates — In making determinations of relative qualifications, the selecting official should evaluate candidates according to job-related factors having a direct relationship to individuals' qualifications and fitness for the position. Examples of such factors include but are not limited to:

- The relatedness of candidates' overall education and experience backgrounds to the work of the position;

- The level of responsibility exercised and quality of work produced in previous jobs;

- Awards and other professional or academic recognition received;

- Specific professional accomplishments or a pattern of overall professional accomplishments and advancement to positions of greater responsibility;

- Recency of experience when current knowledge in a job-related area can be shown to have a bearing on qualifications;

- Traits related to quality of performance and versatility, such as initiative, willingness to take and follow instructions, reliability and dependability and interpersonal communication skills;

- The ability to contribute to the overall operating efficiency and effectiveness of the organization or work unit; and

- Quality of past performance in specific job-related functions.


Sources of information on which evaluations may be based include but are not limited to:

- Application forms;

- Reference checks;

- Examination results;

- Writing samples and voice auditions;

- Performance appraisals; and

- Interviews.

<u>Written Documentation</u> — To be acceptable, written documentation must:

- clearly establish the superior qualifications of the non-U.S. citizen candidate or employee;

- be based solely on job-related criteria; and

- be based on a full and fair evaluation of all candidates.  A full and fair evaluation normally includes a complete and objective evaluation of all available, pertinent application and performance documents and a personal interview when appropriate.

## Approval of Actions

To obtain approval for selections, promotions, or retentions of non-U.S. citizens in the presence of U.S. citizen competitors, the selecting official will transmit the case file, along with written documentation in support of the proposed action, by memorandum through his or her division chief to the Chief, Operations Division, Office of Personnel (VOA/PO).  The Chief, VOA/PO will either (1) approve the proposed action and notify the selecting official and division chief, or (2) recommend disapproval and forward the case to the Director of Personnel (VOA/P).  The Director of Personnel may approve the proposed action or, jointly with the Director of Programs (VOA/B), disapprove the proposed action.


_____                    _____
Janice Brambilla                            Effective Date
Acting Director of Personnel

May 18, 1987

MEMORANDUM FOR:    VOA/P - Glenn Sutton
                   VOA/PO - Johnnie Manzó

THROUGH:           VOA/POP - Jane Fox

FROM:              VOA/POP - Tim Barnhart

SUBJECT:           Methods for Comparing Citizen and non-Citizen
                   Qualifications:  Substantiating Regulation and Cases

This is in reference to an earlier memo on this subject from me presenting a
proposal for revising our methods for comparing citizen and non-citizen
qualifications.  At your request, Monica and I have researched precedent cases
for additional guidance on the legitimacy of our proposal.

BACKGROUND

The United States Information and Educational Exchange Act, PL 80-402, as
amended, authorizes VOA to employ non-U.S. citizens in a variety of functions
related to non-English language programming only when there are no suitably
qualified U.S. citizens available for the position.  After reviewing
Congressional Committee reports, USIA General Counsel has interpreted the term
"suitably qualified" to mean "equally or better qualified".  General Counsel
left to VOA the task of developing a method for judging whether citizens were
"equally or better qualified."  It is that method which is at issue.

VOA's current method of making that decision is as follows:  a panel of
experts reviews relevant documentation pertaining to the qualifications of
citizen and non-citizen candidates for a given IRB position.  Based on this
review of documentation, the panel determines relative qualifications and, if
a citizen is better qualified (e.g., obtains a higher score), a non-citizen
cannot be selected.  In effect, the panel makes the final selection decision.

We feel that this method, at worst, forces us to select the wrong candidates
and, at best, is slow, bureaucratic, and a waste of resources.  Personnel
selection decisions, we have argued, are inherently subjective in that they
cannot be based purely on objective facts but must rest on complex judgments
regarding personality, character, skill, and other relatively intangible
qualities.  A panel, with little personal knowledge of either the position or
the candidates, cannot make good selection decisions precisely because they
have been cleansed of all subjectivity and cannot consider the complexities
involved.

The question which must be settled is this:  Can a selecting official, using
his subjective evaluation of all candidates, legitimately determine the
relative qualifications of citizens and non-citizens?  Can this decision be
defended in court?  In our view, it clearly can.  In fact this decision is at
the very heart of the Federal Merit System.

Consider the statutory explanation of Merit System principles in Title 5: "... selection and advancement should be determined solely on the basis of relative ability, knowledge, and skills, after fair and open competition which assures that all receive equal opportunity." (5 USC 2301) The goals of Title 5 are practically identical to the goals stated in the Cultural and Educational Exchange Act governing our employment of non-U.S. Citizens. They are, in effect, to hire based on merit, hire the best qualified candidate, whether citizen or non-citizen.

In developing its methods for judging relative qualifications, OPM is very clear on one point: while procedures for narrowing the field of candidates should be relatively well-defined and systematic, the final selection decision is a clear management right and must be unconstrained by all but the most general of principles. "Selection procedures will provide for management's right to select or not select from among a group of best qualified candidates. They will also provide for management's right to select from other appropriate sources, such as reemployment priority lists, reinstatement, transfer, handicapped, or Veterans Readjustment eligibles or those within reach on appropriate OPM certificates." (FPM 335, 1-4) And again, "While the procedures used by an agency to identify and rank qualified candidates are proper subjects for formal complaints or grievances, nonselection from among a group of properly ranked and certified candidates is not an appropriate basis for a formal complaint or grievance." (FPM 335, 1-6) Clearly, OPM is confident that merit principles will best be served by relying upon the judgment of a selecting official. They have carved out a strong, almost sanctified niche for the selection decision.

What we propose is simply an analagous approach. If OPM is confident that broad latitude in the selection decision is consistent with merit principles, then we have confidence that broad latitude in the selection decision is also consistent with the mandate of the Information and Educational Exchange Act since both revolve around the process of judging relative qualifications.

## CASES

We looked through a series of MSPB and FLRA cases and an arbitration case to try to buttress our thinking, but found little discussion of this issue, which didn't surprise us. This issue is so clearly spelled out, there is little room to challenge it. We did find two cases, however, which help bring out some of the issues surrounding our proposal.

## AFGE V. FLRA, United States Court of Appeals

This case centered around an attempt by AFGE to negotiate a provision which would force selection from an Agency's Reemployment Priority List. The Court, in analyzing this case, reaffirmed an Agency's right to select from many sources. The court's conclusion: "Thus, the FPM would clearly permit management to select a "repromotion eligible" for promotion. It just as clearly, however, requires that management not be obligated to do so, as would be the case under AFGE's proposal. In consequence, the FPM, on the one hand, and AFGE's bargaining proposal, on the other, are inconsistent, as the FLRA rightly concluded."

In addition to confirming the sanctity of the selection decision, this case makes the further point that the sanctity of that decision is not an option but a requirement which cannot be bargained away. The FLRA and the court upheld the agency's position regarding 5 USC section 7106(a)(2)(C) which requires "management to retain discretion 'to make selections for appointments from - (i) among properly ranked and certified candidates for promotion; or (ii) any other appropriate source.'"

## USIA and AFGE    Arbitration (3/12/84)

This matter came before the arbitrator as a result of a disagreement between the Agency and AFGE regarding the non-selection of a bargaining unit member for promotion. The union alleged that the Agency violated Article XXII (Merit Promotion and Staffing) of the negotiated labor agreement because the position was advertised outside the Agency when there existed within the Agency suitably qualified candidates. Article XXII states:

> It is also Agency policy to promote from within whenever possible. In filling vacancies above the entry or apprentice level, first consideration will be given to Agency employees. However, if the selecting official determines that there are not suitable internal candidates, he/she will submit a request to the Director, Office of Personnel, MGT/P or Director of Personnel, B/P as appropriate, for authority to obtain a certificate of and/or to consider outside applicants.

The Arbitrator ruled in favor of USIA arguing that since an Agency employee was selected in the end, the union had no case. Nevertheless, the arbitrator proceeded to evaluate and comment on the recruiting methods USIA used in this case and their validity regarding the above article.

After listening to testimony from the selecting official, the Arbitrator concluded that the selecting official had "probable cause" to believe there were no suitable internal applicants and thus the decision to consider outside candidates was proper. It is worth noting some of the testimony by the selecting official that convinced the Arbitrator that no suitable candidates existed.

> I was persuaded that I needed an extra dimension in that unit, and I was hoping to get someone from another government agency, to at least see applications from other government agencies, and perhaps find someone in that process who would give me that extra dimension in the job I felt was necessary.

This "extra dimension" was clearly not a formal rating factor, nor should it have been. By recognizing this testimony as evidence that no "suitable candidates" existed within the Agency, the Arbitrator has implicitly endorsed our major point that selections must rely heavily on the subjective judgment of the selecting official and that such judgment is valid, persuasive evidence in resolving a grievance as to who is "suitably qualified."

The Arbitrator goes on to state the following, however: "The arbitrator suggests that the Agency would be well-advised to proceed more formally, and to have the selecting officer expressly declare in a written request for outside posting that he had made the necessary preliminary determination." The Arbitrator is rightfully pointing to the advantages to be gained from adopting a systematic procedure to control and evaluate such decisions. The method suggested by the Arbitrator, however, is simply to document decisions as they are made and to document the reasons behind them. This is essentially the method we propose for making qualifications decisions regarding citizens and non-citizens.

## ANALYSIS

Clearly, our proposal for comparing citizen and non-citizen qualifications carries higher risk than the current method. But the risk is accompanied by important management benefits as outlined in our earlier memo. The decision to be made now is a matter of risk-benefit analysis. Is the added risk worth the added gain?

With the current method, a grievance concerning non-selection of a U.S. citizen would likely focus on procedural issues (e.g., was the selection panel properly constituted, was the panel properly instructed, etc.). The current method defines a rigorous procedure designed to ensure that the decision as to who is most qualified is based purely on well-documented evidence of qualifications. If the procedure is valid, then the only issue to be settled is whether or not the procedure was followed.

The method which we propose, while it still constitutes a clear, structured process, is intentionally designed to rely much less on process and much more on the judgment of the selecting official. Consequently, the central issue in a grievance could easily be the selecting official's judgment, not the extent to which procedures were followed. This increases the potential that such grievances will turn into an investigation of the qualifications of the candidates involved and a determination by the Arbitrator himself as to which candidate was best qualified.

Clearly, the risk of losing a grievance of the latter sort is much greater because the decision to select or not to select, as we have pointed out, is very much a matter of judgment. We designed our procedure, however, with an important safety valve. The decision of the selecting offical, when citizen candidates are being passed over in favor of non-citizen candidates, must be reviewed and concurred in by VOA/P. It is our intention that VOA/P will concur only if absolutely certain that the individual being selected is in fact better qualified and that a strong case supporting such a decision can be made in any subsequent grievances. In other words, it will be incumbent upon us to take the Arbitrator's role and be totally convinced by the selecting official's written "testimony" as to the superior qualifications of the non-citizen.

The question as to our obligation to bargain this proposal should also be raised. In my opinion, arguments for both sides can be made. The argument for not bargaining goes like this: The proposal at issue is concerned with selection procedures, which are a clear management right. It is the same as if we were to propose that all selections in the Office of Programs must be made by the applicable Division Chief, not the Service or Branch Chief. That is a selection procedure, and we have no obligation to bargain matters pertaining to how the selection decision is made. Likewise, the process by which we evaluate comparative qualifications of citizens and non-citizens is a selection process. The process of determining how candidates will be certified has already been completed and is not at issue. The only issue is how management will determine which of those certified candidates to select.

The union, on the other hand, might argue that this process is not a process for making selections but only a continuation of the process for determining who is best qualified, a process the union should be consulted on. The process of judging relative qualifications does not hinder management's right to select because it still leaves us free to select from among any citizens who are certified as well as to select from other outside sources. I would, of course, counter that argument in this way: Management has the right to make selections from "among properly ranked and certified candidates." The process at issue will tell us that some properly ranked and certified candidates (non-citizens whom the process concludes are less qualified than citizens) cannot be selected, thus denying us our right to select them.

The negotiability issue is a toss-up in my opinion. I would resolve it by asking first if we want to negotiate this issue. Do we have anything to gain from it? I don't think it likely the union will agree to give more discretion to management officials as outlined in this proposal. They will likely favor the status quo because it is a highly structured process. What we may get is a process that is somewhere in betweeen — less structured than the current process but more structured than what I have proposed. The advantage of negotiating is getting a process in which the union has concurred and will support. Having union support for the process could help us minimize future grievances.

<u>CONCLUSION</u>

What we are proposing does increase the risk that grievances will be filed against us, as well as increasing the risk that we could lose some of those grievances. This risk, however, must be weighed against the substantial benefits which will accrue as a result of our proposal. Despite the risks this proposal carries, I am convinced we can overcome them by reviewing the selecting official's decision with a cautious eye. If we implement this process and are successful in controlling it for a year or so, our corporate culture should get used to the process and come to respect it in the same way the decision of the selecting official regarding promotion and selection cases not involving non-citizens is now respected. I would not want to see us negotiate this process if the union will insist on the status quo and offer no compromises. Nor do I want us to establish a precedent for negotiating selection procedures. For these reasons, I conclude we should not negotiate.

April 15, 1987

MEMORANDUM FOR:    VOA/P - Glenn Sutton

FROM:    VOA/PO - Johnnie Manzo

SUBJECT:    Selection and Employment of Non-U.S. Citizens in the
Presence of Qualified U.S. Citizens

Summary

The Office of Personnel, Operations Division, in working with various VOA
managers who employ non-U.S. citizens, has found its current methods of
determining the employability and retention of non-U.S. citizens to be
inadequate for our needs.  Specifically, we feel that the methods generally
are overly burdensome and do not in many cases sufficiently take into
consideration the full range of candidate and employee attributes which should
form the basis for an informed selection decision.  We feel the evaluation
methods should be reviewed and adjusted to improve their effectiveness in
identifying the best qualified candidates in a manner which is both flexible
and defendable.

Background

The United States Information and Educational Exchange Act, PL 80-402, as
amended, authorizes VOA to employ, without regard to the civil service and
classification laws, non-U.S. citizens in a variety of functions related to
non-English language programming.  The law provides that such non-U.S.
citizens may be employed only when there are no suitably qualified  U.S.
citizens available for the position.  Based on Congressional Committee
reports, the term "suitably qualified" has been interpreted to mean "equally
or better qualified."  MOA V-A, Section 820 provides in subsection 822.1 that
for positions in VOA the criteria upon which these relative qualifications
decisions will be made will be established by VOA/P.

The current method of evaluation was adopted in December 1983 and provides for
two basic means of evaluating candidates:  (1) comparison of test scores
attained in competitive examination and (2) assessment of relative possession
of job-related knowledge, skills and abilities by a panel of three
evaluators.  Their assessment is based on a review of job application forms,
performance appraisals and other means of appraisal such as writing samples or
voice auditions.  The types of candidate ranking processes used are typical of
those used in merit promotion and related actions to narrow down the group of
qualified applicants for a given job to the best-qualified group (typically 3
- 10) which is referred to the selecting official for employment consideration
and from which the selection is made.

The general practice in competitive staffing actions of referring groups of
candidates and the exercise of wide discretionary authority by the selecting
official within the group referred reflect two essential facts about such
rating processes:  (1) that the rating and ranking mechanisms lack sufficient
precision to assess applicant qualifications beyond a general grouping; and
(2) that the mechanisms can only remotely measure a number of candidate
attributes which are as important as indicators of potential for successful
performance in the job as are knowledge, skills and abilities gained in
previous education and experience.  Such attributes include individual
initiative, ability to work under pressure, ability to take and carry out

-2-

instructions, interpersonal communication skills, etc. Assessing these skills and weighing them against other job-related qualifications requires not only job and organizational knowledge, but also professional judgment that normally cannot be applied by a panel composed of experts unassociated with the particular work environment of the position to be filled, no matter how expert or well briefed the panel members are.

Another problem which arises from use of panels in a number of these cases is the reliance on ratings derived from different types of qualifications information depending on the status of the candidate. For example, when comparing the qualifications of a VOA and a non-VOA candidate, we have a great deal of reliable, detailed performance information for the one, but far less for the other. Comparing two such widely different application packets against the same set of rating criteria often produces questionable results; also, it makes the development of the rating criteria themselves far more difficult than it would be if, as in other competitive staffing actions, the basic means of assessment are the same for all competitors.

The evaluations of U.S. citizens vs. non-U.S. citizens serve three purposes: these are to determine if, in the presence of a qualified U.S. citizen competitor, (1) a non-U.S. citizen candidate can be appointed, (2) a non-U.S. citizen employee can be promoted, and (3) a non-U.S. citizen employee can be retained. Unless a non-U.S. citizen attains a higher score in the evaluation than any competing U.S. citizen, he or she may not be appointed or, if an employee, may not be promoted or may be subject to removal by displacement by an equally or higher scoring U.S. citizen. In effect, the evaluation process in these cases serves not only to identify the best-qualified group of candidates but also to make the finer qualifications distinctions among that group, a function better carried out by close examination of the candidates based on the specific job requirements and the exercise of professional judgment by the selecting official.

Recommendation

The evaluation process should be changed to provide for the evaluation of the fullest range of candidate qualifications. The following revised evaluation policy is proposed:

When evaluation is required – Evaluation under these guidelines normally is required at any time when:

(1)  a non-U.S. citizen is selected for appointment or promotion to a position in the presence of a qualified U.S. citizen; or

(2)  a qualified U.S. citizen indicates availability for a position occupied by a non-U.S. citizen and the U.S. citizen is not selected for that position or an equivalent position.

However, there is no requirement to evaluate a U.S. citizen:

(1)  who is an Agency employee serving at the same or higher grade as the position proposed to be filled by a non-U.S. citizen unless the position has known documented promotion potential higher than that of the U.S. citizen's position;

-3-

(2)  who is an Agency or other U.S. Government employee whose most recent
performance appraisal in a position or with performance elements
directly related to the knowledge, skills, abilities, or other
characteristics critical to performance in the position proposed to
be filled by a non-U.S. citizen indicates an overall rating below the
"fully successful" level;

(3)  who is an Agency or other U.S. Government employee whose most recent
performance appraisal indicates a rating below the "fully successful"
level in an element which is directly related to knowledge, skill,
ability, or other characteristic critical to performance in the
position proposed to be filled by a non-U.S. citizen; or

(4)  who has been separated or resigned after being notified that he or
she would be separated from the most recently held related employment
for performance or conduct reasons.

Methods of evaluation – The employment status of the candidates and the
type of position to be filled will determine the method of evaluation as
follows.  The requirements, as described below, are in terms of
justification for the selection, promotion or retention of non-U.S.
citizens.  A U.S. citizen may be selected or promoted and is retained
without regard to competing non-U.S. citizens.

1.    Selection for positions requiring written and/or voice examinations
      when no candidate is a current Agency employee.  A higher examination
      score will be considered acceptable documentation of a non-U.S.
      citizen's superior qualifications at the option of the selecting
      official if, after full and fair consideration of all candidates, the
      selecting official determines that the non-U.S. citizen is better
      qualified than any U.S. citizen competitor.  The selecting official,
      however, may select any non-U.S. citizen candidate from among the
      highest-ranking candidates (citizens and non-citizens) for the
      position as long as there are less than three U.S. citizen candidates
      with higher examination scores, if the superior qualifications of the
      non-U.S. citizen selected are supported by written documentation
      provided by the selecting official.

2.    All other evaluations.  A higher score in a merit promotion ranking
      process under MOA VA-460 or VA-465 will be considered acceptable
      documentation of a non-U.S. citizen's superior qualifications at the
      option of the selecting official if, after full and fair
      consideration of all candidates, the selecting official determines
      that the non-U.S. citizen is better qualified than any U.S. citizen
      competitor.  The selecting official, however, may select or promote
      any non-U.S. citizen candidate from among the best qualified
      candidates (citizens and non-citizens) for the position if the
      superior qualifications of the non-U.S. citizen are supported by
      written documentation provided by the selecting official.

000043

-4-

A non-U.S. citizen may be selected, promoted or retained if, after full and fair consideration of all candidates, the selecting official determines that the non-U.S. citizen is better qualified than any U.S. citizen competitor and the superior qualifications of the non-U.S. citizen are supported by acceptable written documentation provided by the selecting official, if no merit promotion ranking process occurs.

Written Documentation - Written documentation required under paragraphs #1 and #2 above, consists of an analysis and evaluation by the selecting official of the relative qualifications of any non-U.S. citizen proposed for appointment, promotion or retention and any qualified U.S. citizen competitor for the position.  The analysis and evaluation must be limited to job-related factors having a direct relationship to the individual's qualifications and fitness for the position.  Examples of such factors include but are not limited to:

- The relatedness of the candidates' overall education and experience backgrounds to the work of the position;

- The level of responsibility exercised and quality of work produced in previous jobs;

- Awards and other professional or academic recognition received;

- Specific professional accomplishments or a pattern of overall professional accomplishments and advancement to positions of greater responsibility;

- Recency of experience when current knowledge in a job-related area can be shown to have a bearing on qualifications;

- Traits related to quality of performance and versatility, such as initiative, willingness to take and follow instructions, reliability and dependability and interpersonal communication skills;

- The ability to contribute to the overall operating efficiency and effectiveness of the organization or work unit; and

- Quality of past performance in specific job-related functions.

Sources of information on which evaluations may be based include but are not limited to:

- Application forms;

- Reference checks;

- Examination results;

- Writing samples and voice auditions;

- Performance appraisals; and

- Interviews

**000044**

-5-

To be acceptable, written documentation must:

- clearly establish the superior qualifications of the non-U.S. citizen candidate or employee;

- be based solely on job-related criteria; and

- be based on a full and fair evaluation of all candidates. A full and fair evaluation normally includes a complete and objective evaluation of all available, pertinent application and performance documents and a personal interview when appropriate.

## Approval of actions

1. For actions where examination scores or merit promotion ratings provide adequate documentation of qualifications, no further approval is required.

2. To obtain approval for all other actions, the selecting official will transmit the case file, along with written documentation in support of the proposed action, by memorandum through his or her division chief to the Chief, Personnel Operations Division, Office of Personnel (VOA/PO). The Chief, VOA/PO will either (1) approve the proposed action and notify the selecting official and division chief or (2) recommend disapproval and forward the case to the Director of Personnel (VOA/P). Final decisions to disapprove proposed actions will be made jointly by the Director of Personnel and the Director of Programs (VOA/B).

7129r

**Personnel Handbook**
*for Managers and Supervisors*





Director of Personnel

Director of VOA

1000–General Personnel Topics                    August 15, 1986

The purpose of this Handbook Chapter is to cover personnel topics which are not covered in other Handbook Chapters.

We recommend that each manager and supervisor carefully review and be familiar with each of the sections of this Chapter.

| SECTION | TOPIC | PAGE |
|---|---|---|
| 1001 | Group Dismissals | 1001-1 |
| | Policy | 1001-1 |
| | Responsibilities of various offices | 1001-1 |
| | References | 1001-2 |
| | Guidelines | 1001-3 |
| | 1. Nonessential employees | 1001-3 |
| | 2. Essential employees | 1001-4 |
| | 3. Emergency situations | 1001-5 |
| | 4. Additional information | 1001-5 |
| | 5. Parking, food, and sleeping arrangements | 1001-5 |
| 1002 | Non-US Citizen Employment and Personnel Services | |
| | Authority | 1002-1 |
| | Policy | 1002-1 |
| | Responsibilities of various offices | 1002-1 |
| | References | 1002-4 |

1000-1

000046

August 15, 1986

Guidelines                                    1002-6

1. Recruitment                                1002-6
2. Assignments of responsibilities
   to non-US citizens                         1002-6
3. Pre-employment requirements                1002-9
4. Orientation and settlement                 1002-11
5. Security clearances                        1002-12
6. Personal services contracts                1002-12
7. Conversion to and extension of
   excepted service appointments              1002-13
8. Displacement and termination               1002-14
9. Change to immigrant visa                   1002-15
10. Conversion to the competitive
    Civil Service                             1002-17
11. Rotational assignments                    1002-18
12. Other personnel actions                   1002-19

1003       Delegations of Personnel Authority

General                                       1003-1

Delegation Charts

000047

August 15, 1986

# 1002 - Non-U.S. Citizen Employment and Personnel Services

### Authority

Under the authority of Public Law 80-402, as amended, the Voice of America (VOA) may employ non-U.S. citizens who are better qualified than any available U.S. citizen in positions which require (1) services related to the translation or narration of colloquial speech in foreign languages, (2) the preparation and production of foreign language programs, or (3) the selection, evaluation, editing, and adaptation of source materials for use in foreign language programming.

### Policy

It is VOA policy to employ the talents of non-U.S. citizens in production of VOA programming and to provide assistance to these valued members of VOA's staff in moving and settling into the Washington D.C. area, consistent with the personnel policies outlined in this Handbook section.

### Managerial or Supervisory Responsibilities

- Recruit from sources sufficiently broad to ensure adequate numbers of suitably qualified candidates.

- Select non-U.S. citizens for appropriate positions only when equally or better qualified U.S. citizen candidates are not available.

- Secure appropriate approvals for hiring non-U.S. citizens when qualified U.S. citizens are available.

- Greet any new non-U.S. citizen hires who are recruited overseas upon arrival in the U.S. and provide general advice and guidance on the Washington D.C. area.

- Initiate promotions, reassignments, and temporary assignments (e.g., details and temporary promotions) of non-U.S. citizen employees.

000048

August 15, 1986

.   Appraise performance and recognize accomplishments of
    non-U.S. citizen employees.

.   Prepare position descriptions covering GG positions. Such
    descriptions must include duties which support incumbency
    by a non-U.S. citizen.

.   Establish work schedules and ensure compliance with time
    and attendance requirements.

.   Contact the Labor and Employee Relations Division (VOA/PL)
    on performance and conduct problems.

**Office of Personnel Responsibilities**

.   The Operations Division (VOA/PO) -- formerly the
    Recruitment and Placement Division and the Position and Pay
    Management Division -- will:

    +   Provide advice and assistance to managers and
        supervisors on recruitment strategies and sources for
        non-U.S. citizen candidates.

    +   Administer the testing process for International Radio
        Broadcaster positions.

    +   With the exception of employees born in certain
        designated countries, make interim suitability
        determinations in coordination with supervisors and
        managers and communicate final suitability
        determinations.

    +   In coordination with administrative officers, provide
        information, through the offer cable, to non-U.S.
        citizens on pre-employment requirements, travel, and
        settling-in allowances.

    +   Advise the Deputy Director for Programs, managers, and
        supervisors on selection, promotion, and retention of
        non-U.S. citizens when qualified U.S. citizens are
        available; and recommend appropriate action to the
        Deputy Director for Programs and Director of Personnel.

000049

August 15, 1986

- The Labor and Employee Relations Division (VOA/PL) will advise managers, supervisors, and employees on performance and conduct problems, workers' compensation programs, retirement, performance appraisals, and awards.

- The Training and Development Division (VOA/PT) will advise managers, supervisors, and employees on training and career development programs.

The Personnel Office of Radio Marti (VOA/MP) will provide separate guidelines governing non-U.S. citizens employed in Radio Marti.

### Office of Contracts (M/K) Responsibilities

M/K will:

- Determine authority to contract for the services of non-U.S. citizens.

- Provide draft personal services contracts and make changes in such contracts as necessary.

### Office of Security (M/S) Responsibilities

M/S will:

Make determinations of position sensitivity and conduct preappointment checks on candidates born in certain designated countries and complete clearances and make final suitability determinations after the employee has entered on duty.

### References

- The U.S. Information and Education Exchange Act of 1948, Public Law (P.L.) 80-402, as amended

- The Mutual Educational Cultural Exchange Act of 1961, P.L. 87-256, as amended

- The Immigration and Nationality Act, 66 Stat. 163, as amended

- The Manual of Operations and Administration, Part V-A, Section 820 and Part V-B, Section 870

1002-4

**000050**

August 15, 1986

**Table of Contents**

| Topic | Page |
|---|---|
| 1. Recruitment | 1002-6 |
| 2. Assignment of Responsibilities to Non-U.S. Citizens | 1002-6 |
| 3. Pre-employment Requirements | 1002-9 |
| 4. Orientation and Settlement | 1002-11 |
| 5. Security Clearances | 1002-12 |
| 6. Personal Services Contracts | 1002-12 |
| 7. Conversion to and Extension of Excepted Service Appointments | 1002-13 |
| 8. Displacement and Termination | 1002-14 |
| 9. Change to Immigrant Visa | 1002-15 |
| 10. Conversion to the Competitive Civil Service | 1002-17 |
| 11. Rotational Assignments | 1002-18 |
| 12. Other Personnel Areas | 1002-19 |

**000051**

August 15, 1986

**Guidelines**

1. <u>Recruitment</u>

   A. VOA/PO can assist managers and supervisors in recruiting non-U.S. citizen candidates both within the United States and overseas. Such services include:

      (1) Outreach programs to professional, educational, and ethnic organizations;

      (2) Extensive advertisement of vacancies, including the use of newspaper advertisements and participation at job fairs and professional conferences; and

      (3) Coordination and conduct of recruitment trips with managers and supervisors in the United States and overseas.

   B. In addition to and in conjunction with overseas recruitment trips, managers and supervisors, through VOA/PO, should coordinate closely with officers in USIA or State Department area desks and overseas posts. These officers can provide valuable information on the timing of recruitment activities, the most appropriate advertising sources, and consideration necessary to comply with local laws and customs.

      Routinely, posts will conduct tests overseas and forward completed test materials to VOA/PO; forward test results to overseas candidates after receipt from VOA/PO; and, after receiving notice of selection from VOA/PO, notify selected candidates of pre-employment requirements.

   C. If a non-U.S. citizen is selected, promoted or retained when a qualified U.S. citizen is available, the Deputy Director for Programs and the Director of Personnel must approve or deny the action with the concurrence of the Office Director, Division Chief, and Service Chief.

2. <u>Assignment of Responsibilities to Non-U.S. Citizens</u>

   A. Many of the non-U.S. citizens, who are essential members of VOA's staff, can and do contribute their editorial and leadership talents to the production of high quality VOA programming.

1002-6

August 15, 1986

B. As a matter of Agency policy, non-U.S. citizen employees may not be employed in or promoted to supervisory positions or positions which involve policy or program decision-making unless an exception is approved by the Director of VOA with the concurrence of the Director of the Agency.

C. However, this policy does not bar assignment of non-U.S. citizens to positions with editorial responsibility for planning, organizing, and coordinating preparation of assigned broadcast segments within programming and policy guidelines subject to the direction, guidance, and review of a higher-level official (e.g., Service Chief). Such responsibilities include:

- Selecting material for inclusion in broadcasts from sources such as house material and service originations approved at or above the level of the Service Chief;

- Participating in planning the coverage of events;

- Editing program materials for content, style, linguistic quality, balance, broadcast-area interest, and broadcast suitability; or

- Evaluating the effectiveness of broadcasts.

D. Nor, does this policy bar assignment of non-U.S. citizens to positions with responsibility for providing technical guidance to other employees, such as responsibility for:

- Distributing work in accordance with employees' established duties, responsibilities, and work schedules;

- Assuring timely accomplishment of work;

- Amending or rejecting work which does not meet established standards;

- Making day-to-day adjustments in operations;

- Providing on-the-job training;

- Evaluating language and voice tests;

1002-7

000053

August 15, 1986

    –   Approving leave for a few hours or for emergencies in the absence of the supervisor;

    –   Providing advice to the Rating Officer, as requested, on the appraisal of an employee's performance; or

    –   Providing advice to the supervisor, as requested, on awards, promotions, and other personnel matters.

E. As with any particularly important and sensitive position, managers and supervisors responsible for regional language broadcasts should be especially careful in making selections for positions with editorial responsibilities and overseeing the performance of those responsibilities.

F. In applying these guidelines, it must be recognized that decisions on long-range program goals, programming or policy guidelines, general program content, and other policy issues are made by the Division Chiefs and the Director, VOA/BR. Likewise, administrative supervisory authority such as completing performance appraisals as a rating officer; assigning duties, responsibilities, and work schedules to employees; initiating personnel or disciplinary actions; or adjusting grievances is exercised by Service Chiefs along with other supervisors and managers.

G. There may be some existing GS-13 positions below the Service Chief level to which non-U.S. citizens could be appointed or promoted in accordance with these guidelines. However, classification of editor positions to GS-13 is based primarily on the length of the broadcast segment for which the editor is responsible and the inherent complexities of longer segments. Therefore, we do not expect to upgrade existing GS-12 editor positions to GS-13 or create new GS-13 editor positions.

H. These guidelines have no effect on the requirement that any non-U.S. citizens selected in the presence of a qualified U.S. citizen(s) be better qualified than the U.S. citizen(s).

1002-8

**000054**

August 15, 1986

3.  Pre-employment Requirements

    A.  Suitability Determinations

        Each selected non-U.S. citizen candidate must be
        determined suitable for Agency employment. This
        pre-employment determination, based on past conduct, is
        intended to reduce the likelihood of the candidate's
        conduct interfering with his or her effective job
        performance or the functioning of VOA. Except for
        those employees born in certain designated countries,
        VOA/PO, with the concurrence of the Office Director or
        designee, will make an interim suitability
        determination pending a final determination after an
        employee has come on board. VOA/PO will inform the
        Office Director or designee when the final
        determination is made or of any related problems.
        (Refer to Handbook Chapter 300, Section 304.)

    B.  Funds for Travel and Expenses

        (1) Funds for travel, transportation, moving and/or
            storage of household goods and other related
            expenses will be provided to a non-U.S. citizen
            selectee and eligible accompanying dependents. To
            be eligible to accompany the selectee at Government
            expense, dependents must be:

            (a) Under 21 years of age and unmarried; or

            (b) Parents, brothers, or sisters of the selectee
                or the selectee's spouse who are dependent on
                the selectee or his or her spouse for at least
                51 percent of their financial support.

            Other dependents may be eligible to accompany the
            selectee at Government expense if they are mentally
            or physically incapable of self support.

        (2) The actual number of dependents for which VOA will
            pay travel and expenses is limited by factors such
            as funding. Questions regarding specific
            situations should be referred to VOA/PF. Funds for
            travel and expenses will be authorized once the
            selectee agrees in writing to serve in the Federal
            Government for 24 months (6 months under a personal
            services contract and 18 months under an initial
            excepted service appointment) following the
            effective date of his or her employment.

1002-9

000055

August 15, 1986

(3) In the case of voluntary separation before completion of the service obligation, the employee may be required to reimburse VOA for all travel,

relocation, and settling-in costs. VOA may waive reimbursement if it determines the reason for the voluntary separation so warrant, e.g., physical illness or injury or other reason beyond the control of the employee.

(4) Provided the employee serves at least 24 months and is not displaced involuntarily (refer to paragraph 8D), return travel and shipment of effects is authorized for the employee and dependents. Such travel and shipment expenses will not be authorized if the employee obtains immigrant status or U.S. citizenship.

C.  Physical Examinations

(1) All non-U.S. citizens recruited overseas for positions in the U.S. and any dependents who are accompanying them at Government expense are required to take a physical examination prior to departure. All such examinations are at Government expense.

(2) If the physical examination cannot be conducted at a U.S. Government facility, VOA/PO may authorize a private physician to administer the examination. The Agency will reimburse the candidate provided they present receipts to document the examination.

D.  Visas

(1) The post will provide a non-U.S. citizen recruited overseas with information and documents needed to secure a nonimmigrant exchange visitor visa (J-1) and J-2 visas for his or her spouse as well as any unmarried dependents under 21 years of age. (J-1 and J-2 visas must be renewed annually.)

(2) VOA/PF will ensure that non-U.S. citizens hired in the U.S. have or will be able to obtain permission to work from the U.S. Department of Justice, Immigration and Naturalization Service (INS). Also, VOA/PF will ensure that non-U.S. citizen candidates who have nonimmigrant visas other than a J-1, e.g., tourist visas, are provided appropriate information and forms to obtain J-1 visa status prior to employment in VOA.

1002-10

August 15, 1986

4.   Orientation and Settlement

A.   VOA/PF will help non-U.S. citizen employees recruited overseas to settle in to their new jobs and the Washington, D.C. area. When a candidate is offered employment, VOA/PF will send him or her a letter and information kit to start the orientation process. Each employee will be advised by letter to contact VOA/PF upon arrival. VOA/PF also will be in contact with each Division that expects to receive a new employee to ensure a smooth transition. Divisions should arrange to have Division staff meet new employees at the airport and assist such employees wherever possible.

B.   After the employee arrives, VOA/PF will offer the employee and his or her family, as needed, pertinent information and assistance on housing, parking, transportation, schooling for dependents, available English language training, and any other subject of concern to new employees. VOA/PF also will respond to questions about administrative matters and provide assistance on such matters as employee benefits, allowances, and orientations.

C.   Each new employee will receive a letter from VOA/PF that he or she must take to the Social Security Administration in order to apply for a social security number.

D.   VOA/PF will provide the necessary information whenever a non-U.S. citizen employee needs verification of employment for banking or loans.

E.   In coordination with the language services and VOA/PT, VOA/PF will arrange orientation with Meridian House for any employee new to the United States. The one-week orientation concentrates on acquainting newcomers with American customs, politics, and values in an informal educational setting.

F.   VOA/PF will keep an open-door policy and maintain an ongoing relationship with new employees for several months or as long as there are problems or questions relating to living and working in the U.S.

G.   VOA/PF will assist spouses and unmarried sons and daughters under 21 years of age in obtaining permission from INS to work in the U.S.

1002-11

000057

August 15, 1986

5. Security Clearances

Upon reporting to duty, non-U.S. citizens are granted non-sensitive certifications to permit their access to Agency office buildings. However, unlike other employees in similar positions, non-U.S. citizens are not given security clearances. This limits their ability to:

(a) Have access to classified materials;

(b) Open or close bar lock cabinets or safes containing classified or administratively controlled material; or

(c) Be transferred, promoted, or reassigned without M/S being informed.

6. Personal Services Contract (PSC)

A. A non-U.S. citizen employee must serve an initial probationary appointment not to exceed 180 days under the terms of a PSC. During this period, the employee's performance and conduct must be carefully evaluated to determine whether the employee has demonstrated the qualifications and fitness for continued employment. Managers and supervisors must communicate performance requirements and standards to the non-U.S. citizen employee within 30 days of his or her entrance on duty and must assess his or her performance against established requirements and standards to determine whether the employee is to be converted to an excepted service appointment (refer to paragraph 7).

B. While under a PSC, a non-U.S. citizen will receive the following:

(1) Basic compensation for the corresponding GS grade to which the non-U.S. citizen is assigned. Such compensation is subject to withholding of applicable Federal, state, District of Columbia, and local income taxes;

(2) Annual and sick leave accrual, overtime, and any other applicable premium pay; and

000058

August 15, 1986

(3) A settling-in allowance, if he or she was recruited overseas, to cover temporary living and housing expenses and purchase mandatory health insurance for himself or herself and accompanying dependents or, if he or she was recruited within the United States, an allowance to purchase the mandatory health insurance. Documentation of expenditures made to purchase mandatory health insurance must be retained and submitted to Office of Administration (VOA/A).

7. Conversion to and Extension of Excepted Service (GG) Appointments

A. General

Upon satisfactory completion of the PSC, the non-U.S. citizen may be converted to an excepted service appointment for a period of up to 18 months. The appointment may be extended, thereafter, for additional periods of up to 12 months, or may be terminated by the Director of Personnel at any time on the basis of misconduct, poor performance, the needs of the service, or displacement by an equally or better qualified U.S. citizen or a better qualified non-U.S. citizen.

B. Procedures

(1) At least 2 weeks before the expiration of a non-U.S citizen's PSC employment or approximately 90 days before the expiration of a non-U.S. citizen's excepted service appointment, the Division Chief must submit a memorandum (along with an SF-52, Request for Personnel Action) to the Chief of VOA/PO, recommending whether or not the non-U.S. citizen should be converted to an excepted appointment or have his or her appointment extended and the proposed length of such an appointment or extension. The memorandum should specify the reasons for the recommendation, including an assessment of the employee's performance.

(2) Upon receipt of a recommendation for conversion or extension, the Chief of VOA/PO will consider the following factors in determining whether to approve the recommendation:

(a) The availability of equally or better qualified U.S. citizens;

1002-13

000059

August 15, 1986

    (b) Programming and staffing needs of the organization concerned;

    (c) The attained level of broadcast training, specialized experience, past performance, conduct, and potential performance of the non-U.S. citizen; and

    (d) Any other factors deemed appropriate for consideration.

C. Visa Status

    When a non-U.S. citizen employee holding a J-1 visa is converted from employment under a PSC to an excepted service appointment or has his or her excepted service appointment extended, VOA/PF will ensure that the employee's J-1 visa is extended through the period covered by the appointment or extension.

D. Compensation and Benefits

    (1) Following conversion to an excepted service appointment, the non-U.S. citizen will continue to earn:

        (a) The basic compensation for the corresponding GS grade to which he or she is assigned (with appropriate deductions for taxes); and

        (b) Annual and sick leave, overtime, and any other applicable premium pay.

    (2) After conversion to an excepted service appointment, VOA/PL will provide the GG employee with information on retirement coverage and VOA/PO will provide advice and assistance regarding coverage under the Federal Employees' Health Benefits (FEHB) and the Federal Group Life Insurance (FEGLI) Programs. (Refer to Handbook Chapter 800 for more information on these benefit programs.)

8. Displacement and Termination

A. A non-U.S. citizen may be displaced if an equally or better qualified U.S. citizen or a much better qualified non-U.S. citizen is available. If displaced, the employee's GG appointment will be terminated. If a vacant position at the same or lower grade level is available, and if the employee is qualified, he or she

1002-14

August 15, 1986

may be offered an appointment to that position. (Contact VOA/PO for more information on offers of such appointments.)

B. A non-U.S. citizen, whose appointment is terminated because of displacement by a U.S. citizen or a much better qualified non-U.S. citizen, may be separated from the Agency by the Director of Personnel, if another position at the same or lower grade is not available or if the employee's performance or conduct does not warrant an offer of continued employment. The employee will be given at least 30 days' advance notice prior to the effective date of the termination of his or her appointment.

C. A non-U.S. citizen whose performance or conduct falls below the Satisfactory level or whose services are no longer needed may be terminated at any time by the Director of Personnel. The employee normally will be given at least 30 days' advance notice, but such terminations are not covered by the procedural requirements set forth in sections 702 and 703 of this Handbook Chapter for disciplinary and adverse actions or section 305 for reductions in force. VOA/PL should be consulted if such actions appear warranted.

D. A non-U.S. citizen recruited overseas who retains nonimmigrant status will be given travel and expenses for a return trip to his or her home country regardless of his or her length of service, if separated involuntarily through displacement or if the employee, after displacement, declines an offer of a position with a lower rate of basic pay.

9. **Change to Immigrant Visa**

A. Before becoming eligible to apply for an immigrant visa, a non-U.S. citizen employee with a J-1 visa normally must spend a two-year period of residence in his or her home country. The employee may obtain a waiver of this requirement if:

   (1) A relative who is a U.S. citizen or resident alien, e.g., parent, brother, sister, or child who is at least 21 years old, sponsors the employee and the employee obtains a waiver on the basis of:

1002-15

August 15, 1986

     (a) Well-founded fear of persecution in his or her
         country of origin or last residence; or

     (b) Hardship to a U.S. citizen or resident spouse
         or child; or

  (2) VOA sponsors the employee after determining that it
     is necessary and proper to retain the employee for
     an indefinite period.

B.  To secure VOA sponsorship for an immigrant visa, the
    employee's Division Chief must submit a request through
    VOA/PF to the VOA Exchange Visitor Program Review Board
    no later than the end of the eighth year of
    employment. This Board, composed of the Director of
    Personnel, Chief of VOA/PF, and the Deputy Director for
    Programs or their designees, shall determine whether:

  (1) The employee has met minimum requirements for
     length of service (i.e., at least 3 years), and has
     maintained superior performance particularly with
     respect to programming responsibilities and team
     work; and

  (2) The employee has a career commitment to VOA and
     should be retained for an indefinite period.

When the Board decides in favor of sponsoring an
employee for immigrant status, a request for a waiver
will be sent by the Board to the Waiver Review Office
of the Agency's Office of the General Counsel and
Congressional Liaison (GC). GC will send its
recommendation to INS which has the final authority to
issue the waiver.

Concurrent with the waiver request, VOA/PF will
initiate the petitioning process for immigrant status
with the U.S. Department of Labor (DOL) and INS. DOL
requires VOA certification that no qualified U.S.
citizen or resident has been identified for the
position held by the employee being sponsored. In
addition, DOL requires that the employee complete a
statement of qualifications which is submitted with the
petition documents.

000062

August 15, 1986

Immigrant status is granted on the basis of the employee's qualifications and position on the waiting list (which is determined by the priority date or when DOL receives the petition documents).

It should be noted that the intervention of VOA to obtain a change in visa status in no way obligates VOA to employ permanently any non-U.S. citizen.

C.   Spouses and unmarried sons and daughters under 21 years of age may be included on a sponsored employee's application for an adjustment of status if such dependents are in the U.S. at the time of application. Information on immigration status for such dependents outside the U.S. or for sponsorship of unmarried sons and daughters over 21 years of age following acquisition of permanent residence status may be obtained from VOA/PF.

10.   Conversion to Competitive Service Appointment

A.   To retain a non-U.S. citizen who becomes a U.S. citizen, the Division Chief or designee must initiate an action (through an SF-52) to VOA/PO requesting conversion of the appointment from GG to an appropriate appointment for a U.S. citizen. Except for a reasonable period to meet administrative requirements for conversion, a U.S. citizen normally may not encumber a GG position. Generally, the conversion sought will be to a career-conditional appointment in the competitive Civil Service. To be converted to such an appointment, the employee must:

(1)   Have demonstrated satisfactory performance and conduct;

(2)   Obtain an appropriate security clearance; and

(3)   Be within reach for appointment on a competitive examination register or be appointable under another authority appropriate for the appointment of a U.S. citizen.

B.   If the employee is not appointable under an appropriate authority, he or she will be separated from VOA.

1002-17

August 15, 1986

## 11. Rotational Assignments

### A. Purpose

(1) In order to attract and maintain the largest possible overseas audience, VOA must maintain current idiomatic language capability and understanding of the cultural environments of its broadcast areas.

(2) For this reason, broadcasters for selected language services may be assigned to rotational positions within VOA for pre-determined periods in order to:

(a) Enhance the currency of the language used in the service;

(b) Provide the service with fresh understanding of the cultural, social, and political environment of the broadcast area;

(c) Establish and maintain friendly, mutually beneficial relations with foreign countries and/or radio networks; and

(d) Free the position at the end of the rotational assignment so it may again be filled by a broadcaster with recent broadcast area experience.

### B. Designation of Rotational Positions

(1) VOA Division Chiefs, as appropriate, may recommend, through VOA Personnel to the Deputy Director for Programs, that any number of their International Radio Broadcaster (IRB) positions be designated as "rotational," within the existing ceiling.

(a) Division Chiefs may recommend designating individual positions as "rotational."

(b) Positions designated as "rotational" will not be filled by individuals other than on time-limited, non-renewable appointments.

1002-18

000064

August 15, 1986

(2) Because of recruitment difficulties in certain overseas areas, rotational assignments <u>may not</u> be appropriate in all VOA language services.

(3) Individuals appointed to "rotational" positions will be given time-limited appointments, with the mutual understanding that at the end of a pre-determined period (of between 13-36 months) their appointments <u>will terminate without renewal</u>.

C.  Contacts in the Office of Personnel

Contact VOA/PO, or VOA/PF for more information regarding rotational assignments.

12. <u>Other Personnel Areas</u>

Other personnel subjects applicable to non-U.S. citizen employees but not covered in this section are discussed in the following Chapters and sections.

| Area | Chapter | Section |
|---|---|---|
| Promotion and Reassignment | 300 | 302 |
| Temporary Assignment and Appointment | 300 | 303 |
| Performance Appraisal | 400 | 401 |
| Awards | 400 | 402 |
| Position Classification | 500 | 501 |
| Compensation | 500 | 502 |
| Time and Attendance | 600 | 601 |
| Overtime, Compensation Time and Other Premium Pay | 600 | 602 |
| Leave Administration | 600 | 603 |

000065

August 15, 1986

| Area | Chapter | Section (con't) |
|------|---------|-----------------|
| Labor Management Relations | 700 | 701 |
| Probationary Employees- Performance and Conduct Problems | 700 | 702 |
| Discipline and Adverse Action Procedures (for Civil Service and Non-U.S. Citizen Employees) | 700 | 703 |
| Granting and Denying Within Grade Increases | 700 | 704 |
| Equal Employment Opportunity | 700 | 705 |
| Grievances and Appeals | 700 | 706 |
| Ethics and Conduct | 700 | 707 |
| Outside Employment and Related Activities | 700 | 708 |
| Retirement | 800 | 801 |
| Health Benefits | 800 | 802 |
| Life Insurance | 800 | 803 |
| Workers' Compensation | 800 | 804 |
| Training and Career Development | 900 | 901 |
| Group Dismissals | 1000 | 1001 |
| Delegations of Personnel Authority | 1000 | 1003 |

000066

August 15, 1986

# 1003 - Delegations of Personnel Authority

**General**

The attached charts document the various basic personnel authorities exercised by managers and supervisors. Part I contains a listing of personnel authorities generally delegated to immediate supervisors, the related forms that need to be completed, and references to Handbook Chapters and sections for further guidance. Part II lists personnel authorities that are exercised by higher-level managers, some of which may be delegated to different managerial and supervisory levels within an organization.

The charts reflect existing practice as of the date of the issuance and may be modified as changes occur.

If you have any questions regarding these charts, please contact the Operations Division (VOA/PO) in the Office of Personnel.

**000067**

rec'd from
GC ~ 3/18/83
lh

October 13, 1982

MEMORANDUM FOR:     B/P - Mr. Carroll

FROM           :     GC - Jonathan W. Sloat

SUBJECT        :     Employment of Aliens

<u>Summary</u>

Under recent legislation history, Section 804(1) of the Smith-Mundt Act must be interpreted to favor the employment of U.S. citizens only where these are equally or superior in qualifications to aliens. There is no legal prohibition against the employment of aliens.

<u>Background</u>

Section 804 (1) of the United States Information and Educational Exchange Act of 1948, as amended, provides as follows:

> "Employ, without regard to the civil service and classification laws, aliens within the United States and abroad for service in the United States relating to the translation or narration of colloquial speech in foreign languages or the preparation and production of foreign language programs when suitably qualified United States citizens are not available..." Section 804 (1) of the United States Information and Educational Exchange Act of 1948, as amended.

Until recently, this provision had been consistently interpreted by the Agency's legal staff to mean that should a qualified U.S. citizen present himself or herself for a position held by an alien, the alien must be displaced. This view was reinforced by language of the report of the Senate Foreign Relations Committee accompanying Public Law 96-60. In pertinent part, Senate Report No. 96-116 stated as follows:

> "Section 205. Administrative Authorities
>
> At present, aliens are restricted to doing narration and translation work. It is frequently impossible to find American citizens to do the supervisory level work of preparation or production of programs in several foreign languages, and the purpose of these sub-sections is to

000068

-2-

obtain permission for aliens to do this work when Americans are not available. There is a maximum of 40 such personnel slots which could be filled by aliens, most of which are at the Voice of America (VOA), and most of which will at any time be filled by U.S. citizens. By law, should a qualified U.S. citizen apply for a position held by an alien, the American citizen would be given the position."

In the light of these interpretations and faced with VOA's critical recruiting and promotional problems particularly for broadcasters, this Agency proposed remedial legislation to be enacted as part of the Administration's FY '82 and '83 authorization bill for the Agency.

The draft legislation proposed to delete the words "suitably qualified" in favor of the words "equally or better qualified." When the draft legislative provisions were taken up by the House Foreign Affairs Committee and by the Senate Foreign Relations Committee, both Committees rejected the provisions as unnecessary on the grounds that the Agency's past interpretation was incorrect. The relevant portions of the Committee reports are set out below because of their importance.

House Committee on Foreign Affairs, Report No. 97-480 accompanying H.R. 5998, the Fiscal Year 1983 Supplemental Authorization Bill for the International Communication Agency, states:

"The committee considered a request to amend section 804(1) of the United States Information and Educational Exchange Act of 1948 (22 U.S.C. 1474(1)) to clarify ICA's authority to employ aliens for translation and narration or preparation and production of foreign language programming. ICA requested an amendment to the law to enable the Agency to employ aliens when 'equally or better' qualified U.S. citizens were not available.

"Under existing law, ICA may employ aliens when 'suitably' qualified U.S. citizens are unavailable for employment. The phrase suitably qualified' has, because of the lack of legislative history on the issue, been interpreted by the Agency as 'minimally qualified,' mandating the employment of U.S. citizens over more highly skilled foreign nationals. The Senate report on the Foreign Relations Authorization Act for fiscal years 1980 and 1981 states that, 'By law, should a qualified U.S. citizen apply for a position held by an alien, the American citizens would be given the position.' On the other hand, the House report language offers a different, more flexible description, citing the severe problems encountered by ICA in recruiting U.S. citizens and recognizing that a number of tasks 'can properly be performed by alien employees who are qualified and have the proper security clearances' when suitably

-3-

qualified U.S. citizens are not available. The more specific dictates of the Senate report appear to require VOA to terminate the employment of a qualified alien (or to move that person laterally to a potentially less important job within the Agency) in order that a lesser or 'minimally' qualified U.S. citizen be employed or promoted. In fact, the committee does not view the language in the House and Senate reports as contradictory, provided the term 'suitably qualified U.S. citizen' is interpreted sensibly. The term should be interpreted to mean, in effect, that the person who best fulfills the job requirements would be hired, and that only in those cases where the American and the foreign national are equally qualified should preference be given to an American. Moreover, the committee sees no reason why an alien should be separated from employment or transferred to another position because of the availability of a U.S. citizen, on the basis of citizenship alone.

"USICA's present interpretation apparently protects only a few employment opportunities for Americans. This is done to the detriment of the quality of VOA's programming overseas. In view of the U.S. Government's large investment in its international broadcasting effort, it is not in the interest of the United States or of U.S. citizens to jeopardize the quality of such programing in order to insure that 'minimally qualified' Americans fill every possible position. The ability to communicate information accurately in a foreign language hinges on language capability which includes an idiomatic grasp of the language, not just textbook knowledge. International broadcasting is a competitive field which requires the best possible staff to attract and maintain an overseas audience. The quality of U.S. broadcasts reflects the quality of the message and the seriousness of our intent in broadcasting. Mistakes hamper our effectiveness and our competitiveness, and may offend our intended audience. Indeed, the committee has, over the years, been aware of criticisms of VOA broadcasts which indicate that some VOA broadcasters have not possessed an adequate grasp of the necessary language.

"It is the view of the committee that the phrase 'suitably qualified' is adequate to reflect the staffing needs of VOA, if interpreted correctly. In fact, 'suitable' in itself means 'qualified' and should be applied to those who are able to present a quality product. A suitably qualified person does not mean one who is qualified under

000070

-4-

> minimum standards, but a person whose skills match the demands of the position as well as the demands of the Agency."

Senate Foreign Relations Committee, Report No. 97-429 accompanying S.2581, International Communication Agency Authorization Act, Fiscal Year 1983, in turn states:

> "In addition to the various authorities contained in this bill, the Administration requested an amendment to section 804(1) of the United States Information and Educational Exchange Act of 1948 (22 U.S.C. 1474 (1)) to clarify ICA's authority to employ aliens for translation and narration or preparation and production of foreign language programming. ICA requested an amendment to the law to enable the Agency to employ aliens when "equally or better" qualified U.S. citizens were not available.

> "Under existing law, ICA may employ aliens when 'suitably qualified' has, because of the lack of legislative history on the issue, been interpreted by the Agency as "minimally qualified," mandating the employment of U.S. citizens over more highly skilled foreign nationals.

> "It is the view of the Committee that the phrase 'suitably qualified,' if interpreted in a sensible and intelligent manner, is more than adequate to protect the staffing needs of Voice of America. The problem with respect to the employment of foreign nationals was created by an incorrect administrative interpretation of existing law and should be remedied through administrative, not legislative action. The Committee views the Administration's requested amendment on this issue as unnecessary and urges the Agency to correct its hiring policy accordingly."

On the basis of that legislative history it is our opinion that the phrase "suitability qualified" should henceforth be interpreted to mean that VOA may hire or promote any individual with superior qualifications regardless of citizenship. Thus VOA may make hiring or promotion decisions on the basis of which candidate is the best qualified. Only where a U.S. citizen and an alien are equally qualified must the U.S. citizen be preferred. This rule applies not only where the U.S. citizen and the alien are competing as outsiders for employment, but also where one is an outsider and the other is an employee, or where they are both employees. The legislative history is clear that where an alien is an employee he can be displaced only by a U.S. citizen who is equally or better qualified.

-5-

Addendum

Based upon the foregoing, the questions raised in your memorandum of August 12, 1982 are answered as follows:

1. Under existing law, VOA may employ aliens, ". . . when suitably qualified United States citizens are not available". The phrase "suitably qualified" is presently interpreted as "minimally qualified." Is VOA now permitted to interpret the law to hire and promote non-citizens when there are no available citizens "equally or better qualified?" Or, on the other hand, can VOA reinterpret the law whereby non-citizens can be hired and promoted only if there are no available citizens who are "better qualified"?

Answer: VOA is now permitted to hire and promote non-citizens when there are no equally or better U.S. citizens who apply for the position in the case of outside applicants or who compete for a merit system promotion in the case of co-workers.

2. When non-citizens are in competition with citizens under merit promotion, can the selecting official select the best qualified candidate regardless of citizenship?

Answer: The selecting official may select a non-citizen for promotion only when the alien is better qualified than an available U.S. citizen. If U.S. citizens and non-citizens competing for promotion are equally qualified, the U.S. citizen must still be preferred.

3. A position is announced under the merit promotion program and the area of consideration is limited to Agency employees. If only non-citizens apply for the position and it is known that qualified citizens exist within the workforce, can the non-citizen be selected? If the answer is yes, does the non-citizen have a vested right to the position if a citizen declares his/her availability at a later time?

Answer: When a U.S. citizen does not, for some reason other than failure of the Agency to follow proper procedures, apply for a position under the merit promotion program, in our opinion that U.S. citizen is "not available." Based upon the remedial aspects of the House Report language, in our opinion, the selected non-citizen would be subject to displacement in that position only if a U.S. citizen VOA employee equally or better qualified were to apply specifically for the position held by the alien. (Since both alien and citizen employees of the Bureau of Broadcasting are represented by the same union, the Agency could propose a regulation whose effect — if the union agreed — would be to restrict the exercise of the right of citizen employees to displace aliens to the period of open competition under a vacancy notice. The right of statutory preference would not be extinguished but merely limited to periods of competition.) An outside applicant U.S. citizen with equal or better qualifications who applies is entitled to displace any alien whose qualifications he equals or exceeds.

-6-

4.  If a citizen takes and passes the foreign language broadcaster examination and is considered better qualified based upon test scores and other qualifications, is he/she able to displace a non-citizen currently employed by VOA? The way we have interpreted the law in the past, VOA would be obliged either to displace the non-citizen or establish another position to accommodate the citizen.

Answer:  Even an "outside" U.S. citizen may no longer displace non-citizen employee from a position because of citizenship alone.  The citizen must be at least equally qualified and must manifest his intention to seek employment at the Voice.

5.  Can a non-citizen be assigned higher graded duties resulting in a non-competitive promotion for that individual if there are available but lesser qualified citizens whom the higher graded duties could be assigned?

5(a).  Under any circumstances, can you promote non-competitively a non-citizen when there are equally qualified citizens either within or outside of the workforce?

5(b).  What documentation would be necessary to support a decision to promote a non-citizen over a citizen?

Answer:  Yes, so long as the duties are within the scope authorized by Sec. 804(1) of the Smith-Mundt Act and so long as the non-competitive promotion meets the standards established by regulation and negotiated with the union.

5(a).  As to outside applicants, see the answer to question 3 above.

5(b).  The documentation must show one or more of the following:

(a)  No U.S. citizen VOA employee applied during the period of the vacancy announcement or

(b) The alien had superior qualifications.

6.  In light of the reinterpretation, can non-citizens now supervise citizens?

Answer:  Under P.L. 96-60, aliens may be permitted to supervise citizens if there are no citizens who are equally qualified.  As a policy matter, Agency management may wish to reserve supervisory positions to U.S. citizens.

7.  Under the long-standing interpretation of the law, the final authority for program policy and program content has rested with a U.S. citizen.  Are non-citizens now permitted to perform these duties irrespective of the availability of a qualified citizen?

Answer:  This question is broad and particularly sensitive in terms of Congressional and public relations.  If, however, no U.S. citizen is in a position to exercise the policy-and-content decisions for a position within the scope of Section 804(1) of the Smith-Mundt Act, a non-citizen legally may

-7-

do so subject to security limitations, if any. This office believes, nonetheless, that whether a U.S. citizen in the chain of command should make such important decisions is a policy issue that should be addressed by Agency management. The law does not dispose of the issue.

8. There are positions within VOA that are necessary to the preparation and production of foreign language programs but do not include a foreign language skill and may not require actual script writing, i.e., positions in News and Current Affairs and in Worldwide English; can non-citizens or U.S. citizens be promoted, reassigned or hired into these positions?

Answer: Section 804(1) of the Smith-Mundt Act employs the phrase "as the preparation and production of foreign language programs..." (emphasis added). It goes without saying that aliens can exercise supervisory functions subject, of course, to applicable security restrictions. Where these restrictions are operative, a supervisory position must be limited to a U.S. citizen unless the alien can obtain the necessary security clearance.

As to those VOA positions necessary to the preparation and production of foreign language programs which do not include foreign language skills or require script writing, it is my opinion that aliens can be employed in those positions only if a command or understanding of foreign language is essential to the proper performance of position responsibilities. Otherwise the position should be reserved to U.S. citizens.

000074

August 22, 1979

MEMORANDUM TO:      PGM/P - Mr. McGinley

FROM:               GC - Judith A. Futch

SUBJECT:            Promotion of Aliens

I am returning herewith the memoranda from Gordon
Winkler regarding promotion of Ilya Suslov and George
Shehadeh to GG-12 positions.  On August 15 the President
signed the Agency's authorization act which included
an amendment to our authority to employ aliens.  Under
the revised legislation we may now employ aliens, where
suitably qualified citizens are unavailable, for services
relating not only to "the translation or narration of
colloquial speech in foreign languages," but also to
"the preparation and production of foreign language
programs."

This office no longer has any objection to the
performance by aliens of the duties described in the
two attached memoranda.  PGM/P may proceed with its
processing of the necessary documentation for promoting
Messrs. Suslov and Shehadeh.


Attachments: As Stated

000075

**Calendar No. 611**

| | | |
|---|---|---|
| 97TH CONGRESS<br>*2d Session* } | SENATE | { REPORT<br>No. 97-429 |

---

# INTERNATIONAL COMMUNICATION AGENCY
## AUTHORIZATION ACT, FISCAL YEAR 1983

---

MAY 26 (legislative day, MAY 25), 1982.—Ordered to be printed

---

Mr. BAKER (for Mr. PERCY), from the Committee on Foreign
Relations, submitted the following

## REPORT

### [To accompany S. 2581]

The Committee on Foreign Relations, having had under considera-
tion an original bill (S. 2581) to authorize additional appropriations
for the fiscal year 1983 for the operations of the International Com-
munication Agency, and for other purposes, reports favorably there-
on and recommends that the bill do pass.

### BACKGROUND

The International Communication Agency (ICA) was established
by Reorganization Plan No. 2 of 1977 and began operations on April 1,
1978. It is based on a consolidation of the former U.S. Information
Agency and the former Bureau of Educational and Cultural Affairs
of the Department of State. Its legislative mandate derives from the
Smith-Mundt Act of 1948 and the Fulbright-Hayes Act of 1961. The
purpose of the former act is to "increase mutual understanding be-
tween the peoples of the United States and the people of other
countries." It also prohibits dissemination within the United States
of materials produced for distribution overseas. The latter act deline-
ates how the nation's educational and exchange programs should be
administered.

### PURPOSE

The primary purpose of this legislation is to provide an authoriza-
tion of appropriations of $559,000,000 for the operations of ICA for
fiscal year 1983. This amount represents an increase of $76,660,000
over the amount the Administration originally requested which was
contained in S. 1193, a bill pending before a House-Senate Conference
which passed the Senate on June 18, 1981. The Executive Branch
stated that this increase is necessary primarily to cover "added require-
ments for construction of new Voice of America relay stations over-

seas, international education and foreign language activities to be transferred from the Department of Education and added costs of Agency operations attributable mainly to overseas wage cost increases.

## OTHER PROVISIONS OF THE BILL

The bill also contains provisions which make certain changes in administrative authorities which have been requested by the Administration. These provisions would accomplish the following:

(1) Permit the International Communication Agency to credit tuition fees and other payments received in connection with the Agency's English-teaching programs to ICA's applicable appropriation; and

(2) Clarify the authority of the heads of foreign affairs agencies to establish procedures for the movement of senior foreign service officers from one senior executive service level to another within class without the need for reconfirmation.

## COMMITTEE COMMENTS

In addition to the various authorities contained in this bill, the Administration requested an amendment to section 804(1) of the United States Information and Educational Exchange Act of 1948 (22 U.S.C. 1474(1)) to clarify ICA's authority to employ aliens for translation and narration or preparation and production of foreign language programming. ICA requested an amendment to the law to enable the Agency to employ aliens when "equally or better" qualified U.S. citizens were not available.

Under existing law, ICA may employ aliens when "suitably" qualified U.S. citizens are unavailable for employment. The phrase "suitably qualified" has, because of the lack of legislative history on the issue, been interpreted by the Agency as "minimally qualified," mandating the employment of U.S. citizens over more highly skilled foreign nationals.

It is the view of the Committee that the phrase "suitably qualified," if interpreted in a sensible and intelligent manner, is more than adequate to protect the staffing needs of Voice of America. The problem with respect to the employment of foreign nationals was created by an incorrect administrative interpretation of existing law and should be remedied through administrative, not legislative action. The Committee views the Administration's requested amendment on this issue as unnecessary and urges the Agency to correct its hiring policy accordingly.

### PERFORMANCE PAY

Senator Pell introduced two amendments regarding implementation of the provisions on performance pay for Senior Foreign Service Officers in the Foreign Service Act of 1980. Senator Pell noted that a dispute has arisen between the International Communication Agency and the exclusive employee bargaining representative, the American Federation of Government Employees (AFGE), over this issue. The amendments introduced by Senator Pell were designed to clarify the Congressional intent with respect to the composition and authority of the selection boards on performance pay and the negotiability of these issues between the Agency and the exclusive representative.

In view of the fact that the ICA–AFGE dispute is currently before the Foreign Service Labor Relations Board, the Committee decided

that consideration of Senator Pell's amendments would be premature. Senator Pell expressed his hope, and Senator Percy concurred, that this matter would be resolved in the next few weeks. If not, Senator Pell indicated that he would ask for reconsideration of his amendments when the Committee considers the Administration's package of amendments to the Foreign Service Act of 1980, which is expected to be submitted by June. The Committee agreed that it would be desirable to hold a hearing before acting on Senator Pell's amendments given the complexity of this issue.

## SECTION-BY-SECTION ANALYSIS

### SECTION 1—SHORT TITLE

This section entitles this Act the "International Communications Agency Authorization Act, Fiscal Year 1983."

### SECTION 2(A)—AUTHORIZATION OF APPROPRIATIONS

This subsection authorizes an appropriation of $559,000,000 for the International Communication Agency for fiscal year 1983. Originally, the Administration requested $644,000,000 authorization for FY 1983. However, in reviewing the Administration's justification materials, the Committee took note of the following facts: (a) ICA intends to obligate in FY 1983 only $40 million of the $115 million it requests for the acquisition and construction of radio facilities; and (b) of the additional $43 million requested by ICA for its salaries and expenses account, over $30 million is already provided for in permanent authority contained in legislation (S. 1193) pending before a House-Senate Conference. Consequently, the Committee adopted a proposal offered by Senators Percy and Pell which eliminates both the $75 million in excess autority for radio construction and the $30 million in excess for the salaries and expenses account.

In addition to this reduction of $105 million, the Committee added $20 million to the Administration's proposal for the educational exchange programs. In taking this action, the Committee agreed to an amendment offered by Senator Pell and cosponsored by Senators Percy, Mathias, Zorinsky, Tsongas and Dodd to earmark $120,600,000 for the Educational and Cultural Affairs (ECA) Directorate of ICA for the fiscal year 1983 with specific earmarks of $84,256,000 for the Fulbright Academic Exchange programs and the International Visitor Program, $3,248,000 for the Humphrey Fellowship Program and $8,906,000 for grants to private, not-for-profit organizations engaged exchange-of-persons programs. The $120,600,000 earmark for ECA is an increase of $20,000,000 over the Administration's request and is consistent with the action of the Committee and the Senate in mandating that ICA increase, in real terms, its exchange-of-persons programs threefold over the next four years.

The Committee felt an earmark was appropriate because ICA had ignored the FY 82 continuing resolution conference report earmarking $100,000,000 for exchanges in fiscal year 1982. The Committee was also concerned over the Administration's failure to implement Section 203 of the Foreign Relations Authorization Act of 1979, mandating a significant expansion of exchanges over a four-year period beginning October 1, 1979.

4

In increasing the Educational and Cultural Affairs Directorate's budget, the Committee specified that $19,400,000 of the increase should go to four established programs that have a proven record of effectiveness. These programs are:

The Fulbright Program which has brought 80,000 foreign scholars to the United States and sent 40,000 Americans abroad;

The International Visitor Program which usually brings some 1,500 future leaders to the United States and the alumni of which includes 33 current heads of state, 378 current cabinet ministers, and such leaders as the late President Sadat, former French President Giscard d'Estaing, and Chancellor Schmidt;

The Humphrey Fellowship Program which is new, but which has proven its effectiveness in bringing managers from the Third World to the United States for training in public administration; and

The private sector program which provides seed money to the many private organizations engaging in exchange-of-persons programs such as Sister Cities, Youth for Understanding, Operation Crossroads Africa, and the American Council of Young Political Leaders.

In increasing the funds available for grants to private organizations engaged in exchanges, it is the intent of the Committee that the increase be primarily used to support organizations and projects which have proven their effectiveness in years past in this program.

In earmarking the funds to increase exchange programs, the Committee noted that the Administration's request included over $80 million in authorizations which was not to be obligated in FY 83. Thus, the earmark could be made without subtracting from other important ongoing ICA activities.

The Committee accepted a proposal offered by Senator Lugar to insure that, in the event the appropriations were not sufficient to fund ongoing operations of ICA, ECA would not be unduly advantaged over other programs. Senator Lugar's proposal reduces the earmark for ECA and for the specific programs within ECA by the percentage that appropriated or otherwise made available funds are less than the amounts authorized in this bill, except that the earmarks shall not be reduced where the appropriations bill makes reductions against particular programs.

This proposal is not intended to provide ICA with reprogramming authority of any kind. The Committee notes that the earmarks for exchange-of-persons programs are floor level. Even if Senator Lugar's formula should lower these floor levels, ICA would still be obliged to expend funds at any higher level set by any appropriations legislation.

The following table compares the funding of ICA contained in the legislation now pending in Conference (S. 1193 and H.R. 4814) for fiscal year 1982 and fiscal year 1983, the President's revised fiscal year 1983 request, and the Committee's recommendation.

Q00073

5

U.S. INTERNATIONAL COMMUNICATION AGENCY—COMPARISON OF 1983 BUDGET REQUEST WITH AMOUNTS IN H.R. 4814 AND S. 1193

[Funds in thousands]

| Account | 1982 request as amended March 1981 and approved in H.R. 4814 and S. 1193 | | 1983 request as amended March 1981 and approved H.R. 4814, S. 1193 | 1983 request per President's 1983 budget, February 1982 | Committee recommendation |
|---|---|---|---|---|---|
| | H.R. 4814 | S. 1193 | | | |
| Salaries and expenses: | | | | | |
| Overseas missions | $138,510 | $146,194 | $146,194 | $150,777 | $150,777 |
| Broadcasting service | 104,989 | 106,669 | 106,669 | 117,391 | 117,391 |
| Education and cultural affairs | 50,284 | 92,380 | 92,380 | 100,600 | 120,600 |
| Program coordination, production, and support | 37,877 | 39,456 | 39,456 | 46,664 | 46,664 |
| Agency direction and management | 34,071 | 33,412 | 33,412 | 37,665 | 37,665 |
| Administrative support from other agencies | 33,241 | 34,076 | 34,076 | 42,346 | 42,346 |
| Subtotal | 398,892 | 452,187 | 452,187 | 495,443 | 515,443 |
| Special foreign currency program | 9,110 | 11,451 | 11,451 | 11,327 | 11,327 |
| Committee cut | | | | | −30,000 |
| Total, salaries and expenses | 408,002 | 463,638 | 463,638 | 506,770 | 496,770 |
| Acquisition and construction of radio facilities | 71,178 | 80,884 | 1,882 | 115,000 | 40,000 |
| Center for Cultural and Technical Interchange Between East and West | 14,854 | 16,880 | 16,880 | 18,230 | 18,230 |
| Tsukuba Expo | | | | 4,000 | 4,000 |
| Total, 1983 request | 494,034 | 561,432 | 482,340 | 644,000 | 559,000 |

The Committee's recommended authorization level for fiscal year 1983 is $85 million less than the President's fiscal year 1983 request submitted in February of this year. It is $76 million more than the President's original fiscal year 1983 request submitted in March of 1981. The following is an explanation of the major elements of that $76 million increase:

*Overseas missions:* —$9,057,000

$1,131,000 for higher average employment and other salary changes;

$760,000,000 to transfer funding of mission programs in Egypt to dollar funding due to lack of U.S. Government-owned Egyptian pounds;

savings of $819,000 resulting from program cuts implemented in fiscal year 1982; and

all other net built-in changes resulting in a net savings of $10,129,000 due primarily to favorable exchange rate changes in fiscal year 1982.

*Broadcasting service:* +$8,833,000

$4,600,000 for domestic price increases and other built-in requirements necessary to maintain VOA programs throughout fiscal year 1983;

$3,562,000 for higher average employment and other salary changes in fiscal year 1982;

$485,000 for added transmission and talent costs related to expansion of Polish broadcasts by 35 hours weekly;

000080

6

Savings of $1,100,000 from program cuts implemented in fiscal year 1982; and

All other net built-in changes resulting in a net savings of $3,720,000 resulting mainly from favorable exchange rate changes in fiscal year 1982.

*Educational and cultural affairs: +$24,155,000*

$2,509,000 for domestic price increases and other net built-in requirements necessary to maintain these programs in fiscal year 1983;

$1,566,000 for higher average employment ($1,034,000), and other built-in changes in fiscal year 1982 ($532,000) ; and

$20,000,000 for the enhancement of the educational exchange programs.

*Program coordination, production and support: +9,091,000*

$2,997,000 for higher average employment and continuation of the Foreign Service comparability pay increase to domestic Foreign Affairs Specialist employees ($2,567,000), and expansion of TV satellite programs ($430,000) ;

$3,000,000 enhancement for weekly transmittal of television programs by satellite to overseas audiences of selected policy statements, backgrounders and analyses of events relevant to U.S. Government Policy;

$390,000 for all other net program and built-in requirements, primarily to offset a decrease in prior year balances available for application to programs in fiscal year 1983;

savings of $1,296,000 for program cuts implemented in fiscal year 1982; and

$4,000,000 to fund U.S. participation in the Tsukuba Expo '85.

*Agency direction and management: +$2,887,000*

$1,959,000 for higher average employment and other changes;

$564,000 for domestic price increases, within-grade advancements, and other built-in changes in fiscal year 1982 and anticipated in fiscal year 1983;

$1,044,000 to enhance reception of the Agency's Wireless File transmissions overseas ($1,040,000) and augmentation of the Entertainment in the U.S. allowance ($4,000) ; and

savings of $680,000 for program cuts implemented in fiscal year 1982.

*Administrative support from other agencies: +$7,597,000*

$941,000 for net changes in fiscal year 1982 requirements, mainly to expand office space for the Voice of America and added administrative support payments for programs in France, Brazil and Saudi Arabia;

$3,646,000 for added payments to the Department of State and the General Services Administration to cover projected cost increases in fiscal year 1983; and

$3,010,000 for program enhancements, mainly to consolidate USICA office space in Washington.

*Special foreign currency program: −$1,374,000*

This net decrease results from favorable exchange rate changes and other net built-in savings in fiscal year 1982, partially offset by projected wage and price increases in fiscal year 1983.

*Acquisition and construction of radio facilities: +$38,178,000*

This amount includes $28,475,000 for the continuation of the construction of new high-power transmitting facilities in Sri Lanka and Botswana. An additional $9,703,000 is required to provide for the following changes: (1) $5,860,000 to reequip 19 of VOA's 26 domestic studios with new state-of-the-art equipment; (2) $500,000 to modernize VOA's Washington plant; (3) $930,000 to construct a VOA-owned satellite interconnect network to feed programs from Washington to the domestic relay stations and from U.S. based correspondent bureaus to Washington;

(4) $2,288,000 for land rental payments ($1,061,000) and purchase of antennas and associated equipment ($1,227,000) for the Government of Greece pursuant to recent negotiations to extend the agreement for maintenance of VOA relay stations there; and (5) $125,000 for other changes, mainly rental payments for the proposed transmitting facilities in the Caribbean.

*Center for cultural and technical interchange between East and West: +$1,350,000*

The increase in this account is requested to meet additional mandatory costs for staff and programs that will continue in effect through 1983. These cost increases consist of $426,000 to maintain Federal comparability in personnel compensation and $171,000 for other net salary changes; $461,000 for increased costs of participants; and $292,000 for increased costs of utilities, supplies and materials and other services.

### SECTION 3—USE OF ENGLISH-TEACHING PROGRAM FEES

This section grants ICA the authority to credit tuition fees and other payments received in connection with the Agency's English-teaching programs to its applicable appropriations. Under present practice, ICA is required to return to the Treasury any proceeds it collects as a result of its activities. At present, many of these programs are run under contracts with binational centers overseas where ICA's authority is limited. If ICA is permitted to use the proceeds of its programs, it will be able to strengthen its program control and financial oversight. Annual proceeds from such programs are estimated at $200,000 for the first year and up to $500,000 in succeeding years. The authority provided in this section may be exercised only to the extent that it is approved in appropriations acts.

### SECTION 4—BASIC SALARY RATES FOR SENIOR FOREIGN SERVICE

Section 4 clarifies the authority of the heads of foreign affairs agencies to establish procedures for the movement of senior foreign service officers from one senior executive service level to another within class without the need for reconfirmation.

The Justice Department has interpreted the Foreign Service Act of 1980 as requiring Presidential reappointment and Senate reconfirmation for a senior foreign service member moved from one pay level to another, even within a class. In contrast, in the Senior Executive Service, such movement is permitted through administrative action by the head of agency. The reconfirmation process would be cumbersome and inconsistent with the effort made in the Foreign Service Act to reduce

Q00082

8

the number of confirmations necessary for advancement. In addition, if used, it would place undue emphasis on the pay levels at the expense of the well-established classes carried over from the Foreign Service Act of 1946.

## COMMITTEE ACTION

On March 23, 1982, the Director of the U.S. International Communication Agency, the Honorable Charles Z. Wick, transmitted to the President of the Senate Executive Communication 3059 which contained a draft bill to provide an additional authorization of appropriations for fiscal year 1983 for the International Communication Agency, and for other purposes. On April 26, 1982, Mr. Wick transmitted another executive communication (E.C. 3295) containing draft legislation to authorize the appropriations to fund U.S. participation at the Tsukuba Expo '85. Both executive communications were referred to the Committee on Foreign Relations.

The Committee held a public hearing on the proposal contained in E.C. 3059 on April 19th during which testimony was received from Mr. Wick presenting the Administration's justification for this legislation.

The Committee held an open mark-up session on May 6th at which time a working quorum amended and approved various provisions of the Administration's requested legislation. On May 11th, the bill adopted by the working quorum was ordered reported as a clean bill by a voice vote by a live quorum of the full Committee.

## COST ESTIMATE

In accordance with Rule XXVI, paragraph 11(a) of the Standing Rules of the Senate, the Committee provides the following estimate of the cost of this original bill, prepared by the Congressional Budget Office:

U.S. CONGRESS,
CONGRESSIONAL BUDGET OFFICE,
*Washington, D.C., May 13, 1982.*

Hon. CHARLES H. PERCY,
*Chairman, Committee on Foreign Relations, U.S. Senate, Washington, D.C.*

DEAR MR. CHAIRMAN: Pursuant to Section 403 of the Congressional Budget Act of 1974, the Congressional Budget Office has prepared the following cost estimate on a bill to provide additional authorization of appropriations for the fiscal year 1983 for the International Communications Agency, and for other purposes, as ordered reported by the Senate Committee on Foreign Relations on May 11, 1982.

Should the Committee so desire, we would be pleased to provide further details on this estimate.

Sincerely,

ALICE M. RIVLIN, *Director.*

## CONGRESSIONAL BUDGET OFFICE—COST ESTIMATE

1. Bill number: S.
2. Bill title: A bill to provide additional authorization of appropriations for the fiscal year 1983 for the International Communications Agency, and for other purposes.

3. Bill status: As ordered reported by the Senate Foreign Relations Committee on May 11, 1982.

4. Bill purpose: This legislation authorizes the appropriation of $559 million for the International Communication Agency (ICA) for fiscal year 1983; permits the crediting of tuition fees and other payments received by the ICA to the Agency's appropriations, to the extent provided in advance in an appropriation act; and amends the Foreign Service Act of 1980.

5. Cost estimate:

| Authorization level: Fiscal year: | Millions |
|---|---|
| 1983 | $559 |
| 1984 | 0 |
| 1985 | 0 |
| 1986 | 0 |
| 1987 | 0 |

| Estimated outlays: Fiscal year: | |
|---|---|
| 1983 | 427 |
| 1984 | 113 |
| 1985 | 19 |
| 1986 | 0 |
| 1987 | 0 |

6. Basis for estimate: The estimate assumes enactment of this legislation and subsequent appropriation of the authorization amounts by September 30, 1982. Outlays were estimated by using the Administration's outlay rates.

Section 3 of the bill authorizes the crediting of fees and other payments received by the ICA from its English-teaching program to the Agency's appropriation. This section would permit the ICA to undertake new arrangements for its English-teaching program and finance the program with offsetting collections from non-federal sources.

7. Estimate comparison: None.

8. Previous CBO estimate: None.

9. Estimate prepared by: Joe Whitehill (226-2840).

10. Estimate approved by:

JAMES BLUM, *Assistant Director for Budget Analysis.*

## EVALUATION OF REGULATORY IMPACT

In accordance with Rule XXVI, paragraph 11(b) of the Standing Rules of the Senate, the Committee has concluded that there is no regulatory impact from this original bill.

## CHANGES IN EXISTING LAW

In compliance with paragraph 12 of Rule XXVI of the Standing Rules of the Senate, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic, existing law in which no change is proposed is shown in roman):

UNITED STATES INFORMATION AND EDUCATIONAL EXCHANGE OF 1948

\*        \*        \*        \*        \*        \*        \*

000084

## TITLE VIII—ADMINISTRATIVE PROCEDURES

*   *   *   *   *   *

*USE OF ENGLISH-TEACHING PROGRAM FEES*

*SEC. 808. Notwithstanding section 3617 of the Revised Statutes of the United States (31 U.S.C. 484) or any other law or limitation of authority, tuition fees or other payments received by or for the use of the International Communication Agency from or in connection with English-teaching programs conducted by or on behalf of the Agency under the authority of this Act or the Mutual Educational and Cultural Exchange Act of 1961 may be credited to the Agency's applicable appropriation to such extent as may be provided in advance in an appropriation Act.*

*   *   *   *   *   *

## FOREIGN SERVICE ACT OF 1980

*   *   *   *   *   *

## TITLE 4 COMPENSATION

*   *   *   *   *   *

SEC. 402. Salaries of the Foreign Service.—[(a)] *(a)* (1) The President shall prescribe salary classes for the Senior Foreign Service and shall prescribe an appropriate title for each class. *The President shall also prescribe one or more basic salary rates for each class.* Basic salary rates for the Senior Foreign Service may not exceed the maximum rate or be less than the minimum rate of basic pay payable for the Senior Executive Service under section 5382 of title 5, United States Code, and shall be adjusted at the same time and in the same manner as rates of basic pay are adjusted for the Senior Executive Service.

*(a) (2) The Secretary shall determine which of the basic salary rates prescribed by the President under paragraph (1) for any salary class shall be paid to each member of the Senior Foreign Service who is appointed to that class. The Secretary may adjust the basic salary rate of a member of the Senior Foreign Service not more than once during any 12-month period.*

(b)(1) An individual who is a career appointee in the Senior Executive Service receiving basic pay at one of the rates payable under section 5382 of title 5, United States Code, and who accepts a limited appointment in the Senior Foreign Service in a salary class for which the basic salary rate is less than such basic rate of pay, shall be paid a salary at his or her former basic rate of pay (with adjustments as provided in paragraph (2)) until the salary for his or her salary class in the Senior Foreign Service equals or exceeds the salary payable to such individual under this subsection.

(2) The salary paid to an individual under this subsection shall be adjusted by 50 percent of each adjustment, which takes effect after the appointment of such individual to the Senior Foreign Service, in the basic rate of pay at which that individual was paid under section 5382 of title 5, United States Code, immediately prior to such appointment.

O

000085

ADDITIONAL AUTHORIZATIONS OF APPROPRIATIONS FOR THE FISCAL YEAR 1983 FOR THE INTERNATIONAL COMMUNICATION AGENCY, AND FOR OTHER PURPOSES

---

April 2, 1982.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

---

Mr. FASCELL, from the Committee on Foreign Affairs, submitted the following

## REPORT

[To accompany H.R. 5998]

[Including cost estimate of the Congressional Budget Office]

The Committee on Foreign Affairs, to whom was referred the bill (H.R. 5998) to provide additional authorizations of appropriations for the fiscal year 1983 for the International Communication Agency, and for other purposes, having considered the same, report favorably thereon without amendment and recommend that the bill do pass.

### COMMITTEE ACTION

On March 18, 1982, the Director of the U.S. International Communication Agency, Hon. Charles Z. Wick, sent to the Speaker of the House of Representatives Executive Communication 3463 which contained a draft bill to provide additional authorizations of appropriations for the fiscal year 1983 for the International Communication Agency, and for other purposes. On March 25, 1982, the Assistant Secretary of State for Congressional Relations, Hon. Powell A. Moore, sent to the Speaker of the House of Representatives Executive Communication 3520 containing draft legislation to amend 22 U.S.C. 2653 as well as the executive pay schedule in order to make certain changes in administrative authorities which would confirm, in law, existing practice regarding the treatment of the rank of Counselor within the Department of State. These communications were referred to the Committee on Foreign Affairs, and on March 23 and 30, respectively, the chairman, Hon. Clement J. Zablocki, referred them to the Subcommittee on International Operations.

The Subcommittee held a hearing on March 17, 1982, during which testimony was received from representatives of the Department of State and the International Communication Agency. Among the

89-006 O

witnesses were the following: Hon. Richard T. Kennedy, Under Secretary of State for Management; Hon. Charles Z. Wick, Director of the International Communication Agency; and Mr. James Conkling, Director of the Voice of America.

The subcommittee held an open markup session on March 25, 1982, on the draft legislation and reported to the full committee a draft bill in the form of a committee print. The full committee, on March 31, held an open markup of the draft bill and agreed to to the introduction of a clean bill. H.R. 5998 was subsequently introduced by Hon. Dante B. Fascell, chairman of the Subcommittee on International Operations, and 15 cosponsors. On April 1, 1982, H.R. 5998 was ordered favorably reported by voice vote.

## PURPOSE OF THE BILL

The principal purpose of H.R. 5998 is to provide additional authorization of appropriations for fiscal year 1983 for the International Communication Agency to enhance the U.S. public diplomacy effort—the manner in which the United States can transmit its message worldwide, facilitate the free flow of information, and promote understanding and acceptance of U.S. positions through both its broadcasts and international education and cultural exchange programs.

## OTHER PROVISIONS OF THE BILL

The bill also contains provisions which make certain changes in administrative authorities which have been requested by the agencies or recommended by the committee. These provisions would accomplish the following:

(1) Permit the International Communication Agency to credit tuition fees and other payments received in connection with the agency's English teaching programs to ICA's applicable appropriation; and

(2) Exempt Inter-American Foundation grantees from the obligation to return to the U.S. Treasury interest earned on advances of appropriated funds.

## COMMITTEE COMMENT

The committee considered a request to amend section 801(1) of the United States Information and Educational Exchange Act of 1948 (22 U.S.C. 1474(1)) to clarify ICA's authority to employ aliens for translation and narration or preparation and production of foreign language programing. ICA requested an amendment to the law to enable the Agency to employ aliens when "equally or better" qualified U.S. citizens were not available.

Under existing law, ICA may employ aliens when "suitably" qualified U.S. citizens are unavailable for employment. The phrase "suitably qualified" has, because of the lack of legislative history on the issue, been interpreted by the Agency as "minimally qualified," mandating the employment of U.S. citizens over more highly skilled foreign nationals. The Senate report on the Foreign Relations Authorization Act for fiscal years 1980 and 1981 states that, "By law, should

a qualified U.S. citizen apply for a position held by an alien, the American citizen would be given the position." On the other hand, the House report language offers a different, more flexible description, citing the severe problems encountered by ICA in recruiting U.S. citizens and recognizing that a number of tasks "can properly be performed by alien employees who are qualified and have the proper security clearances" when suitably qualified U.S. citizens are not available. The more specific dictates of the Senate report appear to require VOA to terminate the employment of a qualified alien (or to move that person laterally to a potentially less important job within the Agency) in order that a lesser or "minimally" qualified U.S. citizen be employed or promoted. In fact, the committee does not view the language in the House and Senate reports as contradictory, provided the term "suitably qualified U.S. citizen" is interpreted sensibly. The term should be interpreted to mean, in effect, that the person who best fulfills the job requirements would be hired, and that only in those cases where the American and the foreign national are equally qualified should preference be given to an American. Moreover, the committee sees no reason why an alien should be separated from employment or transferred to another position because of the availability of a U.S. citizen, on the basis of citizenship alone.

USICA's present interpretation apparently protects only a few employment opportunities for Americans. This is done to the detriment of the quality of VOA's programing overseas. In view of the U.S. Government's large investment in its international broadcasting effort, it is not in the interest of the United States or of U.S. citizens to jeopardize the quality of such programing in order to insure that "minimally" qualified Americans fill every possible position. The ability to communicate information accurately in a foreign language hinges on language capability which includes an idiomatic grasp of the language, not just textbook knowledge. International broadcasting is a competitive field which requires the best possible staff to attract and maintain an overseas audience. The quality of U.S. broadcasts reflects the quality of the message and the seriousness of our intent in broadcasting. Mistakes hamper our effectiveness and our competitiveness, and may offend our intended audience. Indeed, the committee has, over the years, been aware of criticisms of VOA broadcasts which indicate that some VOA broadcasters have not possessed an adequate grasp of the necessary language.

It is the view of the committee that the phrase "suitably qualified" is adequate to reflect the staffing needs of VOA, if interpreted correctly. In fact, "suitable" in itself means "qualified" and should be applied to those who are able to present a quality product. A suitably qualified person does not mean one who is qualified under minimum standards, but a person whose skills match the demands of the position as well as the demands of the Agency. Such an interpretation should allow ICA more flexibility in obtaining the staff needed to fulfill its

The committee notes that this bill contains no fiscal year 1983 supplemental authorization request for the Department of State. The committee has decided that additional authorization is unnecessary at this time, given the unusual circumstances which have left the fiscal

year 1982–83 authorization bill pending in conference. The following letter from Hon. Richard T. Kennedy, Under Secretary of State for Management, explains the fiscal year 1982–83 budgetary situation, which assumes enactment of the pending authorization bill:

UNDER SECRETARY OF STATE FOR MANAGEMENT,
*Washington, D.C., March 24, 1982.*

Hon. DANTE B. FASCELL,
*Chairman, Subcommittee on International Operations, Committee on Foreign Affairs, House of Representatives*

DEAR DANTE: I very much appreciate appearing before your Subcommittee last week to explain the Department of State's 1983 budget. As always, we value your strong support, most especially during this long legislative process. I trust my testimony gave a clear picture of our adjusted 1982 and 1983 requirements.

As a matter of practice to avoid confusion, the initial authorization bill has traditionally been presented at the same funding levels as our initially proposed appropriations. However, there have been many subsequent changes to the 1982 and 1983 budgets. Since the bill pending before the Congress covers two years, I would like to review its relationship to the revised 1982 budget figures and the new 1983 appropriation request.

In the context of this review, the 1982 and 1983 amounts authorized for the Department in the pending bill, when combined with existing permanent authorities, are sufficient to cover the revised appropriation requirements. These permanent authorities entail international peacekeeping activities, increases for American salaries, Foreign Service National wages, and the Foreign Service Retirement Fund. I will elaborate further on these authorities below.

For 1982, the bill contains ample authorization to cover the Department's appropriation levels in the Continuing Resolution, as well as for pending and proposed supplemental appropriations. As can be seen from the table at Attachment 1, we would have $68 million more authorization than appropriations in the House version of our bill and $225 million more in the Senate version. In this table we have included $13 million for 1982 supplemental requests (primarily for the United States-Iranian Claims Tribunal, the United States-Canada Maine Boundary dispute, and the Foreign Service Retirement Fund) and $22 million for Federal salary increases (which OMB has not yet transmitted to the Congress). Not included is $10 million in supplemental requests pending at OMB for protective security of U.S. diplomatic personnel overseas and of foreign diplomatic personnel in the United States following increased terrorist attacks on these two groups. However, even after adding these pending supplemental requests, I believe the bill provides sufficient authority in 1982 to meet the Department's requirements.

Concerning 1983, the amounts authorized for the Department in the House or Senate version of our authorization bill, when considered in conjunction with provisions of permanent authority contained in existing law, will provide sufficient authorization to meet our current and anticipated 1983 budget requirements. Specifically, Attachment 2 indicates there is $123 million in existing authorization above the

funding levels for 1983 authorized by either the House or Senate to 1/30/2008
Peacekeeping ($60 million); pay supplementals ($25 million); wages
($23 million); and Foreign Service Retirement Fund ($15 million).

This will cover the $10–17 current 1983 authorization "shortfall" in-
dicated in Attachment 1, and also will provide authority to meet addi-
tional requirements not in our 1983 Congressional budget. The new
items will total up to $70 million for such needs as increased overseas
and domestic security ($48 million—a continuation of our 1982 supple-
mental request), peacekeeping ($10 million) and further Blair House
renovations ($9 million).

Although this approach has been taken this year in view of the un-
usual circumstances involving the authorization legislation, the De-
partment fully intends to continue to include these items in future
fiscal year requests to the Committee. This unusual approach, of
course, presupposes enactment of the fiscal year 1982–83 authorization
legislation now pending in conference. As you know, the Department
is eager to obtain a viable 1982–83 authorization bill, and I will make
every effort to work closely with you to obtain it.

Sincerely,

RICHARD T. KENNEDY.

Attachments: Retained in Committee files.

### COUNSELOR OF THE DEPARTMENT OF STATE

Executive Communication 3520 requesting that the position of
Counselor of the Department of State be upgraded from Executive
Level IV to Executive Level III was submitted to Congress and
jointly referred to the Committees on Foreign Affairs and Post Office
and Civil Service on March 30, 1982. The Department of State
further requested that such a provision be included in H.R. 5998.

During consideration of H.R. 5998, the committee noted that ap-
proval of the executive branch request on this matter would have the
effect of increasing the number of level III positions in the Depart-
ment of State at a time when the Department and other Federal agen-
cies are undergoing severe personnel cuts and are making other budg-
et sacrifices. In view of these reductions, the committee agreed that
upgrading the position of Counselor of the Department without eli-
minating an existing level III position would be inappropriate at this
time.

### SECTION-BY-SECTION ANALYSIS

#### SECTION 1—ADDITIONAL AUTHORIZATION OF APPROPRIATIONS FOR FISCAL YEAR 1983

This section amends the International Communication Agency Au-
thorization Act, fiscal years 1982 and 1983, which is currently in con-
ference, to authorize an additional appropriation of $157,660,000 for
fiscal year 1983 to carry out the Agency's international communication,
education, and cultural exchange functions. The following table pro-
vides a comparison of the executive branch fiscal year 1983 supple-
mental request with amounts contained in the Senate-passed bill, S.
1193, and the House amendment thereto, which is the fiscal years 1982

000090

and 1983 authorization bill for the Department of State, the U.S. International Communication Agency, the Board for International Broadcasting, and the Inter-American Foundation.

**U.S. INTERNATIONAL COMMUNICATION AGENCY—COMPARISON OF 1983 BUDGET REQUEST WITH AMOUNTS IN H.R. 4814 AND S. 1193**

[In thousands of dollars]

| Account | 1983 request fiscal year 1983 [1] | 1982 supplemental request for fiscal year 1982 [2] | Increase (+) or decrease (−) |
|---|---|---|---|
| Salaries and expenses: | | | |
| Overseas missions | 146, 194 | 150, 777 | + 4, 583 |
| Broadcasting service | 106, 669 | 117, 391 | +10, 722 |
| Educational and cultural affairs | 97, 390 | 100, 660 | + 8, 270 |
| Program coordination and support | 39, 454 | 46, 664 | + 7, 740 |
| Agency direction and management | 33, 412 | 37, 663 | + 4, 251 |
| Administrative support from other agencies | 34, 076 | 42, 346 | + 8, 270 |
| Special foreign currency program | 11, 451 | 11, 327 | − 174 |
| Total, salaries and expenses | 461, 636 | 506, 770 | +43, 132 |
| Acquisition and construction of radio facilities | 1, 822 | 115, 000 | +113, 178 |
| Center for Cultural and Technical Interchange between East and West | 16, 880 | 18, 230 | +1, 350 |
| Total 1983 request | 487, 340 | 640, 000 | +157, 660 |

[1] Submitted in March 1983 and approved in the House and Senate version of the ICA fiscal year 1983 authorizations currently pending in conference (H.R. 4814 and S. 1193).
[2] Submitted on Mar. 18, 1982.

The Soviet Union presently outspends the United States by about 7 to 1 in international broadcasting and information efforts around the world, not to mention the additional millions of dollars it spends jamming U.S. broadcasts to the Soviet Union. The United States even ranks below some of its Western allies in broadcast hours around the world.

ICA's product is an important element in the U.S. national defense, a critical weapon in the war of ideas. Mutual understanding is a key element in the peace process and the effort to make information about the United States available to the world must be pursued vigorously if the United States is to maintain and promote the world's information balance.

Though U.S. arsenals of defense are stocked with state-of-the-art weaponry, the United States has neglected the technology of broadcasting and has relayed this Nation's message on transmitters which were "state of the art" in 1938. Therefore the committee feels that this supplemental request is not only justified, but overdue. Indeed, this new executive branch request approximates the committee's original fiscal year 1983 recommendation. The bulk of the supplemental (approximately $113.2 million out of $157.7 million) would be allocated to ICA's account for the acquisition and construction of radio facilities. Principally, these funds would be used to complete the construction of transmitting facilities for the Voice of America in Sri Lanka and Botswana, for broadcasting to Asia and Africa respectively, to reequip and modernize domestic broadcast studios, and to finance construction of a VOA-owned satellite network.

In addition to needed budget increase for plant and equipment and improvements in broadcast technology, the remainder of the supple-

money would be allocated to fund, among other things, Federal pay raise costs, increased education and cultural affairs programing, the establishment of an ICA branch post in Guangzhou (Canton), China, and the consolidation of USICA office space in Washington, D.C.

The committee approves of the planned office space consolidation, which is long overdue. USICA now occupies 12 buildings in Washington, a circumstance which hampers efficiency and makes communication and day-to-day operations unusually difficult. The committee expects this move to be accomplished expeditiously and looks forward to receiving periodic progress reports.

The committee is concerned over allegations that education and cultural affairs programing is being subjected to political influences in derogation of the history, traditions, and intent behind the diverse programs administered by ICA. It is vital that these programs and the broadly representative nature of their participants be unimpeded by political considerations or wildly fluctuating budgetary priorities. Those involved in the business of promoting international understanding have realized that the United States should expend more than its current minuscule efforts in education and cultural exchanges. Therefore, it is imperative that existing programs of this sort be enhanced and expanded. By no means should they be sacrificed to newer, narrower initiatives of unconfirmed effectiveness. The goal should be to increase our efforts as much as possible so that the whole range of USICA's purposes is served.

Furthermore, the committee feels strongly that in order to fulfill effectively its assigned mission to foster mutual understanding, ICA must zealously protect the integrity and objectivity of its broadcasting efforts. The Voice of America must continue to reflect the best of American journalism, to tell the U.S. story clearly, honestly, and reliably. Only in this way will the United States be listened to, and its word respected.

Moreover, the committee supports USICA's efforts to combat disinformation through the dissemination of truth. It does, however, hope that such efforts can be made without harming the Voice's journalistic integrity and without mirroring aspects of the programs they are designed to counter. Some valid concerns have been voiced that a bolder marketing of America worldwide, a more obvious waving of the flag overseas, might damage that credibility as well as the goodwill among foreign audiences which USICA has built over the years. Credibility, in publications as well as in broadcasting, is USICA's best asset and our binding link to audiences worldwide.

The committee firmly supports a growing role for USICA in protecting U.S. interests abroad. It is the committee's hope that, in expanding USICA's reach, we can do so without changing the Agency's mission or threatening existing programs which already serve U.S. interests so well.

The committee further wishes to express its opposition to the Executive Committee of Correspondents' decision to withdraw accreditation to the Radio and TV Galleries of the House and Senate for correspondents of RFE/RL, Inc., as well as its continuing denial of accreditation to Voice of America correspondents. It appears that the committee reached that decision based on the fact that Radio Free

Europe and Radio Liberty are government-financed. By a fantastic leap in logic, they have thereby questioned the integrity and objectivity of the Radios. In addition, the Executive Committee seems to believe that RFE/RL, Inc., is controlled by the Department of State. In fact, the Radios' activities are carried out on a day-to-day basis in an entirely independent and objective manner, without any guidance or direction from the Department of State. Indeed, RFE/RL, Inc.'s research reports are so highly regarded that hundreds of news organizations, individuals, government agencies, and businesses around the world subscribe to them.

The committee is adamant in its belief that these organizations have been unfairly treated, not the least because the "Rules Governing the Radio and TV Correspondents Gallery" do not provide for the expulsion of a member. Moreover, it is highly questionable practice on the one hand, for the Executive Committee to attempt to expel RFE/RL, Inc., by questioning its independence, while on the other hand permitting foreign government-run operations such as Soviet radio and television to retain their accreditation. Indeed, the British Broadcasting Corp., Deutschewelle (Federal Republic of Germany) and French media entities are not only government-financed, but government-controlled. Finally, the committee urges that when the Executive Committee of Correspondents reconsiders its decision it also reconsider the reasons for which the Voice of America has always been denied accreditation. The Committee on Foreign Affairs believes that there is no justification for discrimination against U.S. media entities unless the same treatment is accorded foreign media entities which are government-financed or controlled.

### SECTION 2—USE OF ENGLISH-TEACHING PROGRAM FEES

This section would amend the United States Information and Educational Exchange Act of 1948 to provide the International Communication Agency with the necessary authority to use tuition and other payments received in connection with the agency's overseas English-teaching programs. Under present practice, USICA is required to return to the Treasury any proceeds it collects as a result of its activities. At present, many of these programs are run under contracts with binational centers overseas where USICA's authority is limited. If USICA is permitted to use the proceeds of its programs it will be able to strengthen its program control and financial oversight. Annual proceeds from such programs are estimated at $200,000 for the first year and up to $500,000 in succeeding years. The authority provided in this section may be exercised only to the extent that it is approved in appropriation acts.

### SECTION 3—INTEREST EARNED BY INTER-AMERICAN FOUNDATION GRANTEES

This section would exempt Inter-American Foundation (IAF) grantees from the obligation to return to the Treasury interest earned on advances of appropriated funds. This provision applies to interest earned both before and after date of enactment of the section.

Under present IAF practice, disbursements of grants are made at 6-month intervals, since most grants are under $75,000 and it would

be administratively costly and inefficient to make quarterly disbursements. Although great effort is made to disburse funds so as to minimize the time elapsing between transfer and grantee utilization, the entire disbursement may not be used immediately. In fact, it normally takes several weeks for the grantee to utilize all of the funds. In countries where the annual inflation rate has been as high as 100 percent, the real value of the money drops dramatically if the remaining funds are not permitted to earn interest, even for 2 or 3 weeks. Under current administrative interpretations, these organizations must return to the U.S. Treasury any earned interest. Not only is this practice confusing to the small, unsophisticated organizations which make up the bulk of IAF's grantees, but it would be more costly to the United States administratively to require the return of such small amounts of interest.

Instead, the committee feels that a much more practical and efficient procedure would be to permit grantees to utilize any such interest earned for the purposes for which the IAF grant was made. In this way, the Foundation's funding will not be as diminished by high inflation rates, the purposes of the Foundation will be served, the United States will save money, and the purposes of the individual grants will be enhanced. In addition, the committee wishes to stress that support for this exemption from the requirements of 31 U.S.C. 484 is based upon the unusual aspects of Foundation grantmaking and operations and is not intended to be a precedent for other agencies. Indeed, the committee does not feel that this exemption is inconsistent with the original intent behind enactment of 31 U.S.C. 484 which concerns congressional oversight and control of appropriated funds.

## REQUIRED REPORTS SECTION

### COST ESTIMATE

H.R. 5998 authorizes an additional appropriation of $157,660,000 for fiscal year 1983 for the International Communication Agency. The fiscal year allocation of the total cost of the bill is set forth in the Congressional Budget Office estimate below. Assuming the full appropriation of the amount authorized in H.R. 5998, the committee agrees with the projected cost estimate of the Congressional Budget Office.

### INFLATIONARY IMPACT STATEMENT

The additional amount authorized to be appropriated in H.R. 5998 is only 0.01 percent of the President's total budget authority request for fiscal year 1983. Thus, the bill, if enacted, would have no measurable inflationary impact.

### STATEMENTS REQUIRED BY CLAUSE 2(l)(3) OF HOUSE RULE XI

(a) Oversight findings and recommendations

Principal oversight activities which contributed to the formulation of H.R. 5998 included:

(1) Extensive hearings and review of the executive branch authorization request for the International Communication

Agency during the first session of the 97th Congress by the Subcommittee on International Operations as well as the special hearing on the supplemental fiscal year 1983 authorization request for the International Communication Agency alluded to earlier in the report;

(2) Staff inspections of International Communication Agency overseas operations and Voice of America facilities; and

(3) Ongoing consultation between the committee members and staff and executive branch officials concerning the formulation and administration of U.S. international communication policy.

Based on these oversight activities, the committee recommends the adoption of H.R. 5998.

### (b) Budget authority

The enactment of H.R. 3566 will create no new budget authority.

### (c) Committee on Government Operations summary

No oversight findings and recommendations which relate to the measure have been received from the Committee on Government Operations under clause 4(c)(2) of rule X of the rules of the House.

### (d) Congressional Budget Office cost estimate

APRIL 2, 1982.

1. Bill Number: H.R. 5998.

2. Bill title: A bill to provide additional authorization of appropriations for the fiscal year 1983 for the International Communications Agency, and for other purposes.

3. Bill status: As ordered reported by the House Foreign Affairs Committee on April 1, 1982.

4. Bill purpose: This legislation authorizes the appropriation of $640 million for the International Communication Agency (ICA) for fiscal year 1983; permits the crediting of tuition fees and other payments received by the ICA to the Agency's appropriations, to the extent provided in advance in an appropriation Act; and permits the recipients of Inter-American Foundation grants to invest funds received in interest bearing accounts and use the interest earned for the same purposes for which the grant was made.

5. Cost estimate:

[By fiscal years, in millions of dollars]

| | 1983 | 1984 | 1985 | 1986 | 1987 |
|---|---|---|---|---|---|
| Budget function 150: | | | | | |
| Authorization amount | 640 | 0 | 0 | 0 | 0 |
| Estimated outlays | 434 | 123 | 62 | 19 | 2 |

6. Basis for estimate:

The estimate assumes enactment of this legislation and subsequent appropriation of the authorization amounts by September 30, 1982. Estimated outlays were taken from the President's January Budget.

The $640 million authorization is an increase of $157,660 thousand over the authorization contained in the conference report on S. 1193, the International Communications Agency Authorization Act, fiscal years 1982 and 1983. Since that legislation has not been enacted, the full authorization amount is shown in the cost estimate section.

11

Section 2 of the bill authorizes the crediting of fees and other payments received by the ICA from its English-teaching program to the Agency's appropriation. This section would permit the ICA to undertake new arrangements for its English-teaching program and finance the program with offsetting collections from non-federal sources.

Section 3 would permit recipients of Inter-American Foundation grants to use interest earned on advances for the same purposes for which the grant was made, rather than covering the interest to the U.S. Treasury as a miscellaneous offsetting receipt. The Foundation estimates that less than $300,000 in interest is affected and that additional staffing and collection procedures will greatly offset collections.

7. *Estimate comparison:* Authorization levels and estimated outlays are the same as the Administration.

8. Previous CBO estimate: None.

9. Estimate prepared by: Joe Whitehill.

10. Estimate approved by:

JAMES BLUM,
*Assistant Director for Budget Analysis.*

### CHANGES IN EXISTING LAW MADE BY THE BILL, AS REPORTED

In compliance with clause 3 of rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, as reported, are shown as follows (new matter is printed in italic, existing law in which no change is proposed is shown in roman):

### UNITED STATES INFORMATION AND EDUCATIONAL EXCHANGE OF 1948

\* \* \* \* \* \* \*

## TITLE VIII—ADMINISTRATIVE PROCEDURES

\* \* \* \* \* \* \*

#### USE OF ENGLISH-TEACHING PROGRAM FEES

*Sec. 808. Notwithstanding section 3617 of the Revised Statutes of the United States (31 U.S.C. 484) or any other law or limitation of authority, tuition fees or other payments received by or for the use of the International Communication Agency from or in connection with English-teaching programs conducted by or on behalf of the Agency under the authority of this Act or the Mutual Educational and Cultural Exchange Act of 1961 may be credited to the Agency's applicable appropriation to such extent as may be provided in advance in an appropriation Act.*

\* \* \* \* \* \* \*

### FOREIGN ASSISTANCE ACT OF 1969

\* \* \* \* \* \* \*

### PART IV—THE INTER-AMERICAN FOUNDATION ACT

Sec. 401. INTER-AMERICAN FOUNDATION.— (a) \* \* \*

\* \* \* \* \* \* \*

# UNITED STATES CODE
## *Congressional and Administrative News*

## 96th Congress—First Session
## 1979

Convened January 15, 1979.
Adjourned January 3, 1980

## Volume 1

**PUBLIC LAWS 96–1 to 96–187**
**[93 Stat. pages 1 to 1369]**

## LEGISLATIVE HISTORY

ST. PAUL, MINN.
WEST PUBLISHING CO.

. 14. 1979

NVEYANCE

~ey a reversionary inter-
~ted in Bell County, Ken-
~ntucky.

*Representatives of the*
~d, That the Secretary
~ion, to the Bell County
~ all right, title, and
~ less, a portion of the
~201b in the quitclaim
~the Commonwealth of
~ment of Conservation,
~entucky, in deed book
~es may hold as a result
~: *Provided,* That this
~nterest of the United
~ (not outstanding or
~ed States in said deed:
~from the sale, lease,
~ lands shall be used
~Bell County Board of

~ion 1 lies on the east
~ntain in the Kentucky
~described as follows:
~ot Kentucky Utilities
~ of way line of United
~ith 01 degrees 46
~ ~ent (set); thence,
~grees 34 minutes west,
~ east right-of-way line
~-of-way the following
~500.00 feet; north 28
~concrete right-of-way
~ east, 456.59 feet to a
~1 degrees 25 minutes
~ument (found); north
~concrete right-of-way
~ east, 679.00 feet to a
~50 degrees 02 minutes

~ition, and Forestry).

## PUBLIC LAW 96–60 [H.R. 3363]; Aug. 15, 1979

# DEPARTMENT OF STATE AUTHORIZATION ACT, FISCAL YEARS 1980 AND 1981

*For Legislative History of Act, see p. 982*

An Act to authorize appropriations for fiscal years 1980 and 1981 for the De-
partment of State, the International Communication Agency, and the
Board for International Broadcasting.

*Be it enacted by the Senate and House of Representatives of the
United States of America in Congress assembled,*

## TITLE I—DEPARTMENT OF STATE

#### SHORT TITLE

SEC. 101. This title may be cited as the "Department of State Authorization Act, Fiscal Years 1980 and 1981".

#### AUTHORIZATIONS OF APPROPRIATIONS

SEC. 102. (a) There are authorized to be appropriated for the Department of State to carry out the authorities, functions, duties, and responsibilities in the conduct of the foreign affairs of the United States and other purposes authorized by law, the following amounts, subject to the limitation in subsection (b):

(1) For "Administration of Foreign Affairs", $849,423,000 for the fiscal year 1980 and $1,009,815,000 for the fiscal year 1981.

(2) For "International Organizations and Conferences", $502,945,000 for the fiscal year 1980 and $525,082,000 for the fiscal year 1981.

(3) For "International Commissions", $26,733,000 for the fiscal year 1980 and $26,081,000 for the fiscal year 1981.

(4) For "Migration and Refugee Assistance", $104,910,000 for the fiscal year 1979 (in addition to amounts otherwise authorized), $248,951,000 for the fiscal year 1980, and $254,188,000 for the fiscal year 1981.

(b) The aggregate amount appropriated under paragraphs (1), (2), and (3) of subsection (a) may not exceed $1,369,401,000 for the fiscal year 1980 and may not exceed $1,547,778,000 for the fiscal year 1981.

(c) Funds appropriated under paragraph (2) of subsection (a) may not be used for payment by the United States, as its contribution toward the assessed budget of the United Nations for any year, of any amount which would cause the total amount paid by the United States as its assessed contribution for that year to exceed the amount assessed as the United States contribution for that year less—

(1) 25 percent of the amount budgeted for that year for the Committee on the Exercise of the Inalienable Rights of the Palestinian People (or any similar successor entity), and

(2) 25 percent of the amount budgeted for that year for the Special Unit on Palestinian Rights (or any similar successor entity).

Department of
State,
International
Communication
Agency, and
Board for
International
Broadcasting,
appropriation
authorizations.
Department of
State
Authorization
Act, Fiscal Years
1980 and 1981.

000098

"(c) This section does not apply with respect to any alien who is a member, officer, official, representative, or spokesman of the Palestine Liberation Organization.

"(d) The Secretary of State may refuse to recommend a waiver for aliens from signatory countries which are not in substantial compliance with the provisions of the Helsinki Final Act, particularly the human rights and humanitarian affairs provisions.".

22 USC 3001 *et seq.*

### UNITED NATIONS TECHNICAL ASSISTANCE PROGRAMS

Sec. 110. Title I of the Departments of State, Justice, and Commerce, the Judiciary, and Related Agencies Appropriation Act, 1979 (Public Law 95–431; 92 Stat. 1021), is amended in the paragraph under the heading "CONTRIBUTIONS TO INTERNATIONAL ORGANIZATIONS" by striking out ", of which no part may be made available for the furnishing of technical assistance by the United Nations or any of its specialized agencies".

International Communication Agency Authorization Act, Fiscal Years 1980 and 1981.

## TITLE II—INTERNATIONAL COMMUNICATION AGENCY

### SHORT TITLE

Sec. 201. This title may be cited as the "International Communication Agency Authorization Act, Fiscal Years 1980 and 1981".

### AUTHORIZATIONS OF APPROPRIATIONS

Sec. 202. There are authorized to be appropriated for the International Communication Agency $432,547,000 for the fiscal year 1980 and $465,944,000 for the fiscal year 1981 to carry out international communication, educational, cultural, and exchange programs under the United States Information and Educational Exchange Act of 1948, the Mutual Educational and Cultural Exchange Act of 1961, and Reorganization Plan Numbered 2 of 1977, and other purposes authorized by law.

22 USC 1431 note, 2451 note. 5 USC app.

### ADMINISTRATIVE AUTHORITIES

Sec. 203. (a)(1) Section 1001 of the United States Information and Educational Exchange Act of 1948 (22 U.S.C. 1434) and section 104(f) of the Mutual Educational and Cultural Exchange Act of 1961 (22 U.S.C. 2454(f)) are repealed.

(2) Section 1304(a) of title 5, United States Code, is amended by striking out "290a, and 1434" and inserting in lieu thereof "and 290a".

(b)(1) Section 801(5) of the United States Information and Educational Exchange Act of 1948 (22 U.S.C. 1471(5)) is amended to read as follows:

"(5) to employ persons on a temporary basis without regard to the civil service and classification laws, when such employment is provided for by the pertinent appropriation Act; and".

(2) Section 804(1) of such Act (22 U.S.C. 1474(1)) is amended to read as follows:

"(1) employ, without regard to the civil service and classification laws, aliens within the United States and abroad for service in the United States relating to the translation or narration of colloquial speech in foreign languages or the preparation and production of foreign language programs when suitably qualified United States citizens are not available, and aliens so employed



93 STAT. 398

ny alien who is a
...man of the Pales-

...commend a waiver for
... in substantial compli-
...al Act, particularly the
...ions.".

...CE PROGRAMS

...ate, Justice, and Com-
...appropriation Act, 1979
...ided in the paragraph
...ERNATIONAL ORGANIZA-
...y be made available for
...United Nations or any of

...ICATION AGENCY

...ernational Communica-
...980 and 1981".

...ATIONS

...priated for the Interna-
...for the fiscal year 1980
...arry out international
...change programs under
...onal Exchange Act of
...Exchange Act of 1961,
...  d other purposes

...ES

...States Information and
...1434) and section 104(f)
...change Act of 1961 (22

... Code, is amended by
... in lieu thereof "and

...formation and Educa-
...is amended to read as

...asis without regard to
...hen such employment
...priation Act; and".
...)) is amended to read

...service and classifica-
...and abroad for service
...ation or narration of
...the preparation and
...hen suitably qualified
...ad aliens so employed

abroad may be admitted to the United States, if otherwise qualified, as nonimmigrants under section 101(a)(15) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(15)) for such time and under such conditions and procedures as may be established by the Director of the International Communication Agency and the Attorney General;".

(c) Section 602(d) of the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 474) is amended—

(1) by striking out "or" at the end of paragraph (19);

(2) by striking out the period at the end of paragraph (20) and inserting in lieu thereof "; or"; and

(3) by inserting immediately after paragraph (20) the following new paragraph:

"(21) the Director of the International Communication Agency with respect to the furnishing of facilities in foreign countries and reception centers within the United States.".

(d) Section 108(a) of the Mutual Educational and Cultural Exchange Act of 1961 (22 U.S.C. 2458(a)) is amended—

(1) by inserting "(1)" immediately after "SEC. 108. (a)"; and

(2) by adding at the end thereof the following new paragraph:

"(2) Notwithstanding any other provision of law, the Director of the International Communication Agency may provide, on a reimbursable basis, services within the United States in connection with exchange activities otherwise authorized by this Act when such services are requested by a department or executive agency. Reimbursements under this paragraph shall be credited to the applicable appropriation of the Agency.".

(e) Section 801(3) of the United States Information and Educational Exchange Act of 1948 (22 U.S.C. 1471(3)) is amended to read as follows:

"(3) whenever necessary in carrying out title V of this Act, to    22 USC 1461.
purchase, rent, construct, improve, maintain, and operate facilities for radio transmission and reception, including the leasing of associated real property (either within or outside the United States) for periods not to exceed ten years, or for longer periods if provided for by an appropriation Act, and the alteration, improvement, and repair of such property, without regard to section 322 of the Act of June 30, 1932 (40 U.S.C. 278a), and any such real property or interests therein which are outside the United States may be acquired without regard to section 355 of the Revised Statutes of the United States (40 U.S.C. 255) if the sufficiency of the title to such real property or interests therein is approved by the Director of the International Communication Agency;".

(f) Title VI of the United States Information and Educational Exchange Act of 1948 (22 U.S.C. 1466–1468) is amended by adding at the end thereof the following new section:

"UNITED STATES ADVISORY COMMISSION ON PUBLIC DIPLOMACY

"SEC. 604. (a) The United States Advisory Commission on Interna-    22 USC 1469.
tional Communication, Cultural and Educational Affairs, established
by section 8 of Reorganization Plan Numbered 2 of 1977, is hereby    5 USC app.
redesignated as the United States Advisory Commission on Public
Diplomacy (hereafter in this section referred to as the 'Commission').

"(b) The Commission shall have a Staff Director who shall be    Membership.
appointed by the Chairman of the Commission. Subject to such rules    Duties.

93 STAT. 399

000100

# UNITED STATES CODE
## Congressional and Administrative News

### 96th Congress—First Session
### 1979

Convened January 15, 1979
Adjourned January 3, 1980

## Volume 2

### LEGISLATIVE HISTORY

ST. PAUL, MINN.
WEST PUBLISHING CO.

LEGISLATIVE HISTORY
P.L. 96-60

# DEPARTMENT OF STATE AUTHORIZATION ACT, FISCAL YEARS 1980 AND 1981

*P.L. 96-60, see page 93 Stat. 395*

House Report (Foreign Affairs Committee) No. 96-81,
Apr. 3, 1979 [To accompany H.R. 3363]

Senate Report (Foreign Relations Committee) No. 96-116,
May 3, 1979 [To accompany S. 586]

House Conference Report No. 96-399, July 31, 1979
[To accompany H.R. 3363]

Cong. Record Vol. 125 (1979)

## DATES OF CONSIDERATION AND PASSAGE

House April 24, August 2, 1979

Senate May 15, August 2, 1979

The House bill was passed in lieu of the Senate bill after amending
its language to contain much of the text of the Senate bill.
The Senate Report (this page) and the House Conference Report
(page 1011) are set out.

## SENATE REPORT NO. 96-116

[page 1]

The Committee on Foreign Relations, to which was referred the bill
(S. 586) authorizing appropriations for the Department of State,
the International Communication Agency, and the Board for Inter-
national Broadcasting for fiscal years 1980 and 1981, and a supple-
mental authorization for State for fiscal year 1979, having considered
the same, reports favorably thereon with an amendment and recom-
mends that the bill as amended do pass.

### PRIMARY PURPOSE

The primary purpose of this bill is to authorize appropriations for
fiscal years 1980 and 1981 in the amounts of $2,123,951,000 and $2,342,-
332,000 respectively for the Department of State, the International
Communication Agency, and the Board for International Broadcast-
ing (which makes grants to Radio Free Europe/Radio Liberty), and
to authorize supplemental appropriations for the Department of State
for fiscal year 1979 in the amount of $104,910,000.

The following table shows for each agency the fiscal years 1980
and 1981 authorizations approved by the Committee, by major cate-
gories, together with the authorizations and appropriations for fiscal
year 1979 and the amounts requested by the Executive for fiscal years
1980 and 1981:

982

000102

DEPARTMENT OF STATE
P.L. 96–60
[page 20]

(step 1) level, or about $150 per day. This rate is the same as that provided other Federal advisory boards.

### Section 204. ICA Films

This section, offered as an amendment by Pell, authorizes the distribution within the United States of the following ICA films: "Aspen," and "Margaret Mead—Reflections." In offering this amendment, Senator Pell indicated that he included the film "Aspen" to accommodate Senator Hart who has introduced an amendment to this bill to authorize the release of that film.

Unless specifically authorized by Congress, section 501 of the Smith-Mundt Act prohibits the dissemination in the United States of any product ICA produces for distribution abroad. It should be noted that the Committee authorizes the release of these films contingent upon the Agency's ability to obtain copyright clearances from the performers who produced or appeared in these films.

### Section 205. Administrative Authorities

Security clearances for ICA employees, due to an oversight of the 1978 reorganization, are governed by two separate provisions—section 1001 of the Smith-Mundt Act and section 104(f) of the Fulbright-Hays Act. It is often impossible for the Agency to determine under which law an employee falls.

Subsection 205(a)(1) of this Act repeals these conflicting provisions. Repeal of these sections would allow the ICA to operate under Executive Order 10450 which would enable the Agency to conduct its security clearances more efficiently. It also brings the Agency into line with the practices of other foreign affairs and security agencies in this regard.

Subsection 205(a)(2) is merely a technical amendment correcting a citation in the United States Code.

Subsection 205(b)(1) and (2) amend the Smith-Mundt Act of 1948 by extending ICA's present authority to permit the employment of aliens not only for narration and translation, as is now authorized, but also for the preparation and production of foreign language programs, by deleting the need for repetitious language in the Agency's annual appropriation act for authority to hire aliens within the United States, and by subjecting all alien employees to Executive Order 10450 with respect to security clearances.

At present, aliens are restricted to doing narration and translation work. It is frequently impossible to find American citizens to do the supervisory-level work of preparation or production of programs in several foreign languages, and the purpose of these subsections is to obtain permission for aliens to do this work when Americans are not available. There is a maximum of 40 such personnel slots which could be filled by aliens, most of which are at Voice of America (VOA), and most of which will at any time be filled by U.S. citizens. By law, should a qualified U.S. citizen apply for a position held by an alien, the American citizen would be given the position.

These subsections will also insert in permanent legislation the authority of ICA to hire aliens within the U.S. The Agency now has the power to hire aliens abroad and then to bring them to the U.S. Authority for domestic hiring of aliens has been repeated for many years in appropriation Acts.

1001

# United States

## Congressional Service

### 80th Congress — Second Session

### 1948

Convened January 6, 1948

Adjourned August 7, 1948

### Volume 1

Laws — Tables — Index
New Judiciary and Judicial Procedure Title
New Crimes and Criminal Procedure Title

St. Paul, Minn.          Brooklyn, N. Y.
West Publishing Co.     Edward Thompson Co.

for the Blind who enters the service of such Institution after the date of enactment of this amendment, such notice of desire to come within the purview of this Act must be given within six months after the date of entrance into such service."

Sec. 3.  The first paragraph of section 5 of such Act[2] is amended by inserting after "or the legislative branch of the Government" a comma and "and periods of service as an officer or employee of the National Library for the Blind".

Sec. 4.  Any service rendered prior to the effective date of this Act as an officer or employee of the National Library for the Blind shall be considered creditable service for the purposes of section 9 of such Act.[3]

Approved January 26, 1948.

## SOLDIERS' HOME—REGULATIONS

*See Legislative History, p. 1009*

### CHAPTER 35—PUBLIC LAW 401

[S. 929]

An Act to amend section 2 of the Act prescribing regulations for the Soldiers' Home located at Washington, in the District of Columbia, and for other purposes, approved March 3, 1883 (22 Stat. 564).

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That:*

Section 2 of the Act of March 3, 1883 (22 Stat. 564),[1] is hereby amended to read as follows:

"Sec. 2.  The Inspector General of the Army shall designate officers of the Inspector General's Department under his jurisdiction to inspect thoroughly, once each year, the United States Soldiers' Home, Washington, District of Columbia, its records, accounts, management, discipline, and sanitary condition, and shall report thereon in writing to the Secretary of the Army, including in his report such suggestions as he desires to make."

Approved January 27, 1948.

## UNITED STATES INFORMATION AND EDUCATIONAL EXCHANGE ACT OF 1948

*See Legislative History, p. 1011*

### CHAPTER 36—PUBLIC LAW 402

[H. R. 3342]

An Act to promote the better understanding of the United States among the peoples of the world and to strengthen cooperative international relations.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That:*

### TITLE I—SHORT TITLE, OBJECTIVES, AND DEFINITIONS

SHORT TITLE

Section 1.  This Act may be cited as the "United States Information and Educational Exchange Act of 1948".

OBJECTIVES

Sec. 2.  The Congress hereby declares that the objectives of this Act are to enable the Government of the United States to promote a better

2 5 U.S.C.A. § 707.
3 5 U.S.C.A. § 736b.
1 24 U.S.C.A. § 50.

4

ion after the date of
.. me within the
.. er the date of

Act ? is amended by
..ernment" a comma
..ree of the National

..date of this Act as
..Blind shall be coa-
..of such Act.8

ONS

81

..ulations for the
..ict of Columbia,
..2 Stat. 564).
..the United States of

.., is hereby amend-

..designate officers of
..tion to inspect thor-
..Home, Washington,
..ent, discipline, and
..g to the Secretary
..as as he desires to

UCATIONAL

2

..United States
..cooperative in-

..the United States of

DEFINITIONS

..States Information

..jectives of this Act
..to promote a better

understanding of the United States in other countries, and to increase mutual understanding between the people of the United States and the people of other countries. Among the means to be used in achieving these objectives are—

(1) an information service to disseminate abroad information about the United States, its people, and policies promulgated by the Congress, the President, the Secretary of State and other responsible officials of Government having to do with matters affecting foreign affairs;

(2) an educational exchange service to cooperate with other nations in—

(a) the interchange of persons, knowledge, and skills;

(b) the rendering of technical and other services;

(c) the interchange of developments in the field of education, the arts, and sciences.

## UNITED NATIONS

Sec. 3.    In carrying out the objectives of this Act, information concerning the participation of the United States in the United Nations, its organizations and functions, shall be emphasized.

## DEFINITIONS

Sec. 4.    When used in this Act, the term—

(1) "Secretary" means the Secretary of State.

(2) "Department" means the Department of State.

(3) "Government agency" means any executive department, board, bureau, commission, or other agency of the Federal Government, or independent establishment, or any corporation wholly owned (either directly or through one or more corporations) by the United States.

## TITLE II—INTERCHANGE OF PERSONS, KNOWLEDGE AND SKILLS

### PERSONS

Sec. 201.    The Secretary is authorized to provide for interchanges on a reciprocal basis between the United States and other countries of students, trainees, teachers, guest instructors, professors, and leaders in fields of specialized knowledge or skill and shall wherever possible provide these interchanges by using the services of existing reputable agencies which are successfully engaged in such activity. The Secretary may provide for orientation courses and other appropriate services for such persons from other countries upon their arrival in the United States, and for such persons going to other countries from the United States. When any country fails or refuses to cooperate in such program on a basis of reciprocity the Secretary shall terminate or limit such program, with respect to such country, to the extent he deems to be advisable in the interests of the United States. The persons specified in this section shall be admitted as nonimmigrant visitors for business under clause 2 of section 3 of the Immigration Act of 1924, as amended (43 Stat. 154; 8 U. S. C. 203),1 for such time and under such conditions as may be prescribed by regulations promulgated by the Secretary of State and the Attorney General. A person admitted under this section who fails to maintain the status under which he was admitted or who fails to depart from the United States at the expiration of the time for which he was admitted, or who engages in activities of a political nature detrimental to the interests of the United States, or in activities not consistent with the security of the United States, shall, upon the warrant of the Attorney General, be taken into custody and promptly deported pursuant to section 14 of the Immigration Act of 1924 (43 Stat. 162, 8 U. S. C. 214).2 Deportation proceedings under this section shall be summary and the

1 8 U.S.C.A. § 203.
2 8 U.S.C.A. § 214.

5

000106

bers first taking office on each Commission shall expire, as designated by the President at the time of appointment, two at the end of one year, two at the end of two years, and one at the end of three years from the date of the enactment of this Act. Any member appointed to fill a vacancy occurring prior to the expiration of the term for which his predecessor is appointed shall be appointed for the remainder of such term. Upon the expiration of his term of office any member may continue to serve until his successor is appointed and has qualified.

(e) The President shall designate a chairman for each Commission from among members of the Commission.

(f) The members of the Commissions shall receive no compensation for their services as such members but shall be entitled to reimbursement for travel and subsistence in connection with attendance of meetings of the Commissions away from their places of residences, as provided in subsection (6) of section 801 of this Act.

(g) The Commissions are authorized to adopt such rules and regulations as they may deem necessary to carry out the authority conferred upon them by this title.

(h) The Department is authorized to provide the necessary secretarial and clerical assistance for the Commissions.

#### RECOMMENDATIONS AND REPORTS

Sec. 603. The Commissions shall meet not less frequently than once each month during the first six months after their establishment, and thereafter at such intervals as the Commissions find advisable, and shall transmit to the Secretary a quarterly report, and to the Congress a semiannual report of all programs and activities carried on under the authority of this Act, including appraisals, where feasible, as to the effectiveness of the several programs, and such recommendations as shall have been made by the Commissions to the Secretary for effectuating the purposes and objectives of this Act and the action taken to carry out such recommendations.

### TITLE VII—APPROPRIATIONS

#### GENERAL AUTHORIZATION

Sec. 701. Appropriations to carry out the purposes of this Act are hereby authorized.

#### TRANSFER OF FUNDS

Sec. 702. The Secretary shall authorize the transfer to other Government agencies for expenditure in the United States and in other countries, in order to carry out the purposes of this Act, any part of any appropriations available to the Department for carrying out the purposes of this Act, for direct expenditure or as a working fund, and any such expenditures may be made under the specific authority contained in this Act or under the authority governing the activities of the Government agency to which a part of any such appropriation is transferred, provided the activities come within the scope of this Act.

### TITLE VIII—ADMINISTRATIVE PROCEDURES

#### THE SECRETARY

Sec. 801. In carrying out the purposes of this Act, the Secretary is authorized, in addition to and not in limitation of the authority otherwise vested in him—

(1) In carrying out title II of this Act, within the limitation of such appropriations as the Congress may provide, to make grants of money, services, or materials to State and local governmental institutions in the United States, to governmental institutions in other countries, and to individuals and public or private nonprofit organizations both in the United States and in other countries;

(2) to furnish, sell, or rent, by contract or otherwise, educational

9

and information materials and equipment for dissemination to, or use by, peoples of foreign countries;

(3) whenever necessary in carrying out title V of this Act, to purchase, rent, construct, improve, maintain, and operate facilities for radio transmission and reception, including the leasing of real property both within and without the continental limits of the United States for periods not to exceed ten years, or for longer periods if provided for by the appropriation Act;

(4) to provide for printing and binding outside the continental limits of the United States, without regard to section 11 of the Act of March 1, 1919 (44 U. S. C. 111);[7]

(5) to employ, without regard to the civil-service and classification laws, when such employment is provided for by the appropriation Act, (i) persons on a temporary basis, and (ii) aliens within the United States, but such employment of aliens shall be limited to services related to the translation or narration of colloquial speech in foreign languages when suitably qualified United States citizens are not available; and

(6) to create, with the approval of the Commission on Information and the Commission on Educational Exchange, such advisory committees as the Secretary may decide to be of assistance in formulating his policies for carrying out the purposes of this Act. No committee member shall be allowed any salary or other compensation for services; but he may be paid his actual transportation expenses, and not to exceed $10 per diem in lieu of subsistence and other expenses, while away from his home in attendance upon meetings within the United States or in consultation with the Department under instructions.

## GOVERNMENT AGENCIES

Sec. 802. In carrying on activities which further the purposes of this Act, subject to approval of such activities by the Secretary, the Department and the other Government agencies are authorized—

(1) to place orders and make purchases and rentals of materials and equipment;

(2) to make contracts, including contracts with governmental agencies, foreign or domestic, including subdivisions thereof, and intergovernmental organizations of which the United States is a member, and, with respect to contracts entered into in foreign countries, without regard to section 3741 of the Revised Statutes (41 U. S. C. 22);[8]

(3) under such regulations as the Secretary may prescribe, to pay the transportation expenses, and not to exceed $10 per diem in lieu of subsistence and other expenses, of citizens or subjects of other countries, without regard to the Standardized Government Travel Regulations and the Subsistence Act of 1926, as amended; and

(4) to make grants for, and to pay expenses incident to, training and study.

## MAXIMUM USE OF EXISTING GOVERNMENT PROPERTY AND FACILITIES

Sec. 803. In carrying on activities under this Act which require the utilization of Government property and facilities, maximum use shall be made of existing Government property and facilities.

## TITLE IX—FUNDS PROVIDED BY OTHER SOURCES

### REIMBURSEMENT

Sec. 901. The Secretary shall, when he finds it in the public interest, request and accept reimbursement from any cooperating governmental

---

[7] 44 U.S.C.A. § 111.
[8] 41 U.S.C.A. § 22.

000108

# United States Code

## Congressional Service

### 80th Congress — Second Session

#### 1948

———

Convened January 6, 1948
Adjourned August 7, 1948

### Volume 2

Legislative History — Messages
Proclamations — Executive Orders, Etc.

St. Paul, Minn.          Brooklyn, N. Y.
West Publishing Co.    Edward Thompson Co.

U. S. INFORMATION, ETC., ACT

# UNITED STATES INFORMATION AND EDUCATIONAL EXCHANGE ACT OF 1948

*For text of Act see p. 4*

Senate Report No. 573, July 16, 1947 [To accompany HR. 3342]

Senate Report No. 811, Jan. 7, 1948 [To accompany HR. 3342]

House Report No. 416, May 21, 1947 [To accompany HR. 3342]

*Senate Report No. 811 was issued after H.R.3342 had been recommitted to the Senate Foreign Relations Committee and rereported out on Jan. 7, 1948. It contains a more detailed analysis of the bill than the other reports.*

THE Committee on Foreign Relations, to whom was referred the bill (H. R. 3342) to enable the Government of the United States more effectively to carry on its foreign relations by means of promotion of the interchange of persons, knowledge, and skills between the people of the United States and other countries, and by means of public dissemination abroad of information about the United States, its people, and its policy, having considered the same, report the bill to the Senate favorably with amendments and recommend that it do pass.

## MAIN PURPOSE OF THE BILL

The main purpose of the bill is to enable the Government of the United States to promote a better understanding of the United States in other countries, and to increase mutual understanding between the people of the United States and the people of other countries. Among the means to be used in achieving these objectives are: (1) an information service to disseminate abroad information about the United States, its people, and the policies promulgated by the Congress, the President, the Secretary of State, and other responsible officials of Government having to do with matters affecting foreign affairs; and (2) an educational exchange service which would enable the United States to cooperate more effectively with other nations in (a) the interchange of persons, knowledge, and skills; (b) the rendering of technical and other services; and (c) the interchange of information and developments in the field of education, the arts, and sciences.

## BACKGROUND OF INFORMATION AND EDUCATIONAL EXCHANGE PROGRAM

Our foreign relations always have been, in the broad sense, a mixture of varying amounts of diplomacy, economics, social intercourse, and the diffusion of ideas. Benjamin Franklin was both cultural ambassador and diplomat. From early days, American enterprise, skill, generosity, and zeal made great contributions to the life of other nations which have also enhanced the appreciation of the United States. Frequently, this projection of the United States required no special effort on our part, either as private citizens or as a government. The projection has often been haphazard. No one can estimate fully what differences a greater amount of persistent concern might have made in our foreign affairs.

1011

000110

## LEGISLATIVE HISTORY

Government interest and participation in public relations abroad began to increase by 1938 when the Department of State, working with other Government agencies, instituted a program of scientific and cultural cooperation with the American Republics. Inter-American conferences at Buenos Aires (1936) and Lima (1938) urged each state to exchange knowledge for mutual welfare and security. With the coming of World War II, these programs were increased. A larger effort, which included more direct informational operations, was made by the Office of the Coordinator of Inter-American Affairs, created in 1940. In 1942, war-information functions (both foreign and domestic) of the Government were consolidated in the Office of War Information to provide an intelligent understanding of the status and progress of the war effort and of the war policies, activities, and aims of the Government. In its foreign programs, OWI concentrated on the Eastern Hemisphere. Both OIAA and OWI were created by Executive orders. When OIAA and OWI were reduced into the Department of State, in August 1945, the Department sought to clarify the authorization, programs, and responsibilities by seeking new legislation.

The purpose and programs contemplated in H. R. 3342 have a long congressional background and have been the subject of many debates and hearings in connection with basic legislation and appropriation bills.

In 1938 and 1939, Congress enacted several laws relating to educational and scientific cooperation with Latin America. The act of August 9, 1939, authorized the carrying out of obligations of agreements reached at inter-American conferences in 1936 and 1938.

The Seventy-ninth Congress considered authorizing legislation for a world-wide program which would include an information service.

The bill passed the House on July 20, 1946, and was reported favorably by the Senate Foreign Relations Committee; but it did not come to a vote in the Senate, and died with the Seventy-ninth Congress. The program continued throughout the 1947 fiscal year under authority of only an appropriation act.

The matter was revived in the Eightieth Congress by H. R. 3342, which provided basic authority for these programs and passed the House on June 24, 1947, by a vote of 272 to 97. Hearings were held by the Senate Foreign Relations Committee and the bill was reported favorably, with certain amendments, to the Senate but did not come to a vote before the close of the first session. Report No. 573, which accompanied the bill at that time, can be used in connection with the present report, since, in general, the committee did not alter the amendments or interpretations made at that time. However, it has made additional changes in the light of events, and the experience gained, since July 1947 and reiterates ever more strongly the conviction that enactment is urgent and vital.

In considering appropriations for the fiscal year 1948, the House Appropriations Committee eliminated all funds, on the ground that the program had no basic legislation. The Senate committee, in restoring approximately one-third of the funds requested by the President, also stressed that the program lacked basic authority. H. R. 3342 is designed to meet that need.

1012

000111

**U. S. INFORMATION, ETC., ACT**

## RELATIONSHIP OF PRESENT REPORT TO SENATE RESOLUTION 161, EIGHTIETH CONGRESS, FIRST SESSION

Senate Resolution 161, agreed to July 26, 1947, enabled a subcommittee of the Senate Foreign Relations Committee to study the whole subject of the role of public relations in the foreign policy of the United States, and to cooperate with a subcommittee of the Committee on Foreign Affairs of the House in an on-the-spot investigation in 22 European countries during September and October 1947. There is no desire to anticipate here the forthcoming joint report or the special Senate report to fulfill the subcommittee's obligation under the Resolution.

However, this investigation has had an immediate and practical bearing upon this basic legislation. Consequently, H. R. 3342 was recommitted to the Committee on Foreign Relations on December 8 for further study so that the bill could be presented in revised form to the Senate early in the new session. Experience has been accumulated which may in time affect, assist, and suggest other legislation. The study should aid the Foreign Relations Committee to fulfill its continuing obligations to the Congress under the Reorganization Act of August 2, 1946, generally, as well as specifically in keeping vigilant watch upon the problems and operations in international informational and educational exchange affairs. This legislation, and reports in the near future, will develop guideposts and safeguards which will enable the people of the United States, through their own initiative as well as that which is necessarily expressed in legislation and appropriations by Congress, and the officials responsible for these programs, to get on with a vast and challenging task that faces the United States as a vital, progressive factor in world affairs.

The recent break-down of the London Conference and the pending debates on the European recovery program known as the Marshall plan both point to the urgent need for an adequate information program to interpret the spirit of America to the world.

## GENERAL INTERPRETATIONS

Under the circumstances, before proceeding to the detailed analysis of the bill and amendments, it may be useful to present certain general interpretations and considerations based on the committee's experience.

1. The character of modern international relations and communications, as well as the place held by the United States in world civilization, demand and warrant increased activities abroad in the field of public relations.

2. The present hostile propaganda campaigns directed against democracy, human welfare, freedom, truth, and the United States, spearheaded by the Government of the Soviet Union and the Communist Parties throughout the world, call for urgent, forthright, and dynamic measures to disseminate truth. The truth can constitute a satisfactory counterdefense against actions which can only be described as psychological warfare against us as well as the purposes of the United Nations.

3. The programs and mechanics provided for in this bill are also a necessary corollary to the economic cooperation programs now under consideration by the Congress and the people of the United States.

1013

000112

**LEGISLATIVE HISTORY**

4. Weighing all debits and credits, the United States Government has carried on its informational and educational exchange programs about as efficiently as could be expected under the circumstances to date.

5. While not overlooking errors of omission and commission, the Senate can be assured that generally the costs of such activities are justified.

6. Both at home and abroad, the demands of these programs require competent personnel at all levels, with due regard for the specialization required, and with some balancing to prevent either excessive turnover or stereotyping or bureaucratic entrenchment.

## SEPARATION OF INFORMATION AND EDUCATIONAL EXCHANGE ACTIVITIES

7. The Secretary of State and the head of mission in each country are the proper responsible authorities for these programs. It seems fitting that these activities should come within the particular responsibility of an Assistant Secretary of State for Public Affairs, a post which already exists. However, both at home and abroad, informational and educational exchange work, which are often different from each other because of different methods and operating principles, should be kept as distinct as necessary but under broad-gaged leadership and policies. This should prove a convenience also in enlisting the private resources of this country and the cooperation of American citizens abroad.

Such is the clear intent of the present bill and amendments. For example, this is one of the purposes in setting up two Commissions (title VI), (1) a United States Advisory Commission on Information and (2) a United States Advisory Commission on Educational Exchange. Partly because of this intent, and partly because it was not felt desirable at this time in basic legislation to fix the administrative pattern at the office level in the Department of State, section 1007 has been deleted.

8. The Department of State is urged to take into account, in the development of these programs, not only the considerations of our foreign policy but also the great varieties of peoples, habits, and cultures in the world and to plan such public-relations programs accordingly, with the necessary differences in the means and techniques used, and to explain these program differences regularly and fully to Congress. (See sec. 1008.) Every effort should be made to reach as many leaders and people as possible. Likewise, leadership and policy guidance must be exercised, at home and abroad, so that no unwarranted unbalance, due to bureaucratic or professional enthusiasms, occurs between informational and educational exchange work, or between the various means of communication and methods.

9. Having noted the experience this Government has had in the Western Hemisphere with programs of scientific and cultural cooperation, the committee endorses the intentions of the Department and H. R. 3342 to draw upon participation by other Government agencies of the United States, especially in the interchange of persons, knowledge, and skills.

1014

000113

**U. S. INFORMATION, ETC., ACT**

10. Further, it is vital that the Department of State can and should cooperate with the efforts of private citizens and with profit and non-profit organizations interested in promoting the better understanding of the United States abroad and lasting friendship. Also, the areas of co-operation, consultation, and separate activity between the Department of State and private industry (e. g., films, radio, press, magazines, books) are sufficiently great to expect fruitful and harmonious relationships.

11. The importance of worthy private American activities in the for-eign field cannot be exaggerated. Nonprofit agencies have done much and should be encouraged to do more.

Business enterprise is likewise important. Possibly segments of the various communications industries may well devote even more attention to their global role and opportunities. Improvement and legitimate ex-pansion can be expected, befitting our world position.

Numerous barriers (e. g., the shortages of dollars abroad) are restrict-ing the better understanding of the United States among foreign peoples. It is important that there be a progressive removal of barriers which im-pede the full flow of information from this country.

Necessarily, there must also be constant improvement by private en-terprise of physical facilities and operating mechanisms to get words and images across national boundaries—abundantly, cheaply, quickly, ef-ficiently, and widely. A Government program, even though reasonably supported, cannot be regarded as a substitute for progress in this di-rection.

12. The committee applauds all efforts which attempt by self-discipline and by self-regulatory agreement to discourage the export of substandard American products in the educational and informational fields. This is a plea for quality export not for censorship.

13. We have noted no incompatibilities between our national pro-grams and American participation in the United Nations and especially the United Nations Educational, Scientific, and Cultural Organization (UNESCO). Indeed, certain portions of the national program are neces-sary to carry out our responsibilities to UNESCO. On the other hand, these international organizations are not yet substitutes for the conduct of our own public relations activities.

14. The intent of the bill does not run counter to President's direc-tive to the Department of State of August 31, 1945—

\* \* \* (This Government) will endeavor to see to it that other peo-ples receive a full and fair picture of American life and of the aims and policies of the United States Government.

Anything less than this would impair the credibility of our programs and the curiosity about the United States which still remain among our as-sets.

If the programs are as energetic, creative, and courageous as we hope them to be, there will be mistakes which sometimes happen to be dramatic. However, criticism which reflects perspective and judg-ment cannot but help the programs, and should be applied especially in detecting any persistant tendencies toward ineffectiveness, distortion, or partisanship.

1015

000114

### LEGISLATIVE HISTORY

15. Because of imponderables, it is often difficult to evaluate precisely the effect and results of these programs either on a short-term or long-term basis. We believe, however, the results have assisted the United States and strengthened the bonds of friendship and cooperative international relations, and that these results warrant an expansion and improvement of the program. To go further, the results of these programs, secured with relatively modest expenditures, are absolutely vital ingredients for the peace and security of the United States in a world of political uncertainty, economic disorganization, and ideological aggression.

### BRIEF ANALYSIS OF THE BILL

H. R. 3342 provides a satisfactory basis for both informational operations and educational exchanges with a careful blending of the use of various means of communication, and the resources of the Department of State, other governmental agencies and private organizations wherever practicable.

The principal program provisions in H. R. 3342 include the following:

Section 201. Exchange of students and professors between the United States and other countries on a reciprocal basis.

Section 202. Exchange of books and educational materials with other countries and translations of United States books into foreign languages.

Section 203. Assistance to United States schools, libraries, and community centers abroad.

Section 301. Assignment of United States officials as advisers to other countries (excluding military subjects).

Section 402. Performance of joint technical services by agencies of the United States Government in cooperation with other governments (for example, joint operation of hurricane-warning stations in Mexico and Cuba, by United States Weather Bureau and the Governments of Mexico and Cuba).

Section 501. Dissemination abroad of information about the United States through press, publications, radio, motion pictures, libraries, and other means.

In carrying out such programs, section 1005 of the bill requires that the Secretary of State should use and encourage private organizations wherever practicable. He may also call upon any other Federal agency to assist in the program.

Several important policy statements have been written into the bill. Section 403, for example, establishes limitations on the technical services to be performed jointly with other governments. This is designed to protect private industry against competition from the Government. Section 502 and section 1005 contain statements of policy for the information program which include the provision that the Secretary shall reduce such Government information activities whenever corresponding private information dissemination is found to be adequate.

### IMPORTANT CONTROLS AND SAFEGUARDS IN THE ACT

There are a large number of important safeguards and controls, both as to policy and administration:

1016

000115

## U. S. INFORMATION, ETC., ACT

1. In addition to the usual investigations conducted by the Department of State, the FBI is required to investigate all personnel employed under the information program within 6 months. All new employees are also subject to an FBI investigation.

2. The Secretary of State will be required to use the services of private agencies for carrying on this program wherever practicable.

3. The Secretary of State must also use the existing facilities of the Government to the fullest extent possible, before setting up any new facilities.

4. Reports must be sent to Congress twice a year on both the activities and expenditures of this program, including appraisals of the results of the program in foreign countries.

5. The exchange of persons authorized by this bill must be on a reciprocal basis. This does not mean a literal 50–50 exchange of students, but the program must be a two-way street. The bill also provides for the speedy deportation of any alien who enters the country under this program and then engages in political activities.

6. The legislation may be terminated by concurrent resolution of Congress.

7. The two advisory commissions established by title VI are designed to assist this country in the formulation and recommendation to the Secretary of policies and programs for the carrying out of this act. In addition, the commissions are to report semiannually to the Congress on the recommendations made to the Secretary. But the committee wishes to stress also that the two commissions are not to be viewed primarily as policemen—as constituted they can be of great constructive value to the Secretary of State and the Congress in the best development of public-relations programs in the foreign relations of the United States.

## AMENDMENTS APPROVED BY THE COMMITTEE

During its discussion of the text of H. R. 3342, the committee approved a number of technical amendments designed to afford additional controls over the program, to clarify the meaning of the bill, and to take into account developments since the bill passed the House. These amendments follow:

(1) Amend the title so as to read:

An act to promote the better understanding of the United States among the peoples of the world and to strengthen cooperative international relations.

(2) Section 2 has been changed and clarified partly to indicate the composite nature of the bill and to mark the distinction between an information service and an educational exchange service. This is a positive program to disseminate the truth about the United States and to promote mutual understanding. The amendment recognizes the fact that the conduct of public relations is just as difficult and subtle as economic or diplomatic negotiations, and closely related to them in importance. While the bill authorizes basic activities and mechanisms, many contributions can and must be made to achieve the objectives by all citizens and officials.

1017

## LEGISLATIVE HISTORY

(3) On page 3, the new section 3 indicates that information about the participation of the United States in the United Nations, its organizations and functions, shall be emphasized.

(4) On page 4, line 6–7, strike out the words "in the executive branch." The Library of Congress, for example, is an active participant.

(5) On page 4, line 18, after the word "skill", strike out the period and insert the following:

and shall wherever possible provide these interchanges by using the services of existing reputable agencies which are successfully engaged in such activity.

(6) On page 5, line 4 and thereafter, strike out the last sentence of section 201 and substitute the following language:

The persons specified in this section shall be admitted as nonimmigrant visitors for business under clause 2 of section 3 of the Immigration Act of 1924, as amended (43 Stat. 154, 8 U. S. C. 203), for such time and under such conditions as may be prescribed by regulations promulgated by the Secretary of State and the Attorney General. A person admitted under this section who fails to maintain the status under which he was admitted or who fails to depart from the United States at the expiration of the time for which he was admitted, or who engages in activities of a political nature detrimental to the interests of the United States, or in activities not consistent with the security of the United States, shall, upon the warrant of the Attorney General, be taken into custody and promptly deported pursuant to section 14 of the Immigration Act of 1924 (43 Stat. 162, 8 U. S. C. 214). Deportation proceedings under this section shall be summary and the findings of the Attorney General as to matters of fact shall be conclusive. Such persons shall not be eligible for suspension of deportation under clause 2 of subdivision (c) of section 19 of the Immigration Act of February 5, 1917 (54 Stat. 671; 56 Stat. 1044, 8 U. S. C. 155).

(7) On page 7, line 8 and line 18, and on page 8, line 9, strike out "person" and substitute "citizen of the United States."

(8) Title IV, Participation by Government Agencies: In general, the changes made in this title strike out unnecessary language. The amendments do not alter the intent of the bill to state clearly that the Secretary of State is authorized to utilize the service, facilities, and personnel of the other Government agencies, with the approval of the President, and that activities such as contemplated are for the purposes of this act, and that the responsibility for coordination rests with the Secretary of State. Other governmental agencies have notable contributions to make to these programs, and maximum use is to be made of existing Government property and facilities (sec. 803). However, this bill is not an excuse for other governmental agencies to overextend their activities. The injunction to the Secretary of State to utilize, insofar as is practicable, the services and facilities of private agencies applies to other Government agencies as well as to the Department of State, and to the Secretary's requests to other Government agencies.

In the interest of efficient administration it is assumed that the President would delegate to the Secretary of State the authority to approve such activities, and the President would then be called on only if a disagreement arose between the Secretary of State and another Government agency.

1018

## U. S. INFORMATION, ETC., ACT

(a) On page 9, line 6, strike out "their" and substitute "the" and after "approval" add "of the President."

(b) On page 9, line 7, strike out remainder of section beginning with "Whenever".

(c) On page 10, line 14, strike out "the" and add "any appropriate" and strike out "with appropriate legislative authority".

(d) On page 10, line 17, after "agencies", add

and shall not enter into the performance of such services to any foreign government where such services may be performed adequately by qualified private American individuals and agencies and such qualified individuals and agencies are available for the performance of such services.

(e) On page 11, strike out subparagraphs (4) and (5). Considering the nature and safeguards of this bill, and the structure of our government and appropriating procedures, it does not seem relevant to retain subparagraph (4) which enjoins the head of a Government agency not to impair his own agency. Regarding subparagraph (5), there is provision elsewhere in this bill for advisory commissions and committees which may be created to assist in reviewing and advising. It is not the intent of this bill to legislate innumerable committees.

(f) On page 11, strike out section 404, which refers to training. Sections 201 and 401 together cover this amply.

(g) On page 12, strike out section 405. This is amply covered by sections 202 and 401 and the deletion in no way impairs, for example, the official exchange of Government documents covered by bilateral agreements.

(h) On page 12, strike out section 406. The Secretary of State already has the benefit of an Interdepartmental Committee on Scientific and Cultural Cooperation for purposes of coordination and advice and there is no problem in adapting it to a world-wide program.

(9) On page 13, line 4, strike out the sentence beginning "All such press releases" and substitute the following:

On request, representative samples or specific individual press releases and radio scripts shall be made available in the English language for examination at the Department of State by representatives of press associations, newspapers, magazines, radio systems and stations, and be made available to Members of Congress within 15 days after release as information abroad.

This provision is on behalf of Members of Congress and representatives of United States press associations, newspapers, magazines, radio systems, and stations.

(10) On page 13, line 20, strike out clause beginning "shall encourage" and ending "where necessary". This language is considered unsatisfactory primarily because it obligates the Secretary to be indiscriminate in his encouragement and facilitating, and opens the Government channels and resources to any kind of special pleading from any body.

Section 1005 states the intention of Congress that the Department shall make use of the services of private agencies wherever practicable. The House committee report interprets this to mean that the Secretary of State should use a private agency "if a private agency can perform

1019

an activity as well as or better than a Government agency, and at no greater expense." This language should not, of course, enable any particular private agency to demand a contract or a grant of funds for participation in the purposes of this act. The discretion would seem to the committee to lie with the Secretary of State to determine what agencies should receive public funds through contracts or grants.

(11) On page 14, strike out paragraph (3). Provision is made elsewhere for commissions and committees.

(12) On page 14, strike out paragraph (4). The committee has no desire to minimize the principle expressed and sought for in paragraph (4). It has been the practice of the Government program to identify the materials which it writes and produces, and to indicate whether a Government or private source is used, and this appears to be the intent of the deleted paragraph. However, as worded, the language appears ambiguous when applied to certain operating procedures abroad; for example, it would seem to require that the Government must put a Government label on each copy of private American publications when it is the disseminating source by loans, circulation, and so forth—a practice which may or may not be desirable or feasible. Under the circumstances, this is an operating problem which could well be reexamined by the Advisory Commission on Information.

(13) On page 14, beginning with line 13 through line 9 on page 17, strike out all of title VI, Advisory Commission to Formulate Policies, and substitute new title VI, Advisory Commissions to Formulate Policies, beginning on page 17, line 10 through line 2, page 20.

There is established a United States Advisory Commission on Information and a United States Advisory Commission on Educational Exchange. The Commissions shall formulate and recommend to the Secretary policies and programs for the carrying out of this act. This constructive role does not jeopardize the responsibility and authority of the Secretary of State. Their quarterly reports to the Secretary and semiannual reports to the Congress should prove most helpful. It is not intended that these two Commissions have authority over the Board of Foreign Scholarships or the United States National Commission for UNESCO, both established by other laws.

(14) On page 22, after "create," add:

with the approval of the Commission on Information and the Commission on Educational Exchange

## ADVANCE OF FUNDS

(15) On page 24, after line 7, insert the following:

Sec. 902. If any other government shall express the desire to provide funds, property, or services to be used by this Government, in whole or in part, for the expenses of any specific part of the program undertaken pursuant to this Act, the Secretary is authorized, when he finds it in the public interest, to accept such funds, property, or services. Funds so received may be established as a special deposit account in the Treasury of the United States, to be available for the specified purpose, and to be used for reimbursement of appropriations or direct expenditure, subject to the provisions of this Act. Any unexpended balance of the special deposit account and other property received under this section and no longer

000119

U. S. INFORMATION, ETC., ACT

required for the purposes for which provided shall be returned to the government providing the funds or property.

Sections 901 and 902 cover different situations. Section 901 in part recognizes the fact that it is sometimes possible (and often desirable) to receive some reimbursements in the course of our Government programs, but such amounts return as miscellaneous receipts to the Treasury. Section 902 differs from section 901 in that it provides a convenient method of accepting an advance of funds from any other government by establishing a special deposit account in the Treasury of the United States. This is a desirable addition for the development of cooperative projects which also benefit the United States.

[16] On page 25, line 3, after section 1001, strike out lines 3 to 18, ending with the word "Senate", and add:

No citizen or resident of the United States, whether or not now in the employ of the Government, may be employed or assigned to duties by the Government under this Act until such individual has been investigated by the Federal Bureau of Investigation and a report thereon has been made to the Secretary of State: Provided, however, That any present employee of the Government, pending the report as to such employee by the Federal Bureau of Investigation, may be employed or assigned to duties under this Act for the period of six months from the date of its enactment. This section shall not apply in the case of any officer appointed by the President by and with the advice and consent of the Senate.

[17] Page 26, line 8, strike out subtitle and section 1002, which becomes section 1010 on page 29, lines 11 through 16.

[18] On page 27, line 23, add "including existing American private publications".

The term "private agencies" is interpreted to include both nonprofit and profit organizations and to be applicable to both informational and educational exchange activities. For example, private agencies would include such as those concerned with motion pictures, radio, the press, magazines, books, theater, music, and so forth. The committee wishes to draw special attention to the desirability of the greater use and dissemination abroad of a wide range of quality products used and produced by Americans for themselves. It can be pointed out that certain segments of American private enterprise—for example, motion pictures—have been especially prominent abroad, and that others are only now beginning to develop a large and appropriate role.

## BALANCE AND SEPARATION OF THE PROGRAMS

[19] On page 28, lines 5 through 11, strike out section 1007. No new Government agency is authorized by this act. It was considered undesirable at this time to fix the administrative pattern and details of the Department of State, at the office or division level, in basic legislation, especially since the Secretary of State and the Assistant Secretary of State for Public Affairs will have to adjust or change the present administrative structure (especially of the existing Office of Information and Educational Exchange) to carry out adequately the intent of this bill to maintain a proper balance and separation, probably at the office level, between the informational operations and educational exchanges and ac-

1021

## LEGISLATIVE HISTORY

tivities, and to adapt the work of the area specialists to each and to the functions of the geographic desks in the Department.

Nor do we wish to legislate the corresponding balance and separation necessary in the conduct of the field operations if we are to secure the benefits that accrue both from the information service and the educational exchange activities when the best operating principles are maintained. But the intent is clear. For example, the United States libraries should be located in central and accessible areas, preferably separated from embassies and consulates, yet close enough to make easy consultation practical, and American librarians should be in charge.

(20) On page 28, lines 14 and 15, strike out "or under any provision thereof".

## COMMITTEE INTERPRETATIONS OF THE ACT

The subcommittee considered a number of additional amendments which they rejected as undesirable or unnecessary. However, certain interpretations of the bill are stated here:

### 1. AUTHORITY FOR SERVICES TO OFFICIAL VISITORS AND STUDENTS

The House eliminated from the act a provision containing authority for the Department of State to provide services at the principal ports of entry of the United States for the handling of official foreign visitors. The Secretary of State asked the subcommittee to consider the restoration of this authority. The subcommittee learned that the State Department now maintains officers at five cities outside of Washington and that these officers assist with immigration and customs problems, travel arrangements, and related services for approximately 8,000 foreign students and distinguished visitors a year. The subcommittee believed that this service, insofar as it is incidental to the "interchange of persons," is already authorized in the bill, and no amendment is necessary.

### 2. AUTHORITY FOR ENGLISH TEACHING

The House also eliminated from the bill a provision for "the development and demonstration of better methods for teaching the English language abroad." The Secretary of State asked that the subcommittee consider the restoration of this provision. Members of the House Foreign Affairs Committee pointed out that the bill already contains some authority for this type of activity, through assistance to American schools and community centers abroad and through grants to private organizations. The subcommittee is favorable to the type of program described by representatives of the State Department and believed that no amendment was necessary.

## BLOCKED CURRENCIES AS THEY AFFECT PRIVATE COMMUNICATIONS INDUSTRIES

At the present time, the shortage of dollars abroad and blocked currencies are among the important barriers to the greater diffusion of information about the United States, and threaten the continued or expanded selling operations of America's mass communications industries

1022

abroad. The subcommittee and full committee have examined this problem with sympathy and in detail, and members of the subcommittee have consulted frequently with the Department of State and the magazine, book, and motion-picture industries. This is an exceedingly complex problem involving the balance of payment structure, the avoidance of subsidies, preferential treatment, and the like. It was felt that this problem, which may be of a temporary nature, should not be handled in connection with H. R. 3342 for of necessity it would delay the consideration and passage of the bill. Broad or more limited language, to be carried out, would involve sizable appropriations to enable American companies to exchange their foreign earnings for dollars. In the present international situation, much can be said in favor of giving special consideration to the mass communications industries whose products and services are in great demand among foreign peoples. Various aspects of this problem have not yet been fully studied, and it is important that the industries concerned, as well as the appropriate Government officials, continue to pursue this subject which may soon warrant special hearings and specific legislation, or in connection with the discussions of economic recovery programs.

Each of these industries has a slightly different problem because each operates in a slightly different way. It would also seem that the task of Government administering of any plan directly with each of the considerable number of individuals concerned would be an impractical administrative burden.

## ACTIVITIES TO ASSIST THE OBJECTIVES OF THIS ACT

During the past 6 months, the subcommittee has noted with interest many useful, practical ideas which would assist the objectives of this act and supplement the programs authorized in H. R. 3342, very frequently involving little or no expense to the Government. The committee urges the Department to be alert to these possibilities. Four samples may be mentioned (1) the lowering of postal rates for printed matter to foreign countries; (2) private individuals sending abroad their copies of recent magazines; (3) the sale of United States Government documents in our overseas libraries; and (4) the coordination and timing of official speeches.

## PASSAGE OF THE ACT IS IMPORTANT

There are a number of reasons why the passage of this act, at an early date, is highly desirable. Among others, the following should be mentioned by way of summary:

In the first place, the importance of maintaining such a program cannot be gainsaid. The American people, our ideals, and our form of government are being misrepresented and distorted abroad by the propaganda of other nations. The prestige of the United States and of democracy itself are suffering as a result of this unequal battle of ideas. We must be able to tell abroad the truth about the United States. We cannot afford to let others tell that story for us.

In the second place, the United States information program cannot begin to fulfill its responsibilities properly so long as it remains a step-

000122

## LEGISLATIVE HISTORY

child without congressional legislative authority and when its appropriations are subject to a point of order. This work has been going on for 29 months in the State Department. The time has come when Congress should give the program its official sanction. Further delay in taking action will seriously embarrass the President and the Secretary of State in the conduct of foreign relations, since information in the modern world is an exceedingly important instrument of policy.

In the third place, the information programs in the State Department have lost to private agencies many of the top people who guided it during the war. Moreover, it has often been impossible to recruit new top-caliber personnel because of the insecurity of the program. Secretary Marshall, before the subcommittee, emphasized the fact that the problem of personnel will remain extremely serious until the program is given legislative stability.

In the fourth place, the State Department at the present time has a number of requests from governments in Europe and Asia asking for governmental advisers. Some of the requests include offers to reimburse the full expense involved. These are opportunities which the United States cannot afford to reject. Without enabling legislation, however, the State Department does not have the authority to arrange such assignments for employees of the Government except in Latin America, Liberia, and the Philippines.

In the fifth place, the present information program is operating without any restrictions or requirements from the Congress. The present act contains numerous important restrictions and safeguards written into the bill by the House and the Senate Foreign Relations Committee. These limitations and restrictions should prove exceedingly helpful in giving guidance and direction to the program.

## RECOMMENDATION OF THE COMMITTEE

With these considerations in mind, the committee believes that the enactment of the bill is essential if we are to have mutual understanding between the people of the United States and the people of other nations which will serve as a firm and lasting foundation for world peace. Today that peace is endangered by the weapons of false propaganda and misinformation and the inability on the part of the United States to deal adequately with those weapons.

Truth can be a powerful weapon on behalf of peace. It is the firm belief of the committee that H. R. 3342, with all the safeguards included in the bill, will constitute an important step in the right direction toward the adequate dissemination of the truth about America, our ideals, and our people. It is hoped that the Senate may be able to act speedily on the bill at an early date.

1024

000123